# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TERENCE COLLINS, Derivatively on Behalf of Nominal Defendant VIATRIS, INC, <br><br> Plaintiff, <br><br> v. <br><br> SCOTT A. SMITH, THEODORA MISTRAS, MELINA HIGGINS, MARK PARRISH, W. DON CORNWELL, JOELLEN LYONS DILLON, ELISHA FINNEY, LEO GROOTHUIS, JAMES M. KILTS, HARRY KORMAN, RAJIV MALIK, RICHARD MARK, and ROGERIO VIVALDI COELHO, <br><br> Defendants, <br><br> and <br><br> VIATRIS, INC., <br><br> Nominal Defendant. | Case No. <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |

Plaintiff Terence Collins ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Viatris, Inc. ("Viatris" or the "Company"), against certain of its Board of Directors (the "Board") and executive officers seeking to remedy Defendants' breach of fiduciary duties, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), waste of corporate assets, and unjust enrichment occurring from June 14, 2024 through the present (the "Relevant Period"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, such as filings by Viatris with the U.S. Securities and Exchange

Commission (the "SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, including a federal securities class action against the Company and certain of the Individual Defendants (defined below) captioned *Quinn v. Viatris, Inc. et al*, Case No. 2:25-cv-00466 (W.D. Pa.) (the "Securities Class Action"), and other matters of public record.

## I.     NATURE AND SUMMARY OF THE ACTION

1.      Viatris is a Delaware corporation with its principal offices located in Canonsburg, Pennsylvania.  The Company supplies medicines to approximately one billion patients across more than 165 countries and territories via its 26 manufacturing and packaging facilities worldwide.

2.      A primary focus of Viatris' business is the production and sale of generic drugs, which are designed to be the therapeutic equivalent of existing branded drugs. One such generic drug, lenalidomide, was one of Viatris' most profitable products during the Relevant Period. Lenalidomide is the generic version of a Bristol-Myers Squibb brand-name cancer drug called Revilmid. Because of patent-litigation settlement agreements with Britsol-Myers Squibb limiting the volume of lenalidomide that could be sold by generic manufacturers through the end of 2025, lenalidomide commanded unusually high prices and profit margins for a generic drug.

3.      Viatris manufactured its lenalidomide at a facility in Indore, India (the "Indore Facility"). The Indore Facility was responsible for producing the Company's oral finished dose drugs (which included lenalidomide) that are distributed worldwide, including in the United States. According to Viatris' Chief Financial Officer ("CFO") Theodora Mistras, the Indore Facility is a vital component of the Company's international drug manufacturing operations, which she called "a global facility for us" that "services our network across the world."

4.      Unbeknownst to investors, leading up to the Relevant Period, the Indore Facility suffered from significant deficiencies that were in violation of the United States Food and Drug

Administration's ("FDA") regulations concerning current good manufacturing practice ("cGMP"). These issues included improperly cleaned ducts and testing equipment, fabricated quality control records, and out-of-specification test results that were not adequately investigated. Further, while Viatris' senior management learned of these cGMP violations at the Indore Facility no later than January 2024, the Individual Defendants made no effort to inform the FDA, disclose the issues to the public, or fully investigate and remediate the issues.

5.      Then, between June 14 and 26 of 2024, the FDA conducted an on-site inspection of the Indore facility. During the inspection, FDA personnel uncovered multiple safety and health violations, including, but not limited to: (i) a failure to ensure reliability and integrity of quality control data, (ii) failure to investigate unexplained discrepancies in drug batches or failures of drug batches to meet specifications, (iii) failure to operate an effective quality system in accord with cGMP, and (iv) failure to ensure the accuracy and integrity of data to support safety, effectiveness, and quality of the drugs being manufactured.

6.      As a result of these findings, the FDA gave Viatris the opportunity to correct the issues uncovered by the inspectors. However, rather than informing the public of the issues at the Indore Facility or the FDA's involvement, the Individual Defendants continued to conceal the truth and presented the FDA with a response and remediation plan that the FDA determined to be inadequate. In response, in July 2024, the FDA issued a Warning Letter[1] to the Company, describing why its responses and remediation plan was inadequate. Along with the Warning

---

[1] A Warning Letter is issued to a Company when the FDA identifies what it believes are significant violations of federal requirements. The Warning Letter identifies the concern(s), such as poor manufacturing practices, problems with claims for what a product can do, or incorrect directions for use. The letter provides an opportunity for the company or individual to address FDA's concerns and requests a response within a certain timeframe. *See* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/about-warning-and-close-out-letters.

3

Letter, the FDA also issued an Import Alert.[2]  The Import Alert, which prevented the Company from importing impacted products into the United States, affected 11 products,[3] including lenalidomide.

7.      Given the importance of the Indore Facility and the lucrative nature of the drugs it produced, particularly lenalidomide, the Individual Defendants would or should have been aware of the status and quality of its operations.  This is further bolstered by the oversight systems the Company purportedly has in place to ensure product quality and adherence to relevant laws.  For instance, the Board has a Compliance and Risk Oversight Committee that is specifically tasked with, among other things, "[r]eview[ing] the enterprise risk framework, infrastructure, and controls implemented by management," "[r]eview[ing] significant global compliance-related policies," and "[r]eviewing metrics used by management . . . to provide insight into the status and efficacy of the Compliance Program, including the Company's global compliance systems and organization." That the facility's safety and quality systems and procedures were permitted to degrade to the point that the FDA banned the Company's products from entering the United States is indication that the Company had no oversight system in place, or if it did, the Individual Defendants failed to adhere to such system in the face of significant internal control problems.

8.      Further, despite being aware of the issues at the Indore Facility as early as January 2024, the FDA inspection in June 2024, and the Warning Letter and Import Alert—issued in late December 2024—throughout the Relevant Period, the Individual Defendants either issued, or

---

[2] Import Alerts are used to protect consumers against products with a history of known violations. The FDA can place a product on an Import Alert after discovering a violation and then detain future shipments of the product without having to test or otherwise physically examine it. *See* https://www.fda.gov/industry/actions-enforcement/import-alerts.
[3] The FDA subsequently exempted four of the drugs cited in the Import Alert due to shortages of those drugs in the United States.

permitted the Company to issue a variety of materially false and misleading statements and omissions that concealed the nature and extent of the FDA action and the resulting risk to the Company's revenues. Specifically, the Individual Defendants initially failed to disclose that the inspection and resulting findings had even occurred. Then, on December 23, 2024, when the Company finally disclosed the existence of the FDA inspection and resulting Warning Letter and Import Warning, the Individual Defendants continued to conceal vital details, including that the Indore Facility was the production location for lenalidomide, that lenalidomide was one of the drugs barred from importation into the United States, and that Viatris had neither received nor was realistically eligible for an exemption to the import ban for lenalidomide. Further, rather than aligning investors to the full extent of the harm the FDA's action would likely cause to the Company's revenues, the Individual Defendants merely described it as a "minor headwind."

9.     It was not until February 27, 2025, when Viatris released its financial results for the fourth quarter and full fiscal year 2024, that the truth was fully revealed. As part of the release, the Company disclosed financial guidance that was materially below expectations. The Company attributed this guidance miss to "the expected financial impact from Indore facility warning letter and import alert."

10.     During an earnings call held the same day, the Individual Defendants finally provided investors with clarity with respect to the date the inspection took place and the status of the Company's remediation efforts. Further, the Individual Defendants disclosed for the first time that the Company's lenalidomide was produced at the Indore Facility, that lenalidomide was subject to the FDA's import ban, and that lenalidomide would not be eligible for an exemption to the import ban. The Individual Defendants also indicated that the FDA's Warning Letter and

Import Alert would result in a $500 million reduction in revenue and a $385 million reduction in adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA").

11.     On this news, the price of Viatris' stock dropped significantly, falling from $11.24 per share on February 26, 2025 to $9.53 per share on February 27, 2025.  This represented a decline of approximately 15.21% in the span of single day.

12.     As a result of the foregoing, Viatris has suffered, is suffering, and will continue to suffer significant financial and reputational harm.  The Company is now the subject of the Securities Class Action, has had its corporate and commercial reputation damaged for the foreseeable future, and has had to make disruptive changes to the leadership at its Indore Facility.[4] Further, the Company is now facing approximately $500 million negative impact to 2025 total revenues and approximately $385 negative impact to 2025 earnings as a result of the FDA Warning Letter and Import Alert.

13.     Moreover, one of the Individual Defendants, Malik, breached their fiduciary duties by engaging in a lucrative insider sale of Company common stock at artificially inflated prices, obtaining proceeds of over $10.6 million.

14.     Plaintiffs have not made a pre-suit demand on the Viatris Board because a majority of the members of the Board lack the capability to make independent and/or disinterested decisions with regard to initiating and pursuing a proper legal action because a majority of the Board faces a substantial likelihood of liability for the misconduct alleged herein, among other reasons detailed below.

---

[4] According to the FDA's Warning Letter, in response to the inspection findings, Viatris terminated the Indore facility's Site Head of Quality, Head of Quality Control, Head of Quality Assurance, Head of Investigations, and the Manager responsible for the packaging materials laboratory. *See* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/viatris-inc-690897-12192024.

## II.    JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

16.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.    Venue is proper in this District because Viatris is headquartered in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## III.    PARTIES

### A.    Plaintiff

19.    Plaintiff Terence Collins is a current holder of Viatris stock and has been a continuous owner of Viatris stock since November 2020.

### B.    Nominal Defendant

20.    Nominal Defendant Viatris is a Delaware corporation with its principal offices located at 1000 Mylan Boulevard, Cannonsburg, PA 15317.  Viatris' common stock trades on the Nasdaq market under the ticker "VTRS."

### C.    Individual Defendants

21.    Scott A. Smith ("Smith") has served as Viatris' CEO since April 1, 2023 and has served as a Viatris Director since December 2022.  Smith is also named as a Defendant in the

Securities Class Action.  During the Relevant Period, Viatris paid Smith $47,189,486 in total compensation.

22.    Theodora Mistras ("Mistras") has served as Viatris' CFO since March 2024. Mistras is also named as a Defendant in the Securities Class Action.  During the Relevant Period, Viatris paid Mistras $6,373,692 in total compensation.

23.    Melina Higgins ("Higgins") has served as a Viatris Director since October 2020. Higgins also serves as Chair of the Board and Chair of the Board's Executive Committee and Finance Committee.  During the Relevant Period, Viatris paid Higgins $670,001 in total compensation.

24.    Mark Parrish ("Parrish") has served as a Viatris Director since 2020.  Parrish also serves as Chair of the Board's Compliance and Risk Oversight Committee and a member of the Board's Executive Committee, Governance and Sustainability Committee, and the Science and Technology Committee.  During the Relevant Period, Viatris paid Parrish $475,001 in total compensation.

25.    W. Don Cornwell ("Cornwell") has served as a Viatris Director since 2020. Cornwell also serves as a member of the Board's Audit Committee and Compliance and Risk Oversight Committee.  During the Relevant Period, Viatris paid Cornwell $395,001 in total compensation.

26.    JoEllen Lyons Dillon ("Dillon") has served as a Viatris Director since 2020.  Dillon also serves as Chair of the Board's Governance and Technology Committee and a member of the Board's Audit Committee and Compensation Committee.  During the Relevant Period, Viatris paid Dillon $425,001 in total compensation.

27.    Elisha Finney ("Finney") has served as a Viatris Director since 2022.  Finney also serves as a member of the Board's Audit Committee and Finance Committee.  During the Relevant Period, Viatris paid Finney $395,001 in total compensation.

28.    Leo Groothuis ("Groothuis") has served as a Viatris Director since May 2023.  Groothuis also serves as a member of the Board's Compliance and Risk Oversight Committee, Executive Committee, and Governance and Sustainability Committee.  During the Relevant Period, Viatris paid Groothuis $400,001 in total compensation.

29.    James M. Kilts ("Kilts") has served as a Viatris Director since 2020.  Kilts also serves as a member of the Board's Compensation Committee and Finance Committee.  During the Relevant Period, Viatris paid Kilts $395,001 in total compensation.

30.    Harry Korman ("Korman") has served as a Viatris Director since 2020.  Korman also serves as Chair of the Compensation Committee and a member of the Board's Compliance and Risk Oversight Committee, the Governance and Sustainability Committee, and the Science and Technology Committee.  During the Relevant Period, Viatris paid Korman $400,001 in total compensation.

31.    Rajiv Malik ("Malik") has served as a Viatris Director since 2020.  Malik also serves as Chair of the Board's Science and Technology Committee.  Malik also served as Viatris' President from November 2020 through April 2024.  During the Relevant Period, Malik sold $10,643,805 worth of his personally held Viatris stock while in possession of material nonpublic information ("MNPI").  During the Relevant Period, Viatris paid Malik $375,787 in total compensation.

32.    Richard Mark ("Mark") has served as a Viatris Director since 2020.  Mark also serves as Chair of the Audit Committee and a member of the Board's Compliance and Risk

Oversight Committee, Executive Committee, and Finance Committee. During the Relevant Period, Viatris paid Mark $445,001 in total compensation.

33. Rogerio Vivaldi Coelho ("Coelho") has served as a Viatris Director since June 2024. Coelho also serves as a member of the Board's Compliance and Risk Oversight Committee and Science and Technology Committee. During the Relevant Period, Viatris paid Coelho $311,480 in total compensation.

34. Defendants Smith, Higgins, Parrish, Cornwell, Dillon, Finney, Groothuis, Kilts, Korman, Malik, Mark, and Coelho are at times referred to herein as the "Demand Defendants."

35. Defendants Smith and Mistras are at times referred to herein as the "Officer Defendants."

36. Defendants Smith, Mistras, Higgins, Parrish, Cornwell, Dillon, Finney, Groothuis, Kilts, Korman, Malik, Mark, Coelho are collectively referred to herein as the "Individual Defendants" and, along with Viatris, the "Defendants."

## IV. DUTIES OF THE INDIVIDUAL DEFENDANTS

37. By reason of their positions as officers, directors, and/or fiduciaries of Viatris and because of their ability to control the business and corporate affairs of Viatris, at all relevant times, the Individual Defendants owed Viatris and its stockholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Viatris in a fair, just, honest, and equitable manner. The Individual Defendants were required to act in furtherance of the best interests of Viatris and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Viatris and its stockholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

38. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Viatris, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Viatris, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

39. To discharge their duties, the officers and directors of Viatris were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Viatris were required to, among other things:

    (a) Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    (b) Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

    (c) Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

    (d) When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

40. In addition, Viatris' Audit Committee, of which Mark is Chair and Cornwell, Dillon, and Finney are members, has a responsibility to, among other things, oversee the integrity of the Company's financial statements and the effectiveness of the Company's internal control over financial reporting. The Company's Audit Committee Charter states, in relevant part:

**Purpose:**

The Committee shall assist the Board in fulfilling its fiduciary responsibilities, in particular through the Committee's exercise of oversight of: (1) the integrity of the

11

Company's financial statements and its accounting and financial reporting processes; (2) the effectiveness of the Company's internal control over financial reporting;. . .; (5) the Company's processes and procedures relating to risk assessment and risk management of financial and disclosure control-related, as well as reporting-related, matters;. . .; and (7) the Company's compliance with applicable legal and regulatory requirements (including U.S. federal securities laws) regarding the preceding matters.

*    *    *

**Duties and Responsibilities**

The Committee shall, in addition to any other duties or responsibilities the Board may from time-to-time delegate to the Committee, have the following duties and responsibilities:

*    *    *

**(3)    With respect to financial reporting and internal controls:**

(a)    Review the annual audited financial statements and quarterly financial statements, and financial information to be included in related public releases and SEC filings with management (including the Internal Audit Group) and the independent auditor. Such review shall include (1) the Company's Quarterly Reports on Form 10-Q and Annual Report on Form 10-K, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" prior to their filing with the SEC; (2) any related GAAP and non-GAAP annual and quarterly financial information to be included in earnings press releases, including pro-forma or adjusted non-GAAP information, and other related financial information or earnings guidance contained therein; . . .; (4) analyses prepared by management (including Internal Audit) and/or the independent auditor setting forth significant accounting and/or financial reporting issues, judgments or estimates made in connection with the preparation of the Company's financial statements; (5) the status of significant pending litigation, taxation matters, and other areas of oversight as may be appropriate; . . .; (7) any significant financial and accounting risk exposures and the steps management has taken to mitigate and control them . . .; (8) the impacts of any new rules, standards, or regulatory guidance that pertain to accounting, auditing, and/or financial reporting, including but not limited to discussions, as needed, with the independent auditor, management, and external advisors with respect to the Company's implementation progress regarding any such new rules, standards, or regulatory guidance;

(b)    Review with management (including the Head of Internal Audit) and the independent auditor, as appropriate, the quality and adequacy of the Company's internal control over financial reporting, including (1) management's

12

report on the effectiveness of the Company's internal control over financial reporting; (2) the independent auditor's report on its audit of the effectiveness of the Company's internal control over financial reporting; and (3) the Company's disclosure controls and procedures, including their effectiveness;

(c)     Review, including reviewing and discussing with management (including the Head of Internal Audit) and the independent auditor, as appropriate, the Company's processes and procedures with respect to risk assessment and risk management of financial and disclosure control-related, as well as reporting-related, matters;

\*     \*     \*

**(4)     With respect to reporting by and recommendation from the Committee:**

(a)     Provide at least one report annually to the Board describing the Committee's (1) plans for carrying out the Committee's duties and responsibilities; (2) appraisal of the financial reporting processes and internal control over financial reporting. . . .

(b)     Make recommendations to the Board as to whether the Company's audited financial statements should be included in its annual reports on Form 10-K on the basis of (1) the Committee's review of audited financial statements; (2) its review with management regarding such audited financial statements; . . . .

(c)     Report to the Board that the Committee has reviewed the Company's quarterly reports on Form 10-Q with management and the Company's independent auditor;

\*     \*     \*

**(5)     With respect to other Audit Committee Duties:**

\*     \*     \*

(b)     Approve Company procedures for the receipt, retention, and treatment of complaints regarding accounting, internal accounting controls, or auditing matters, including procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters, and regularly review any reports of such nature[.]

41.     Viatris' Compliance and Risk Oversight Committee, of which Parrish is Chair and Cornwell, Groothuis, Korman, Mark, and Coelho are members, has a responsibility to, among

13

other things: (i) oversee the Company's enterprise risk management framework, (ii) oversee the Chief Compliance Officer's implementation of the Company's Corporate Compliance Program, (iii) report to the Board with respect to the status of the Corporate Compliance Program, and make recommendations to the Board and/or management with respect to the formulation or re-formulation of, and the implementation, maintenance and monitoring of, the Corporate Compliance Program, the Code of Business Conduct and Ethics, and significant related global policies designed to support and promote compliance with Company requirements, and legal rules and regulations.  The Company's Audit Committee Charter states, in relevant part:

**Duties and Responsibilities:**

\*        \*        \*

In connection with its oversight responsibilities and its advice and recommendations to the Board, the Committee shall, in addition to any other duties or responsibilities the Board may from time-to-time delegate to the Committee:

(a)      Review the enterprise risk framework, infrastructure, and controls implemented by management to help identify, assess, manage and monitor the Company's material risks;

(b)      Review the Company's efforts to foster a culture of risk-adjusted decision-making without constraining reasonable risk-taking and innovation;

(c)      Review significant global compliance-related policies implementing the Company's Code of Business Conduct and Ethics, or related to the operations of the Company's business, and its mode or methods of doing business, including, for example, policies relating to pricing and/or commercialization of the Company's products and services;

(d)      Review metrics used by management or requested by the Committee to provide insight into the status and efficacy of the Compliance Program, including the Company's global compliance systems and organization;

(e)      Review reports of significant actual and alleged violations of the Code of Business Conduct and Ethics, corporate policies and procedures, and applicable laws and regulations, including all reports of significant alleged violations by "executive officers", as that term is defined in Rule 3b-7 promulgated under the Securities Exchange Act of 1934, and any related disciplinary actions;

(f)      Review checks and balances implemented by the Company designed to support and promote compliance with approved corporate policies, legal rules, and regulations;

(g)      Review standards and procedures implemented by the Company designed to help reduce the potential for violation of corporate policies and legal rules and regulations, and the communication of such standards and procedures to employees and external agents as appropriate;

(h)      Review results of audits and assessments by and on behalf of the Corporate Compliance Group and, as appropriate, reports by Internal Audit, other global audit functions, and external consultants relating to matters within the scope of this Charter;

*      *      *

(m)      At its discretion, and no less than semi-annually, consult with the Chairs of the other Board Committees to discuss risk-related matters delegated to those Committees and the Company's enterprise risk management framework, and report the results of those discussions to the full Board;

(n)      Periodically report to the Board on the status and efficacy of (i) the Company's enterprise risk management framework, including structure and implementation, (ii) the most significant risks and how these are managed, and recommendations, if any, that any risk-related oversight responsibilities should be delegated to, or reviewed by, other committees of the Board, (iii) the Compliance Program and (iv) the Committee's meetings, actions and recommendations[.]

42.      Further, Viatris has a comprehensive Code of Business Conduct and Ethics ("Code of Conduct") that affirms, among other things, the Company's—and by extension the Company's directors and employee's—required adherence to all applicable laws and regulations.

43.      In the section titled "Compliance with the Code and Company Policies" the Code of Conduct states:

Compliance with this Code of Business Conduct and Ethics . . ., and applicable law by all Viatris directors, officers and employees is mandatory and is a condition of retention, employment or continued engagement as a contractor or agent.

*      *      *

15

Every Viatris employee must periodically certify that they have read the code and that they, to the best of their knowledge and belief, understand, have complied with and will continue to comply with the code, applicable law and company policy.

44.     In the section titled "Quality and Safety of Our Products", the Code of Conduct states:

Viatris is committed to the highest standards of product quality and safety. Our careful attention to product quality has a direct and substantial effect on our reputation and performance, and is central to our ability to empower people worldwide to live healthier at every stage of life. . . .

As a pharmaceutical manufacturer, we are governed by current good manufacturing practices, good laboratory practices and other similar requirements for making and storing our products. Following these requirements strictly ensures that we continue to deliver high quality medicines, and retain our strong reputation for quality. . . .

45.     In the section titled "Accuracy and Integrity of Data, Books and Records, the Code of Conduct states:

All Viatris personnel must comply with all established internal controls at all times. We must accurately enter all assets, liabilities, revenues and expenses of Viatris in the company's regular books, records and other standard financial documents.

We are all required to record and report all data and information accurately and honestly. This applies to every business record or document that you prepare or contribute to as part of a team. . . .

\*        \*        \*

If you prepare or contribute to any business record, or represent or certify to the accuracy of the information contained in such records, you must be diligent in assuring their accuracy and complete integrity.

All Viatris personnel must comply with all established internal controls at all times. We must accurately enter all assets, liabilities, revenues and expenses of Viatris in the company's regular books, records and other standard financial documents. These books, records and documents also must accurately reflect and properly describe the transactions they record.

46.     The Code of Conduct also states the following with regard to Public Disclosures:

Viatris is committed to delivering accurate information when communicating with the investment community, regulators, the media and other interested parties, and

16

to making full, fair, accurate, truthful, timely and understandable disclosures in all public reports and filings made pursuant to law or regulation. We are responsible for ensuring that information which will or may be part of a financial statement or related filing is accurate, complete and meets all legal requirements.

47.     The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or officers of Viatris, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware, or should have been aware, posed a substantial risk of serious injury to the Company.

48.     Finally, the Company's Code of Ethics for Chief Executive Officer, Chief Financial Officer and Corporate Controller states the following:

The officers covered by this Code:

- are expected to engage in honest and ethical conduct. . ."

- shall endeavor to make, and to promote the making by others of, full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission and in other public communications made by the Company;

- should comply with applicable governmental laws, rules and regulations; and

- have a duty to promptly report any violations of this Code to a responsible member of management.

## V.     SUBSTANTIVE ALLEGATIONS

**Company Background**

49.     Viatris is a global healthcare company that supplies medicines to approximately one billion patients across more than 165 countries and territories via its 26 manufacturing and packaging facilities worldwide.  The Company was formed in 2020 through the merger of Mylan N.V. and The Upjohn Company, a legacy division of Pfizer, Inc.  Apart from its headquarters in Pittsburgh, Pennsylvania, the Company has centers in Shanghai, China and Hyderabad, India.

50.     One of Viatris' most lucrative products immediately preceding the Relevant Period was lenalidomide, a generic version of Bristol-Myers Squibb's popular cancer drug, Revlimid. Due to production agreements with Briston-Myers Squibb, generic drug manufacturers like Viatris could only produce limited volumes of lenalidomide, giving the drug unusually high profit margins.

51.     While it was publicly known that lenalidomide was important to the Company's financial results, Viatris did not disclose precisely how much of its revenue and earnings were attributable to lenalidomide. Nor did Viatris disclose that lenalidomide was produced at the Indore Facility.

**Viatris' Indore Facility Suffers from Significant Undisclosed Quality Deficiencies**

52.     Viatris' Indore Facility has a history of quality issues and violations of cGMP. During an FDA inspection of the facility in October of 2019, the FDA identified multiple violations of cGMP, including: (i) failure to comprehensively evaluate invalid laboratory investigations and implement adequate corrective actions to prevent recurrences; (ii) failure to thoroughly investigate repeated major complaints concerning tablet defects; (iii) failure to certify operators who visually inspected tablets in the packaging area; (iv) lack of adequate written procedures for visual inspection of tablets; and (v) failure to perform shipping studies for tablets meant for the U.S. market.

53.     Further, beginning in at least January of 2024, Viatris' Indore Facility again suffered from a variety of undisclosed quality issues and violations of cGMP. Despite Viatris personnel reporting these issues to senior management at corporate headquarters, the Individual Defendants failed to adequately investigate and remediate the issues. Further, the Individual Defendants failed to inform the FDA or the public about the issues at the Facility.

18

54.    It would not be until five months later that the FDA would learn of the mirid quality issues and safety violations as the result of an inspection of the Indore Facility.

**The FDA Inspects Viatris' Indore, India Facility and Uncovers Multiple Violations**

55.    Between June 14 and 26 of 2024, the FDA conducted an inspection of the Indore Facility.  During the inspection, the FDA uncovered a variety of significant safety violations, including poor quality control and inadequate handling of manufacturing errors.

56.    According to a Warning Letter that the FDA issued to Viatris on December 19, 2024, and which was subsequently made public, the FDA inspectors uncovered "significant violations of Current Good Manufacturing Practices (CGMP) regulations for finished pharmaceuticals."[5]  The Warning Letter went on to describe violations uncovered during the inspection.  These violations included, but were not limited to:

- Viatris "failed to establish written responsibilities and procedures applicable to the quality control unit and to follow written procedures applicable to the quality control unit. . . ."

- Viatris "failed to thoroughly investigate any unexplained discrepancy or failure of a batch or any of its components to meet any of its specifications. . . ."

- Viatris failed to "operate an effective quality system in accord with CGMP."

- Viatris' "quality system does not adequately ensure the accuracy and integrity of data to support the safety, effectiveness, and quality of the drugs [the Company] manufacture[s]."[6]

---

[5]https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/viatris-inc-690897-12192024.
[6] *Id.*

19

57.     Further, the Warning Letter noted that in July of 2024, Viatris provided responses and proposed remediations to the FDA's findings,[7] but that these responses and promised remediations were insufficient to avoid the issuance of the Warning Letter.[8]

58.     The Warning letter also indicated that the Individual Defendants had been aware of serious issues at the Indore Facility as early as January 2024. Specifically, the Warning Letter stated: "In subsequent communications, following the [June 2024] inspection, you disclosed that both your site and global quality organization became aware of the data integrity issues related to component testing in January 2024. FDA is concerned that you did not adequately investigate or begin to implement holistic corrective actions until after the subsequent FDA inspection."

59.     Along with the Warning Letter, in December 2024, the FDA issued an Import Alert in which the FDA prohibited the Company from importing into the United States most of the drugs it produced at the Indore Facility. Included in the list of drugs prohibited for import was lenalidomide.

**Certain Viatris Drugs Are Subsequently Exempted from the FDA Import Ban but Lenalidomide Is Predictably Excluded**

60.     FDA policy permits drugs to be exempted from import bans when the drug is in short supply in the United States market. This includes the availability of generic alternatives. Subsequent to the import ban, Viatris was able to exempt several of its drugs based on this policy.

61.      Further, after the import ban was disclosed, the Individual Defendants either personally made, or allowed others to make public statements indicating that the Company was attempting to get lenalidomide added to the exemption list. However, during the Relevant Period,

---

[7] Viatris did not publicly disclose the existence of the FDA's findings or the Company's responses and proposed remediation efforts.
[8] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/viatris-inc-690897-12192024.

there was no shortage of lenalidomide in the United States, nor was there any reason to believe that the import ban on Viatris' lenalidomide would create such a shortage. Specifically, (i) Viatris held a limited share of the total Revlimid/lenalidomide market, (ii) Bristol-Myers Squibb had the ability to supply virtually unlimited amounts of Revlimid, and (iii) multiple companies, other than Viatris, sold generic lenalidomide in the United States. As such, there was little if any chance that Viatris could successfully demonstrate the requisite shortage to get lenalidomide added to the exemption list.

62.     This predictable outcome would not come to public light, however, until February 27, 2025, when the Individual Defendants finally admitted that the FDA had refused to include lenalidomide in the exemption list.

**The Individual Defendants' Failure of Oversight**

63.     Nor should the FDA's actions have been unforeseeable to the Individual Defendants.  As described *Infra* ¶¶ 40-48 as Viatris purports to have a robust oversight system that ensures product quality and adherence to relevant domestic and internal controls.  This includes the oversight responsibilities as described in the various Board committee charter and the Company's Code of Conduct.

64.     Given the importance of the Indore Facility and the Company's purported robust system of oversight, the Individual Defendants would have been aware or should have been aware that the facility was suffering from serious internal control deficiencies.

65.     The Individual Defendants, due to their self-proclaimed oversight duties, should have detected these issues and remedied them long before the FDA got involved.  Their failure to do so led to a highly damaging import alert that has effectively ceased sales of seven of the Company's products in the United States—including lenalidomide.  Not only has this led to a $500

million negative impact to 2025 total revenues and approximately $385 million negative impact to 2025 earnings, it will almost certainly invite greater regulatory oversight of the Company's other facilities. Had the Individual Defendants implemented proper internal oversight controls, or if such controls actually exist, had they followed them, these harms certainly would have been avoided or at least mitigated.

66. Further, as described below, not only did the Individual Defendants fail to ensure effective safety and operational procedures at the Company's Indore Facility; after the FDA's actions came to light, but before the actions became public, the Individual Defendants failed to ensure that accurate information concerning this subject was being disseminated publicly. This demonstrates a further failure of control and oversight on the part of the Individual Defendants.

**The Individual Defendants Caused the Company to Issue Materially Misleading Statements**

67. Despite the Individual Defendants first learning of the issues at the Indore Facility at least by January 2024, the FDA's inspection occurring in June of 2024, the Company's response to the FDA's findings being submitted in July of 2024, and the Warning Letter being issued in December of 2024, the Individual Defendants did not even disclose the existence of the FDA's inspection and subsequent actions until December 23, 2024. Further, it was not until February 27, 2025 that the Individual Defendants began to disclose the full details of the FDA's action, the status of the Company's remediation attempts, and the full extent to which the Import Alert would negatively impact the Company's finances, including with regard to lenalidomide.

68. In fact, throughout the Relevant Period, the Individual Defendants made, or allowed others to make—with no meaningful intervention by the Individual Defendants—numerous materially false and misleading statements and/or material omissions that served to conceal: (i) the nature of the significant health, safety, and operational issues at the Indore Facility—which had been occurring well before the FDA's June 2024 inspection, (ii) the existence and extent of the

FDA's actions, (iii) the existence and content of the Company's remediation plans, (iv) that lenalidomide would likely not be exempted from the import ban, and (v) the extent to which Viatris' financial performance would be negatively impacted as a result of the import ban. As a result, investors were given a false impression that the Company's financial prospects were better than they actually were.

69.     On February 28, 2024, Viatris filed its annual report for the year ending December 31, 2023 with the SEC on Form 10-K (the "2023 10-K"). The 2023 10-K was signed by Smith, Higgins, Cornwell, Dillon, Finney, Groothuis, Kilts, Korman, Malik, Mark, and Parrish.

70.     In the 2023 10-K, the Individual Defendants touted the Company's compliance process with respect to manufacturing-quality regulations, stating *"[m]anufacturing is conducted under exacting conditions governed by extensive regulation including strict in-process and finished pharmaceutical products specifications and controls."*

71.     The above statement in the 2023 10-K was materially false and misleading. Despite touting the Company's "exacting" manufacturing conditions and "strict. . .specifications and controls", the 2023 10-K failed to also disclose that: (i) serious quality control issues and cGMP violations at the Indore Facility were actively occurring and had been occurring since at least January 2024; (ii) that the Individual Defendants had failed to adequately investigate or correct those issues; and (iii) the FDA had previously cited the Indore Facility for cGMP violations during a 2019 inspection.

72.     Further, the 2023 10-K also promoted the Company's inclusion of lenalidomide in its product line-up stating *"[n]ew product launches are an important growth driver,"* that *"important recent launches include lenalidomide . . . in the U.S.,"* and that *"[n]ew product sales, including lenalidomide . . . in the U.S. . . . helped to partially offset the anticipated lower net*

*sales of certain existing products . . .* as a result of lower volumes and lower pricing due to additional competition."

73.     The statements in the 2023 10-K touting lenalidomide were materially misleading because they failed to disclose that the facility where the lenalidomide was produced, the Indore Facility, was suffering from significant quality issues and violations of CGMP—thus risking the integrity and marketability of this potentially lucrative drug.

74.     The 2023 10-K also discussed risks relating to quality inspections at Viatris' facilities, which the Individual Defendants misleadingly described as being "in the past" or merely hypothetical, while touting the Company's commitment to regulatory compliance, despite their awareness of Viatris' cGMP violations at the Indore Facility and vulnerability to an import ban:

> Further, approved drugs, as well as their manufacturers, are subject to ongoing postmarketing review and inspection, which can lead to the discovery of previously unknown attributes of the products or the manufacturing or quality control procedures used in their production, which may impact the marketing of the products or result in restrictions on their manufacture, sale or use or in their withdrawal from the market. *Any failure or delay by us . . . in obtaining and maintaining regulatory approvals could adversely affect the marketing of our products and our ability to receive product revenue . . . .*
>
> *     *     *
>
> The pharmaceutical industry is subject to regulation by various governmental authorities in the jurisdictions in which we operate, including the U.S., EU, China and India. For instance, we must comply with applicable laws and requirements of the FDA and other regulatory agencies, including foreign authorities, with respect to the research, development, manufacture, quality, safety, effectiveness, approval, labeling, tracking, tracing, authentication, storage, record-keeping, reporting, pharmacovigilance, sale, distribution, import, export, marketing, advertising, and promotion of pharmaceutical products. *We are committed to conducting our business, including the sale and marketing of our products, in compliance with all applicable laws and regulations.* These laws and regulations, however, are numerous, complex and continue to evolve, and *it is possible that a governmental authority may challenge our activities, or that an employee or agent could violate these laws and regulations without our knowledge. Failure to comply with these laws, regulations or expectations could result in a range of consequences, including,* but not limited to, . . . recall or seizure of products, *total or partial*

*suspension of production and/or distribution, [and] our inability to sell products*
. . . .

\*　　　\*　　　\*

The FDA and comparable foreign regulatory authorities also regulate the facilities and operational procedures that we use to manufacture our products. We must register our facilities with the FDA and similar regulators in other countries. Products must be manufactured in our facilities in accordance with cGMP or similar standards in each territory in which we manufacture. Compliance with such regulations and with our own quality standards requires substantial expenditures of time, money, and effort in multiple areas, including training of personnel, recordkeeping, production, and quality control and quality assurance. The FDA and other comparable regulatory authorities, including foreign authorities, periodically inspect our manufacturing facilities for compliance with cGMP or similar standards in the applicable territory. Regulatory approval to manufacture a drug is granted on a site-specific basis. *Failure to comply with cGMP and other regulatory standards at one of our or our partners' or suppliers' manufacturing facilities could result in an adverse action brought by the FDA or other regulatory authorities, which has resulted and could in the future result in the receipt of an untitled or warning letter, . . . unanticipated compliance expenditures, . . . recall or seizure of products, total or partial suspension of production and/or distribution, our inability to sell products, the return by customers of our products, . . . refusal to permit import or export, . . . and/or other adverse actions.*

*Our business could be adversely affected if any regulatory body were to . . . require a recall or other adverse product action; require one of our manufacturing facilities to cease or limit production; or suspend, vary, or withdraw related marketing authorization. . . .*

Although we have established internal quality and regulatory compliance programs and policies, there is no guarantee that these programs and policies, as currently designed, will meet regulatory agency standards in the future or will prevent instances of non-compliance with applicable laws and regulations. *Additionally, despite our compliance efforts, we or our partners have in the past and may in the future receive notices of manufacturing and quality-related observations following inspections by regulatory authorities around the world, as well as official agency correspondence regarding compliance. If we are unable to resolve these observations and address regulatory concerns in a timely fashion, our business, financial condition, results of operations, cash flows, ability to pay dividends and/or stock price could be materially adversely affected.*

75.     Further, the 2023 10-K discussed risks relating to quality deficiencies in the manufacturing process, which the Individual Defendants again misleadingly described as being "in the past" or merely hypothetical:

> A substantial portion of our capacity, as well as our current production, is attributable to a limited number of manufacturing facilities . . . . *A significant disruption at any such facilities within our internal or third-party supply chain, even on a short-term basis,* whether due to the failure of a third-party supplier to fulfill the terms of their agreement with us, labor disruption, *adverse quality or compliance observation, other regulatory action,* infringement of brand or other third-party intellectual property rights, natural disaster, civil or political unrest, *export or import restrictions, or other events could impair our ability to produce and ship products to the market on a timely basis and could, among other consequences, subject us to exposure to claims from customers. Any of these events could have a material adverse effect on our reputation, business, financial condition, results of operations, cash flows, ability to pay dividends and/or stock price*. . . . *If we* or our third-party suppliers' *face significant manufacturing issues, this could lead to shutdowns, delays or product shortages, or to our being entirely unable to supply certain products to customers for an extended period of time*.

> \*      \*      \*

> *In addition, quality deficiencies in the products which we or our suppliers provide, or at our or their manufacturing facilities, have in the past and could in the future adversely impact our manufacturing and supply capabilities, [or] cause supply interruptions* . . . .

> \*      \*      \*

> In addition, the manufacture of some of our products is a highly exacting and complex process, due in part to strict regulatory requirements. *Problems may arise during manufacturing at our* or our third-party suppliers' *facilities for a variety of reasons, including*, among others, equipment malfunction, *failure to follow specific protocols and procedures*, problems with raw materials, natural disasters, power outages, labor disputes or other civil unrest, cybersecurity or compliance issues, and environmental, health and safety issues, laws, regulations and permits. *If problems arise during the production of a batch of product, that batch of product may have to be discarded. This could, among other things, lead to increased costs, contractual penalties, lost revenue, damage to customer relations, time and expense spent investigating the cause, and, depending on the cause, similar losses with respect to other batches or products.*

26

76.     The above statements regarding the risks related to regulatory compliance and manufacturing quality in the 2023 10-K were materially false and misleading because: (i) rather than being in the past or merely hypothetical, serious quality control issues and cGMP violations at the Indore Facility were actively occurring and had been occurring since at least January 2024; (ii) that the Individual Defendants had failed to adequately investigate or correct those issues; and (iii) the FDA had previously cited the Indore Facility for cGMP violations during a 2019 inspection.

77.     On May 21, 2024, Viatris issued a document titled "Building Sustainable Access at Scale: Viatris 2024 Sustainability Report (the "2024 Sustainability Report"). The 2024 Sustainability Report provided assurances to investors that Viatris maintained robust quality control and complied with applicable cGMP regulations, stating:

> **All of Viatris' operations [and] manufacturing sites . . . globally are subject to robust quality infrastructure and strategy. This infrastructure is comprised of the extensive experience and expertise of our personnel, our comprehensive Global Quality Policies that establish uniform requirements for fundamental process and controls within our Global Quality Management System (QMS), as well as Global Quality IT systems, which are implemented and designed to establish industry best practices, consistency and global quality assurance throughout our network.**
>
> **All of our operations are also subject to robust quality systems, standards and processes which are designed to ensure product quality and patient safety. These programs are designed and implemented across our global operations and are executed in alignment with statutory and regulatory requirements, such as current Good Manufacturing Practices (cGMP) . . . for all markets that they serve.**

78.     The statements made described above in the 2024 Sustainability Report, which were made by, or with the knowledge of the Individual Defendants were materially false and misleading. Despite touting the Company's "robust" quality systems, standards, processes, and infrastructure, "in alignment" with cGMP, the Individual Defendants misleadingly omitted that:

(i) serious quality control issues and cGMP violations at the Indore Facility were actively occurring and had been occurring since at least January 2024; (ii) that the Individual Defendants had failed to adequately investigate or correct those issues; and (iii) the FDA had previously cited the Indore Facility for cGMP violations during a 2019 inspection.

79. On August 8, 2024, Viatris filed its quarterly report for the second quarter of 2024 with the SEC on Form 10-Q (the "2Q 2024 10-Q). In the 2Q 2024 10-Q, the Company included the following factors that could have an impact on the Company's future financials:

> Any changes in or difficulties with the Company's manufacturing facilities, ***including with respect to inspections, remediation and restructuring activities,*** supply chain or inventory or the ability to meet anticipated demand.

80. Despite including this language, the 2Q 2024 10-Q failed to disclose that: (i) serious quality control issues and cGMP violations at the Indore Facility were actively occurring and had been occurring since at least January 2024; (ii) that the Individual Defendants had failed to adequately investigate or correct those issues; and (iii) the FDA had previously cited the Indore Facility for cGMP violations during a 2019 inspection. Nor was the FDA inspection disclosed during an earnings call held to discuss the Q2 2024 results.

81. On November 7, 2024, Viatris filed its quarterly report for the third quarter of 2024 with the SEC on Form 10-Q (the "3Q 2024 10-Q"). The 10-Q once again provided general risk disclosures stating that inspections and remediation activities could impact the Company's financials:

> Any changes in or difficulties with the Company's manufacturing facilities, ***including with respect to inspections, remediation and restructuring activities,*** supply chain or inventory or the ability to meet anticipated demand.

82. Despite these warnings, the 3Q 2024 10-Q once again failed to disclose that: (i) serious quality control issues and cGMP violations at the Indore Facility were actively occurring

28

and had been occurring since at least January 2024; (ii) that the Individual Defendants had failed to adequately investigate or correct those issues; and (iii) the FDA had previously cited the Indore Facility for cGMP violations during a 2019 inspection.

83.    On November 21, 2024, the Individual Defendants participated in the Jefferies London Healthcare Conference. During the conference, Smith downplayed the likelihood of any particular problem with any of the Company's products in any particular geography having a significant impact on the Company's financial results:

> [Glen Santangelo, Jefferies Financial Group, Inc., Moderator]: ***This diversification issue, I think, remains underappreciated, right?*** Given that you're running those, that branded and that generics portfolio. ***No one product accounts for any meaningful share of your revenue and you're in 100-and-something countries and so no one country really represent – you're very diverse from a product and geographic perspective. So you don't really, I guess, worry too much about any one specific issue or maybe that's not the right characterization.***
>
> [Smith]: ***No, I think that's a good characterization, right? That 165 countries, 4,400 different products in different areas. It provides incredible base of stability for the company***. On the other side of that, also we need to do things from a BD [i.e., business development] perspective, which move the needle, right? And when you have $15 billion of diversified sales, there's some comfort and stability there. ***And as you said, not one product in any one geography really changes the needle. So we do have incredible stability***. It's our ability then to add to that stability with new products and new revenue that's going to really create a growth profile for the future.

84.    The statements made by Smith were materially false and misleading because the Individual Defendants were aware that lenalidomide was "one product" with "one specific issue" in "one geography" that was highly likely to have a significant adverse impact on the Company's financial results. Further, due to the issues uncovered by the FDA at the Indore Facility, the Individual Defendants were aware that there was a high likelihood that the importation of lenalidomide in the United States would be barred, with no realistic prospect of an exemption from the FDA. When the statements were made, the Individual Defendants were also aware that due to

29

the importance of lenalidomide to the Company's revenue, an import ban on the product would have a significant adverse impact on the Company's financial results for 2025.

85.    During the Jefferies London conference, Mistras and Smith were also questioned about financial forecasts going into 2025:

[Glen Santangelo, Jefferies Financial Group, Inc., Moderator]: And Doretta, I know you're not going to give me any 2025 guidance here today, but I'm going to push a little bit, right? *And so the obvious question would be, as we segue the conversation to 2025, based on all the previous answers, it feels like a lot of the trends that we've seen year to date continue to be in place. . . . I think Corinne [Le Goff] mentioned that generic pricing is sort of stable. And so when we think about what we've seen in 2024, is that a reasonable baseline for us to start to think about 2025? Or is there anything else that you'd call out specifically that we should have on our radar screen?*

[Mistras]: *No, I think it is. As we've mentioned, this is the sixth consecutive quarter that we've seen of operational revenue growth, and we expect to see that momentum to continue into next year. And it's really two factors that give us that confidence. Number one, it's what we've talked about, the kind of stability that we've kind of seen in the base business and then compounded by the $450 million to $550 million of new product revenue that we kind of anticipate to be able to deliver on. So the combination of those factors is what continues to give us the momentum that we expect to see as we go into next year.*

\*        \*        \*

[Smith]: *I think the company is significantly undervalued at where we sit today. I think what's underappreciated is the stability of the base business and the fact that the base business has actually returned to growth.*

86.    The statements made by Mistras and Smith were materially false and misleading. Mistras's agreement that 2024 was "a reasonable baseline for us to start to think about 2025," and Smith's emphasis on Viatris' stability and growth, were false and misleading because the Individual Defendants knew that the significant issues at the Indore Facility were highly likely to negatively impact Viatris' ability to maintain its revenue and profit levels that it had derived from lenalidomide in 2024.

30

87.     On December 23, 2024, Viatris issued a press release disclosing, for the first time, the FDA inspection at the Indore Facility.  The press release disclosed that the FDA had issued a Warning Letter following a failed inspection at the facility, stating:

> ***Following an inspection by the U.S. FDA at our oral finished dose manufacturing facility in Indore, India earlier this year, the Agency has issued a warning letter, and an Import Alert related to this facility.***

88.     The press release further noted that the Import Alert "***affects 11 actively distributed products that will no longer be accepted into the U.S. until the Warning Letter is lifted***" but that there were "four products" excepted from the Warning Letter based "on shortage concerns," and further that "***[t]here could be potential for additional exceptions based on further discussions with the Agency.***"

89.     Finally, the press release disclosed that the Company had been implementing ongoing remediation efforts at the facility since Viatris first learned of the inspection results at an undisclosed time earlier in the year but that there would be no impact to the current-year's financials:

> ***Following the substance of FDA's original inspection observations, we immediately implemented a comprehensive remediation plan at the site.*** The necessary corrective and preventative actions are well underway, including but not limited to related personnel actions. Additionally we have engaged independent third-party subject matter experts to support the remediation plan.
>
> *     *     *
>
> ***At this time, we do not anticipate these actions impacting our current 2024 guidance ranges.*** We will incorporate potential future financial impact in our 2025 guidance ranges when we provide these in early 2025.

90.     Despite disclosing the existence of the FDA's actions, the statements described above that were made in the December 23, 2024 press release continued to be misleading. First, the press release failed to disclose that the Company had already attempted to implement

remediation measures that were rejected by the FDA. Second, the press release failed to disclose that lenalidomide was produced at the Indore Facility and that it was one of the drugs impacted by the Import Alert. Third, there was little chance the Company would be able to secure an exemption for lenalidomide as there was no shortage of the drug in the United States. Fourth, given the impact that a ban on lenalidomide would have on the Company's revenues, there was in fact a significant likelihood that the FDA actions would have a negative impact on the Company's 2024 guidance ranges.

91.    On January 14, 2025, Viatris presented at the J.P. Morgan Healthcare Conference. During the Company's presentation, Smith and Mistras attempted to downplay the impact of the FDA Warning Letter on the Company's financials:

> [Christopher Thomas Schott – JPMorgan Chase & Co.]: Maybe one last bigger picture one. Just—I know, you're not giving formal guidance for 2025. But just headwinds and tailwinds, what are the things we should watch for as we go for this year?
>
> [Smith]: So headwinds and tailwinds. So just 1 thing, and I'll let Doretta take on the headwinds and tailwinds from finance perspective. ***One of the things that was announced was an Import Alert from our facility in Indore,*** and she will address that, I think, ***a little bit as a headwind for us.*** And I just wanted to say before she gets into the headwinds and tailwinds. ***So we take it very seriously.***
>
> ***The Indore facility is 1 of 26 manufacturing facilities. It's an important facility within our global network. It's focused on oral solid doses. The Warning Letter and Import Alert are a result of an inspection which happened about 8 months ago. And we're in close communication with the FDA and receiving initial FDA feedback some months ago.***
>
> ***When we got that feedback, we agreed to immediate remediation at that time of the issues that they had. And the Import Alert involves 11 products in the U.S., however, 4 products of the 11 are on an exempt list, and we're in active discussions with the FDA to add more products to that exempt list.*** So that was one of the things and Doretta go into it a little bit more to ***provide a little bit of a headwind for us as we move into 2025.***

[Mistras]: Yeah. Just to give some additional color regarding our headwinds and our tailwinds. There are some pushes and pulls as to consider as we think about 2025. . . .

*From a headwind perspective, as Scott mentioned, specifically with respect to Indore, currently, we're having ongoing discussions, both with the FDA as well as current customers. And so we're not in a position right now to disclose specific products, and we're continuing to assess the potential impact from Indore. . . .*

[Christopher Thomas Schott]: I know the specific products aren't disclosed and you're still working on it. Just any – just to quantify just how big is this facility from a revenue perspective?

[Mistras]: So as Scott – *it's 1 of 26 facilities. It's an oral dose manufacturing facility. It services our network across the world. So it's a global facility for us as it relates to Indore.*

*          *          *

[Chris Schott, JPMorgan, Analyst]: Maybe just one specific generic product. *Generic Revlimid, how big of a tailwind has that been for you?* And do we have to think about that as a headwind at some point as we look out to 2026 and beyond?

[Corinne Le Goff, Viatris Inc., Chief Commercial Officer]: *So generic Revlimid has been like a stable component of our generic portfolio.*

92.     The statements and omissions described above were materially false and misleading when made.  Specifically, each of the statements: (i) failed to provide specific details as to the issues occurring at the Indore Facility, or how long the Company was aware of the issues, (ii) failed to disclose that lenalidomide was produced at the Indore Facility and was subject to the import ban, (iii) give the impression that Viatris would be able to secure additional exceptions to the products on the import ban list—including with respect to lenalidomide, (iv) failed to provide details on the significance of the products included in the import ban (particularly with regard to lenalidomide), and (v) downplayed the extent to which the Warning Letter and resulting Import Alert would have a negative impact on the Company's finances, having stated merely that the FDA action caused a "minor headwind."

93.     As a result of these misstatements and omissions, made by or with the knowledge of the Individual Defendants, investors were deprived of material information necessary to understand the full extent to which the Company's valuable operations were being impacted by the adverse FDA action.

**The Truth Emerges**

94.     On February 27, 2025, Viatris issued a press release disclosing that the FDA's import ban applied to lenalidomide and that neither lenalidomide nor any other product manufactured at the Indore Facility would be granted an exemption from the ban. Further, the press release revealed that the issues discovered at the Indore Facility would cause a negative impact on 2025 revenue and operating earnings amounting to approximately $500 million and $385 respectively, caused in significant part by the import ban on lenalidomide. According to the press release:

> Following an inspection of Viatris' oral finished dose manufacturing facility in Indore, India, in June 2024 the Company received a warning letter and import alert from the U.S. Food and Drug Administration (FDA) in December 2024. ***The import alert affects 11 actively distributed products, including lenalidomide and everolimus. The FDA made exceptions, subject to certain conditions, for four products based on shortage concerns. Following recently concluded interactions with the FDA regarding potential additional product exceptions, the Company currently does not expect any additional product exceptions to be granted.***
>
> ***While product continues to be shipped from the Indore facility to markets outside the U.S., the Company currently anticipates some impact in other markets, including to parts of its ARV business in Emerging Markets and to select generic products in Europe. The Company currently estimates the negative impact on 2025 total revenues to be approximately $500 million and to 2025 adjusted EBITDA to be approximately $385 million.***

95.     On the same day, Viatris filed its annual report for the year ending December 31, 2024 with the SEC on Form 10-K (the "2024 10-K"). The 2024 10-K was signed by Smith, Higgins, Cornwell, Dillon, Finney, Groothuis, Kilts, Korman, Malik, Mark, Parrish, and Coelho.

The 2024 10-K included much of the same information regarding the Import Alert's impact as had been disclosed in the press release:

> Following an inspection by the FDA at our oral finished dose manufacturing facility in Indore, India in 2024, the FDA has issued a warning letter, and an import alert related to this facility. ***The import alert affects 11 actively distributed products that will no longer be accepted into the U.S. until the warning letter is lifted. It makes exceptions, subject to certain conditions, for four products based on shortage concerns. Following recently concluded discussions with the FDA, the Company does not expect additional product exceptions to be granted by the FDA.***
>
> \*        \*        \*
>
> ***While product continues to be shipped from the Indore facility to markets outside the U.S., some impact in other markets, including the ARV business in Emerging Markets and select generic products in Europe, is anticipated. The Company currently estimates the negative impact to 2025 total revenues to be approximately $500 million and to 2025 earnings from operations to be approximately $385 million.***

96.    The 2024 10-K also described the consequences of the FDA's action in response to the violations found at the Indore Facility:

> [I]n December 2024 the FDA issued a warning letter and import alert related to our oral finished dose manufacturing facility in Indore, India. ***The warning letter and import alert restrict our ability to distribute certain products into the U.S. and have also negatively impacted our ability to sell products made at this facility to customers in other regions***. We currently expect a negative impact from the Indore actions on our financial condition, results of operations and cash flows in fiscal year 2025, and, if we are unable to resolve any such observations and address regulatory concerns in a timely fashion, our business, financial condition, results of operations, cash flows, ability to pay dividends or repurchase shares, and/or stock price could be materially adversely affected in 2025 as well as future periods.
>
> \*        \*        \*
>
> ***Negative publicity*** related to the receipt of a warning letter, import alert, or similar restrictions from the FDA or other regulatory authorities, ***such as the recent restrictions at our Indore facility, have damaged and could continue to damage our reputation among customers, lead customers to seek other suppliers of our products, or lead to additional inquiries from other regulatory authorities.***
>
> \*        \*        \*

35

In addition, *actual or alleged quality deficiencies in the products* which we or our suppliers provide, or at our or their manufacturing facilities, *including with respect to the recent warning letter and import alert at our Indore facility, have in the past and could in the future adversely impact our manufacturing and supply capabilities, cause supply interruptions*, or lead to voluntary market withdrawals or product recalls.

97.     During an earnings call held the same day, Smith disclosed further information concerning the FDA's inspection.  Specifically, Smith disclosed that no other products would be granted exceptions as previously suggested, and that the headwinds in 2025 from the FDA's Warning Letter would be significant:

> [*We r]eceived a warning letter and import alert from the FDA at the end of December. The import alert affects 11 actively distributed products in the U.S., including lenalidomide.*
>
> *The FDA made exceptions subject to certain conditions for 4 products based on shortage concerns. We recently finished interactions with the FDA about potential additional product exceptions, and we do not expect any additional exceptions will be granted at this time.*
>
> While product continues to be shipped from the facility to markets outside the U.S., *we currently anticipate some impact on other markets, including parts of our ARV business and emerging markets and to select generic products in Europe. We currently estimate the negative impact on 2025 total revenues to be approximately $500 million and on 2025 adjusted EBITDA to be approximately $385 million.*

98.     During the call Mistras also disclosed the substantial impact the import ban on lenalidomide would have on the Company's finances:

> *We estimate an impact of approximately $500 million to 2025 total revenue and $385 million to adjusted EBITDA. This includes estimated penalties and supply disruptions of approximately $100 million, which we believe are mostly short-term in nature.*
>
> *Lenalidomide, which after discussions with the FDA was not granted an exception, is the largest product impacted and represents approximately 40% of the total revenue impact and 50% of the total adjusted EBITDA impact given its margin profile.*

99.     During the question-and-answer portion of the call, Smith and Mistras responded to multiple questions regarding the Company's prior disclosures concerning the Warning Letter and its impact on the Company's financial projections:

[Christopher Thomas Schott – JPMorgan Chase & Co.]: [C]an you just walk through a little bit **when we think about the year-over-year step down in gross margins how much of that is coming from Indore** and how much of that is coming from some of the factors that you cited?

[Mistras]: And to your question, Chris, around gross margin. There were a couple of components, as I mentioned, that we're factoring into the step-down. **The largest component is Indore. Just given the high-margin nature of both the penalties as well as lenalidomide, the margin impact of Indore is about – kind of close to 80% margin.** And then in addition to that, we just have normal kind of base business price erosion and increase in some product supply cost. And that has been offset with kind of benefits from just ongoing segment mix in our business.

\*       \*       \*

[Jason Matthew Gerberry – BofA Securities]: So just for me, maybe I missed this, but why does the Indore facility issues have an impact on revenues outside the United States?

[Scott Andrew Smith]: So just on the first question, **I think when you get a situation like Indore and warning letter and an active remediation that's ongoing right now, that active remediation sometimes can cause you to have a pause in manufacturing, supply issues in certain cases. Even though the product can go into Europe, there might be shortages of certain products, as we work through that plan and remediate.**

**We look for alternate sources of products while we're doing the remediation. So you can see some shortages with some products, but certainly not across the board, and it's very specific to product and location. But it has to do with the remediation of the facility.** And again, we've got a network of facilities here from a manufacturing perspective, 26 globally, and we look for alternate sources when we have a shutdown for remediation or a slowdown for remediation like we do at Indore.

100.     Also during the question-and-answer portion of the call, Umer Raffat of Evercore ESI Institutional Equities challenged Smith and Mistras on the Individual Defendants prior public statements regarding the Warning Letter and Import Alert, particularly with regard to the fact that

lenalidomide had not been disclosed as a product covered by the import ban at the January 14, 2025 J.P. Morgan Healthcare Conference:

> [Umer Raffat – Evercore ESI Institutional Equities]: First, Scott, Doretta, for you, at the conference in January, you guys talked about – *for the Indore warning letter, you guys mentioned it's 11 products and most – and 4 of the 11 were exempt and more could get exempt. So most folks listening in just assumed, you know what, hundreds of products, 11-100 of products in this company, 11 of them, so probably not so much. But the top of EBITDA hit we learned about today, considering also that you knew generic Revlimid was one of them, I'm just curious about the thought process around how you guys communicated that to investors previously.*
>
> [Scott Andrew Smith]: Yeah. So relative to disclosure, JPMorgan, it was a very dynamic situation at that time. *There were some products which were excluded, others in which we had agreement from the FDA that we could go ahead and ask for exclusion and put our case together, why. So we were unsure exactly what that would look like. We were also exploring alternate forms of lenalidomide from other companies to help fill that shortage gap. So it was a very dynamic situation at that time.*
>
> *We didn't even have a good view on exactly whether lenalidomide will be excluded or not until just a few days ago. So it's been very dynamic. We thought we had a great case because of the importance of the medication. It just did not materialize.* And so, for me, JPMorgan to start to say, well, this is this product and not that product without being able to give the whole picture, I think, gets to our credibility. *What was really concerning to me was to be accurate, to be credible to when I understood what exactly that list would look like and what exactly the impacts would look like that I could share that.*
>
> And I think it's only been in the last couple of days that it's been very clear to us what the U.S. and non-U.S. impacts are, including lenalidomide. *I think the distortion that you see in terms of the magnitude from a revenue and EBITDA perspective is because specifically of lenalidomide and the profit profile of that particular product.*

101.    These disclosures, which were made by, or with the direct knowledge of, the Individual Defendants, were shocking to the investment community as they were in direct contrast to statements the Company made during the Relevant Period.  Specifically, up until these disclosures were made, the Individual Defendants: (i) had not provided specific details as to the issues occurring at the Indore Facility, or how long the Company was aware of the issues, (ii) had

not provided a specific date in which the FDA inspection had occurred, (iii) had given the impression that Viatris would be able to secure additional exceptions to the products on the import ban list, (iv) had failed to provide details on the significance of the products included in the Import Ban (particularly with regard to lenalidomide), and (v) had downplayed the extent to which the Warning Letter and resulting Import Ban would have a negative impact on the Company's finances, having stated merely that the FDA action caused a "minor headwind." As a result, the disclosures portrayed a much bleaker picture of Viatris' prospects than the investment community had been led to believe over the past six months.

102. As a result of these revelations, the price of Viatris' stock dropped significantly, falling from $11.24 per share on February 26, 2025 to $9.53 per share on February 27, 2025. This represented a decline of approximately 15.21% in the span of single day.

103. Further, in the wake of these revelations, analysts began to lower their price targets for Viatris. For example, on February 27, 2025, an analyst at J.P. Morgan stated that:

> Overall, 2025 guidance came in below expectations largely due to the company's Indore manufacturing plant warning letter, which is particularly impacting gRevlimid [i.e., generic Revlimid or lenalidomide] sales. While VTRS had talked about this warning letter at the JPMorgan Healthcare Conference, the size of the impact is larger than we/the Street expected and we see Indore as a setback for the VTRS story (as the company had been posting solid/stable results over the past year). Elsewhere, VTRS's business is largely trending in-line with our expectations and we exit today's update lowering our 2025/2026 estimates.

104. The J.P. Morgan analyst also cited the impact of the Indore Facility's failed inspection, stating:

> ***Indore impact bigger than expected and could take time to resolve.*** VTRS is expecting the import restrictions at Indore to reduce revenues by $500mm and EBITDA by $385mm this year. Revlimid is driving ~50% of this impact with VTRS estimating a $200mm revenue/$190mm EBITDA headwind from this product . . . VTRS is also expecting a $75mm impact in Europe and a $125mm impact in Emerging Markets . . . ***VTRS is working on remediating the plant,***

*although this could take some time (mgmt. hoping for an FDA inspection in late 2025/2026) and we would not be surprised for this issue to persist into 2026.*

105.    On the same day, a Jefferies analyst described the impact of the FDA's actions as "much worse than expected":

**The Indore impact was much worse than feared[.] We are not surprised to see shares down in pre-market. We expect shares to be rangebound NT [near term] amidst Indore uncertainty. . . .**

2025 guidance came in below as expected, but ***Indore impact of $500M and $385M on rev/EBITDA was much worse than we thought***. Viatris issued a widely expected below-consensus guide given 1) 2-3% FX headwinds and 2) the Indore facility shutdown. However, ***the Indore impact came in much worse than expected so we think that will be the primary focus post the print***.

\*      \*      \*

**[T]he Indore impact for 2025 was much worse than we thought, which will be the primary driver of the stock post 4Q as we think the update overshadows underlying stability in the business. . . . [W]ith the key positive catalyst (a repo announcement) overshadowed by negative news, we think shares could be pressured in the NT.**

106.    In another report, Morningstar expressed shock at the significance of the headwinds facing the Company due to the FDA action:

***Headwinds from facility inspections in Indore, India, were revealed at a conference in January but look much more significant than we had originally anticipated***. The import alert affects seven products mainly distributed in the US and is to create $500 million sales and $385 million EBITDA headwinds for 2025. ***Importantly, lenalidomide is included in the seven impacted products and is responsible for a majority of the headwinds. This was especially discouraging since 2025 was the last full year that Viatris, along with other key generic manufacturers, would have enjoyed meaningful contributions from the drug before additional competition is expected starting in 2026.*** The profit impact is also disappointing since the firm's consolidated EBITDA margin of 35% (average of the past three years) is likely to see meaningful headwinds given that the margin impact of the facility looks to be close to 80%.

2025 full-year guidance of $13.8 billion in revenue and $2.19 EPS, both at midpoint fall short of our original assumptions by 5% and almost 18%, respectively.

**Viatris' False and Misleading 2024 Proxy Statement**

107.    On October 25, 2024, Viatris filed its 2024 Proxy Statement with the SEC on Form DEF14A (the "2024 Proxy Statement").  The 2024 Proxy Statement was solicited by Cornwell, Dillon, Finney, Groothuis, Higgins, Kilts, Korman, Malik, Mark, Parrish, Smith, and Coelho. Despite the FDA inspection having occurred between June 14 and 26 of 2024 and the Company's response issued in July of 2024, the 2024 Proxy Statement failed to include any reference to or information concerning the FDA inspection, the violations uncovered, the Company's response, or any potential risks the FDA's action could have on the Company's operations or revenues.

108.    The 2024 Proxy Statement did include a variety of statements touting the Company's product quality, shareholder engagement, and its systems of oversight and governance. Under the heading "Quality and Safety" the 2024 Proxy stated:

> *Our global operations are supported by companywide quality systems, standards and processes which are designed to ensure product quality and patient safety*. From product development to making or sourcing raw materials to producing finished dosage forms, *every step of our development, manufacturing and monitoring processes is grounded in our commitment to good manufacturing practices and the quality and safety of our products*.

109.    With respect to shareholder engagement, the 2024 Proxy Statement touted its "shareholder-centric model . . . rooted in [Viatris'] Board of Director's . . . and management's commitment to on-going, robust dialogue with shareholders to discuss and solicit shareholder feedback on key strategic operation, financial, governance, and executive compensation topics, and to address other topics of importance to shareholders."

110.    The 2024 Proxy also touted the oversight responsibilities of the Audit Committee and the Compliance and Risk Oversight Committee that largely mirror the descriptions included in ¶¶40–41 *supra*.

41

111.    Under the section titled "Risk Oversight," the 2024 Proxy Statement included the following language:

Viatris operates in a complex and rapidly changing environment that involves many potential risks. In addition to general market, industry, R&D, supply chain, political, financial, and economic risks, the Company faces potential risks related to, among others, executing on and implementing our strategic objectives, including. . . legal, regulatory and compliance requirements and developments; the global nature of our operations; human capital management; environmental and social responsibility; and product portfolio and commercialization, among others. As a company committed to operating ethically and with integrity, we proactively seek to manage and, where possible, mitigate risks to help ensure compliance with applicable rules and regulations, maintain integrity and continuity in our operations and business, including in support of achieving strategic priorities and long-term financial and operational performance, and protect our assets (financial, intellectual property, and information, among others). Risk management is an enterprise-wide objective and is subject to oversight by the Board and its committees.

It is the responsibility of Viatris' management and employees to identify material risks to our business and to implement and administer risk management and mitigation processes and programs, while also maintaining reasonable flexibility in how we operate. Our internal audit function coordinates cross functionally to update the Company's enterprise risk assessment, including the identification of key and emerging risks, and reviews and refreshes this analysis quarterly with executive management. For each key or emerging risk identified, the Company establishes risk monitoring ownership from which quarterly updates are collected for executive management and the Compliance and Risk Oversight Committee. . . . To further embed risk management and compliance into our culture, Viatris has a robust global corporate compliance program, implements comprehensive policies and procedures, trains employees on how to implement and comply with them, and maintains an extensive program of oversight and audit to help ensure compliance and appropriate enterprise risk management.

The Company's risk oversight framework also aligns with our Disclosure Controls and Procedures. For example, the Company's Disclosure Committee reviews the Company's quarterly and annual financial statements and related disclosures. The Disclosure Committee consists of senior management including our CFO, Chief Legal Officer, Corporate Controller, Chief Corporate Affairs Officer, Head of Capital Markets, and General Counsel—Corporate Securities and Transactions, all of whom participate in the associated risk assessment as described above. The financial statements are also reviewed with the CEO before being reviewed with and approved by the Audit Committee, and filed with the SEC.

The Board directly, or through its committees, oversees the implementation of risk management and mitigation processes. The Board and its committees rigorously

42

review with management the risk management program and discuss risk assessment matters at least quarterly, as well as during the Board's annual budget review and approval process. Each of our Board committees has full access to officers and employees of the Company, and the Board and committees also meet without members of management present. The Board and committee Chairs periodically discuss the allocation of specific risk oversight matters between the various Board committees and the Board believes that its current risk oversight structure . . . assigns particular risk oversight matters to the Board committees that have the appropriate expertise to manage them. The Board also has the authority to form special strategic committees if it believes that it would be advisable to oversee significant strategic or other corporate actions, including the risks related thereto.

112. The 2024 Proxy Statement also solicited shareholder approval of, among other things, the reelection of directors Cornwell, Dillon, Finney, Higgins, Kilts, Groothuis, Korman, Malik, Mark, Parrish, Smith, and Coelho to the Board, approval of lucrative executive compensation, and a 49,000,000 increase in the number of shares available for issuance under the Company's 2020 Incentive Plan.

113. By touting Viatris' "companywide quality systems, standards and processes which are designed to ensure product quality and patient safety," the Individual Defendants gave the impression that the Company was being operated effectively.  Yet, despite these positive proclamations, the Individual Defendants failed to provide any information in the 2024 Proxy Statement that would have warned investors that: (i) the Indore Facility had been suffering from significant health, safety, and operational issues well before the FDA's June 2024 inspection, (ii) the Company had already been the subject of a significant FDA inspection, (iii) that inspection had resulted in the discovery of the multiple health, safety and operational failures at one of the Company's key manufacturing facilities, (iv) that the FDA had found Viatris' responses and proposed remediations to those findings lacking, and (iv) that the FDA findings could pose a material negative risk to the Company's operations and revenue—including a potential risk to its lenalidomide business.  This is vital information that would have provided timely and material

context to the pronouncements in the 2024 Proxy Statement regarding the Company's risk oversight and internal controls and Viatris' overall prospects. By touting the Company's acumen without providing the full picture, the Individual Defendants provided misleading statements and omitted material facts in the 2024 Proxy Statement.

114.    Additionally, by touting the Board's system of controls and procedures with regard to risk oversight without also disclosing that the Company was suffering from significant internal control deficiencies—both from the perspective of managing global operations and ensuring the Company was disclosing accurate information to the public—the Individual Defendants omitted vital information from the 2024 Proxy Statement that an investor would find material when assessing the Board's ability to effectively oversee the Company.

115.    By soliciting votes for, among other things, the re-election of directors, an executive compensation package, and amendments to the Company's incentive plan utilizing a proxy statement that contained material misleading information and omissions, the Individual Defendants deprived voting stockholders of vital, material information that would be necessary to make an honest and informed assessment of the health of the Company the ability of the directors—who were themselves up for re-election—to properly and effectively oversee the Company, and whether the Board's stewardship of the Company warranted the proposed amendments to the Company's 2020 Incentive Plan.

116.    The Company was directly harmed as these votes caused the Company to expend significant sums of money on benefits for the culpable directors and officers and permitted the culpable directors and officers to continue their wrongful conduct at the Company's expense.

**Insider Sales**

117. During the Relevant Period, specifically between June 13, 2024 and September 12, 2024, Malik sold $10,643,805 worth of his personally held Viatris stock while in possession of MNPI. When these stock sales occurred, the truth about the conditions at the Indore Facility, the FDA's actions, and the impact those actions would have on the Company's revenues had not yet been made public. As such, when Malik made his sales, the price of Viatris' stock was artificially inflated as a result of the false and misleading statements and omissions being disseminated by the Individual Defendants.

118. Further, all of Malik's sales occurred immediately around the time of the FDA's June 14 to 26, 2024 inspection of the Indore Facility, when the Company would have been provided with the FDA's negative findings and when the Company attempted to provide what was to ultimately be a fruitless remediation plan. That so many large sales of stock occurred within the immediate vicinity of significant regulatory action is at the very least, suspicious.

## VI.    THE SECURITIES CLASS ACTION

119. As a direct result of the Individual Defendants' actions and inactions, Viatris has become the subject of damaging and costly litigation. On April 4, 2025, Viatris stockholders filed a federal securities class action complaint in the United States District Court, Western District of Pennsylvania (Pittsburgh). The case is filed under the caption *Quinn v. Viatris, Inc. et al*, Case No. 2:25-cv-00466. The case names as defendants Viatris, Smith, and Mistras.

120. The Complaint makes claims under 10(b) and 20(a) of the Securities Exchange Act of 1934. The complaint alleges that Defendants made materially false and/or misleading statements and omissions in multiple public statements and SEC filings. Specifically, the Complaint alleges that the Individual Defendants created the false impression that they possessed reliable information pertaining to the headwinds impacting the Company's projected revenue

outlook and anticipated growth while also minimizing the significance and risk associated with the impact of the failed inspection and corresponding warning letter from the FDA.

121.    The Securities Class Action is still in its early stages, and as such, it will likely continue to be a financial and reputational drain on the Company, potentially for years to come.

## VII.    DAMAGES TO THE COMPANY

122.    As a result of the misconduct described herein, the Company has suffered, and will continue to suffer, immense economic and reputational harm, including, but not limited to, lost revenue, legal liability, compromised financial integrity, susceptibility to government investigation and action, and irreparable damage to its credibility in the business community and financial marketplace.

123.    To date, as a result of the Individual Defendants' misconduct, Viatris has been and will continue to be forced to expend millions of dollars.  Such losses include, but are not limited to:

a)    Legal and other costs incurred in connection with being named as a defendant in the Securities Class Action, including the defense and settlement of, or judgement in, the litigation;

b)    Costs incurred with respect to implementing remediation efforts at the Indore Facility;

c)    The approximately $500 million negative impact to 2025 total revenues and approximately $385 million negative impact to 2025 earnings as a result of the FDA Warning Letter;

d)    Costs incurred with high-level personnel replacement at the Indore Facility; and

e)    Costs incurred in connection with the lavish and unjustified compensation and benefits paid to Individual Defendants while they were actively breaching their fiduciary duties to the Company.

124.    Moreover, these actions have irreparably damaged Viatris' corporate image and goodwill.  For at least the foreseeable future, Viatris will suffer from what is known as the "liar's

discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Viatris' ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VIII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

125.    Plaintiff brings this action derivatively in the right and for the benefit of Viatris to redress injuries suffered, and to be suffered, by Viatris as a direct result of the wrongdoing alleged herein.  Viatris is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

126.    Plaintiff will adequately and fairly represent the interests of Viatris in enforcing and prosecuting its rights.

127.    Plaintiff has continuously been a stockholder of Viatris at times relevant to the wrongdoing complained of and is a current Viatris stockholder.

128.    Plaintiff did not make a demand on the Board to institute this action as such a demand would be a futile, wasteful, and useless act, as set forth below.

129.    When this action was filed, Viatris' Board consisted of the following fourteen (14) directors: Individual Defendants Smith, Higgins, Parrish, Cornwell, Dillon, Finney, Groothuis, Kilts, Korman, Malik, Mark, and Coelho and non-parties Frank D'Amelio, David Simmons, and Michael Severino. Plaintiff need only to allege demand futility as to eight of the fifteen Directors who are on the Board at the time this action is commenced.

130.    A pre-suit demand on the Board would be futile—and thus Plaintiff has made no such demand—as there is legitimate reason to believe that a majority of the members of the Viatris Board lack the capability to make independent and/or disinterested decisions with regard to initiating and pursuing a proper legal action.

47

131. Throughout the Relevant Period, the Demand Defendants have either known or, pursuant to their oversight responsibilities, should have known, of the issues impacting the Indore Facility, failed FDA inspection, the Company's subsequent inadequate response, the Warning Letter and Import Alert, and the likely impact these events would have on the Company's revenues. Likewise, the Demand Defendants also would have been aware that the statements and SEC filings they made, or that were made by the Company under their watch were materially false and/or misleading. Furthermore, at no time did the Demand Defendants take any good faith action to prevent or remedy the issues befalling the Company. In fact, each of the Demand Defendants either approved and/or permitted the wrongdoing alleged herein to occur, or at the very least, were unreasonable in ignoring the wrongdoing. Demanding that these directors pursue legal action under such circumstances would, in effect, be demanding that a majority of the directors bring legal action against themselves and their own interests. As such, the Demand Defendants, comprising a majority of Viatris' Board, are not disinterested parties.

132. Further, Smith is not disinterested or independent. As the CEO of Viatris throughout the Relevant Period, Smith's performance, and by extension compensation, is directly tied to the perceived success of the Company. Smith derives substantial compensation from his position with Viatris. Thus, any negative outcome from an action based on the wrongdoings described herein would have a very real and negative impact on Smith's position with the Company and the compensation he derives from it. Also, according to the 2024 Proxy Statement, Smith is not considered independent pursuant to Nasdaq listing rules. Additionally, as CEO, Smith had a duty to ensure the Company was managed in an effective and ethical manner. When he learned of the issues befalling the Indore Facility, and the subsequent FDA action, which his position almost certainly would have made him privy to, Smith had a duty to ensure the Company

48

remedied the issues and disclosed accurate and timely information. By failing to ensure that the Company operated its facilities in a manner that met relevant laws and regulations and by personally making and allowing the Company to make, materially false and misleading statements and omissions regarding the FDA action and the subsequent negative impact to the Company's finances, Smith breached his most basic fiduciary duties to the Company. For these reasons, Smith faces a substantial likelihood of liability, is not disinterested or independent, and thus demand is excused as to him.

133. Malik is not disinterested or independent. As President of Viatris for a portion of the Relevant Period, Malik would have known of significant issues facing the Company. As such, it is likely he would have been aware of the health, safety, and operational failures and the subsequent FDA action. By failing to ensure that the Company operated its facilities in a manner that met relevant laws and regulations and by permitting the Company to disseminate false and misleading statements and omit material information that served to conceal the action and the subsequent harm to the Company, Malik breached his fundamental duties to the Company and likely faces substantial liability. Further, according to the 2024 Proxy Statement, Malik is not considered independent pursuant to Nasdaq listing rules. Finally, during the Relevant Period, Malik sold over $10.6 million of his personally held Viatris stock while in possession of MNPI. These sales and the profit he derived from them, likely make him substantially liable for unlawful insider selling. For these reasons, Malik faces a substantial likelihood of liability, is not disinterested or independent, and thus demand is excused as to him.

134. Higgins is not disinterested or independent. As Chair of the Viatris Board, Higgins had a duty to ensure the Board upheld its fiduciary obligations of oversight to the Company. Specifically, as noted in Viatris' Corporate Governance Principles, the Chair is responsible for

"determin[ing] the information sent to the Board, its meeting agendas, and meeting schedules to assure that the Board is properly informed with respect to agenda items. . . ." Higgins would have been aware or should have been aware of the issues at the Indore Facility, the FDA inspection, and the resulting events leading up to and including the Warning Letter and Import Alert as this would have been information the Board should have known.  By permitting, or at the very least unreasonably ignoring, the wrongful conduct described herein without implementing any effective Board action, Higgins failed in her duty of oversight, is likely liable, is not disinterested, and thus demand is excused as to her.

135.    Mark is presently Chair of the Board's Audit Committee and Cornwell, Dillon, and Finney are members.  According to the Audit Committee Charter, the Committee is responsible for overseeing, *inter alia*: (1) the integrity of the Company's financial statements and its accounting and financial reporting processes; (2) the effectiveness of the Company's internal control over financial reporting. . .; (5) the Company's processes and procedures relating to risk assessment and risk management of financial and disclosure control-related, as well as reporting-related, matters. . .; and (7) the Company's compliance with applicable legal and regulatory requirements (including U.S. federal securities laws) regarding the preceding matters.  As described herein, Viatris suffered from significant issues at its Indore Facility that not only impacted the Company's operations, but also its anticipated revenue stream.  Additionally, the Company misled the investing public by including false statements in its SEC filings and other public forums.  As Chair and/or members of the Audit Committee, Mark, Cornwell, Dillon, and Finney failed to detect and/or stop these issues from occurring and in the process breached the basic tenants of the Audit Committee Charter and the Company's governance policies.  Therefore,

50

Mark, Cornwell, Dillon, and Finney likely face liability, are not disinterested or independent and thus demand is excused as to them.

136. Parrish is presently Chair of the Board's Compliance and Risk Oversight Committee and Cornwell, Groothuis, Korman, Mark and Coelho are members. According to the Compliance and Risk Oversight Committee Charter, the Committee is responsible for, *inter alia*: (i) overseeing the Company's enterprise risk management framework, (ii) overseeing the Chief Compliance Officer's implementation of the Company's Corporate Compliance Program, (iii) reporting to the Board with respect to the status of the Corporate Compliance Program, and making recommendations to the Board and/or management with respect to the formulation or re-formulation of, and the implementation, maintenance and monitoring of, the Corporate Compliance Program, the Code of Business Conduct and Ethics, and significant related global policies designed to support and promote compliance with Company requirements, and legal rules and regulations. Given the Committee's robust oversight functions with respect to the Company's global risk and compliance functions, Parrish, Cornwell, Groothuis, Korman, Mark, and Coelho would have been in a position to detect the issues at the Indore Facility and would have had a duty to remedy those issues. Further, once the FDA inspected the facility, issued its findings and subsequently issued the Warning Letter and Import Alert the Committee would have had a further duty to act. Finally, when the Company disseminated public statements and SEC filings that materially misrepresented these events and the impact they were having and would have on the Company, they would have been aware that they materially misrepresented and omitted key facts necessary to make the statements truthful and complete. Because of this failure of oversight and action, Parrish, Cornwell, Groothuis, Korman, Mark, and Coelho breached their fiduciary duties, likely face liability, are not disinterested or independent and thus demand is excused as to them.

51

137. Additionally, the problems at the Indore Facility and resulting FDA inspection and failed Company response were significant events impacting one of the Company's vital global manufacturing facilities. The subsequent FDA Warning Letter and Import Alert were even more significant given the $500 million reduction in revenues and $385 million reduction in EBITDA the Company expected to incur as a result of the Import Alert. It is highly unlikely that the Demand Defendants could not have been aware these issues were occurring. The inclusion of lenalidomide in the Import Alert, a drug that was on the verge of losing its lucrative value to the Company due to a loss of patent protection, would have made these actions even more obvious to the Director Defendants. Yet despite the obvious and ongoing issues that were wreaking havoc on the Company's bottom line and reputation, the Demand Defendants failed to take any meaningful action to stop or correct the multiple false and misleading statements and omissions being disseminated to the investing public. As such, each member of the Board is liable for the harm described herein, is not independent or disinterested and as such demand is excused as to them.

138. Finally, each of the Demand Defendants have also received and receive lucrative payments, benefits, stock options, and other compensation in their capacities as members of the Viatris Board and their control of the Company. Any litigation initiated against the Demand Defendants would put this compensation at risk, thus making the Demand Defendants neither disinterested nor independent.

## COUNT I

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

139. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

140. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate

52

commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

141.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

142.    Under the direction and watch of the Director-Defendants, the 2024 Proxy Statement failed to disclose any information about the issues impacting the Company's Indore Facility or the subsequent FDA inspection and findings.  Specifically, the 2024 Proxy Statement failed to disclose, *inter alia*, that: (i) the Company's Indore Facility had been suffering from significant health, safety, and operational issues well before the FDA's June 2024 inspection, (ii) in June of 2024, the FDA had conducted an inspection of the Company's Indore Facility, (iii) during that inspection, the FDA uncovered multiple material safety violations, (iv) in July of 2024, Viatris submitted responses and proposed remediation plans to the FDA, and (v) given the nature and scope of the violations, there was a material chance that the Company's operations and revenues would be negatively impacted— including with respect to its lenalidomide business

143.    Moreover, the Proxy Statement was false and misleading when it discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct and specific Board committee charters, due to the Individual Defendants' failures to abide

53

by them and their engagement in the scheme to issue false and misleading statements and omissions of material facts.

144. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the 2024 Proxy Statement was materially false and misleading. The misrepresentations and omissions were material to stockholders in voting on the matters set forth for shareholder determination in the Proxy Statement, including but not limited to, election of directors, approval of certain Company's executive's compensation, and approval of an amendment to the Company's 2020 Incentive Plan. Had stockholders been aware that the Company was facing down a significant failed FDA inspection, they likely would have been more hesitant to vote to bestow lucrative benefits on many of the same directors and officers who were responsible for wrongdoing described herein.

145. Yet, because the truth was concealed through the false and misleading statements and omissions in the 2024 Proxy Statement, stockholders voted to, among other things, approve lucrative executive compensation, increase by 49,000,000 the number of shares available for issuance under the Company's 2020 Incentive Plan, and reelect or elect Cornwell, Dillon, Finney, Higgins, Kilts, Groothuis, Korman, Malik, Mark, Parrish, Smith, and Coelho to the Board, thus allowing them to continue to breach their fiduciary duties to Viatris.

146. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statement.

147. Plaintiff, on behalf of Viatris, has no adequate remedy at law.

## COUNT II

### Against the Officer Defendants for Breach of Fiduciary Duty

148. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

54

149. The Officer Defendants owed and owe fiduciary duties to Viatris and its stockholders. By reason of their positions as fiduciaries to the Company, the Officer Defendants owed duties of good faith, loyalty, candor, and truthful disclosure. In addition, the Officer Defendants have specific duties as defined by the Company's corporate governance documents, including its Code of Ethics for the Chief Executive Officer, Chief Financial Officer and Corporate Controller that, had they been discharged in accordance with the Officer Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

150. The Officer Defendants violated these duties by failing to properly oversee the Company's operations at the Indore Facility and by issuing, causing to be issued, or otherwise allowing the material omissions and misrepresentation described herein. Furthermore, given the central nature of Viatris' global production activities, and the significance of the FDA action, the Officer Defendants either knew, or should have known, that the public statements concerning these matters were materially false and misleading.

151. As a direct and proximate result of the Officer Defendants' breaches of their fiduciary obligations, Viatris has sustained significant damages. Accordingly, the Officer Defendants are liable to the Company.

152. Plaintiff, on behalf of Viatris, has no adequate remedy at law.

### COUNT III

**Against the Director Defendants for Breach of Fiduciary Duty**

153. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

154. The Director Defendants owed and owe fiduciary duties to Viatris and its stockholders. By reason of their fiduciary relationships, the Director Defendants specifically owed and owe Viatris the highest obligation of good faith, fair dealing, loyalty, and due care in the

administration of the affairs of the Company, including, without limitation, the oversight of the Company's compliance with applicable laws, regulations, and ethical business practices, as well as the duty of candor and truthful disclosure with respect to their public statements.

155.    In addition, the Director Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including its Corporate Governance Principles, Code of Business Conduct and Ethics, and the charters of the various Board committees, and principles that, had they been discharged in accordance with the Director Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

156.    Further, in breach of his fiduciary duties, Malik engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

157.    Each Director Defendant violated his or her fiduciary duties by consciously causing, or consciously failing to prevent the Company from engaging in, the improper acts complained of herein, including failing to detect and mitigate the issues at the Indore Facility, and permitting the release of materially false and misleading statements that the Director Defendants knew or should have known were false and misleading.

158.    As a direct and proximate result of the Director Defendants' breach of their fiduciary obligations, Viatris has sustained significant damages.  Accordingly, the Director Defendants are liable to the Company.

159.    Plaintiff, on behalf of Viatris, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Waste of Corporate Assets

160.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

56

161.    The wrongful conduct alleged herein was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and on-going harm to the Company.

162.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) paying excessive compensation to certain of its directors and officers; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending Viatris and certain of its officers against the Securities Class Action.

163.    Plaintiff, as a stockholder and representative of Viatris, seeks restitution from the Individual Defendants, and each of them, for their wrongful conduct and fiduciary breaches.

164.    Plaintiff, on behalf of Viatris, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Unjust Enrichment

165.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

166.    By their wrongful acts and omissions, and violations of law, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Viatris.

167.    The Individual Defendants either benefited financially from the improper conduct and their making lucrative insider sales, or received bonuses, stock options, or similar compensation from Viatris that was tied to the performance or artificially inflated valuation of Viatris, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

168.    Plaintiff, as shareholder and representative of Viatris, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits,

including from insider transactions, salaries, benefits, and other compensation obtained by these Individual Defendants, and each of them, from their wrongful conduct and breaches of fiduciary duty.

169.    Plaintiff, on behalf of Viatris, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of Viatris, demands judgment as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Viatris and that Plaintiff is an adequate representative of the Company;

B.    Against all of the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Defendants' breach of fiduciary duties, violations of Section 14(a) of the Exchange Act, waste of corporate assets, and unjust enrichment;

C.    Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Viatris;

D.    Directing Viatris to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Viatris and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.    The Board should require Individual Defendants to account to the Company for all damages sustained, or to be sustained, by the Company by reason of the wrongs and misconduct complained of herein, and should make certain that no Company funds are used towards any settlement or resolution of any litigation related to the wrongful conduct described herein;

58

2.      The Board should terminate, for cause, any Company employee responsible for the wrongdoing discussed herein;

3.      The Board should require Individual Defendants to return to the Company all salaries, bonuses, and the value of other remuneration of whatever kind paid to them during the time they were in breach of their fiduciary duties;

4.      The Board should require Individual Defendants to pay interest, at the highest rate allowable by law, on the amount of damages sustained by the Company as a result of their culpable conduct;

5.      The Board should adopt and implement internal controls and systems at the Company, as well as corporate governance reforms, to ensure that the improper and illegal conduct complained of herein is not permitted to occur in the future;

6.      The Board should place before stockholders for a vote a proposal to permanently split the CEO and Chairman of the Board into separate roles; and

7.      The Board should strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding any unlawful activities, public disclosures, and internal controls.

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' ill-gotten gains or their other assets so as to assure that Plaintiff on behalf of Viatris has an effective remedy;

F.      Awarding to Viatris restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Defendants;

G.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  November 10, 2025

*s/ James M. Ficaro*
JAMES M. FICARO

**THE WEISER LAW FIRM, P.C.**
James M. Ficaro (PA Bar. No. 308198)
200 Barr Harbor Dr., Suite 400
West Conshohocken, PA 19428
Telephone: (610) 225-2677
Facsimile:(610)408-8062
Email: jmf@weiserlawfirm.com

**JOHNSON FISTEL, PLLP**
Michael I. Fistel, Jr.
Mary Ellen Conner
Murray House
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
Facsimile: (619) 363-8326
Email: michaelf@johnsonfistel.com
        maryellenc@johnsonfistel.com

***Counsel for Plaintiff***