UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRANDY A. QUINN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civ. Action No. 2:25-cv-00466-CBB |
| Plaintiff, | ) ) | CLASS ACTION |
| vs. | ) ) ) | |
| VIATRIS INC., SCOTT ANDREW SMITH, THEODORA MISTRAS and CORINNE LE GOFF, | ) ) ) ) | |
| Defendants. | ) ) ) ) | DEMAND FOR JURY TRIAL |

**AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

JURISDICTION AND VENUE ............................................................................................6

PARTIES ...............................................................................................................................6

VIATRIS'S BUSINESS AND REGULATORY CONTEXT ................................................9

    A.    Viatris's Business Operations, Including Its Key Generic Drug
        Lenalidomide ................................................................................................9

    B.    Viatris Must Comply with the FDA's cGMP Regulations to Sell Drugs in
        the United States ........................................................................................12

    C.    Severe, Undisclosed Quality Deficiencies and Violations Plagued the
        Company's Indore Facility During the Class Period .................................18

    D.    Drugs That Are Not Produced in Compliance with cGMP Cannot Be
        Imported into the United States Unless the FDA Grants an Exemption
        Based on a Shortage of the Drug and Therapeutic Equivalents............................32

    E.    There Was No Shortage of Revlimid and Lenalidomide in the United
        States and Therefore Viatris's Lenalidomide Was Ineligible for an
        Exemption from the Import Ban .................................................................35

DEFENDANTS' FALSE AND MISLEADING STATEMENTS ...............................................44

    A.    Defendants' False and Misleading Statements from the Start of the Class
        Period Until the Indore Inspection ...........................................................44

    B.    Defendants' False and Misleading Statements from the Indore Inspection
        Until the Issuance of the Warning Letter ..................................................53

    C.    Defendants' False and Misleading Statements from the Issuance of the
        Warning Letter Until the End of the Class Period ....................................60

THE TRUTH IS REVEALED, CAUSING VIATRIS'S STOCK PRICE TO PLUMMET .........66

LOSS CAUSATION AND ECONOMIC LOSS ..................................................................79

ADDITIONAL SCIENTER ALLEGATIONS......................................................................79

    A.    Reporting of Severe Data-Integrity Violations to Viatris's Global Quality
        Organization in January 2024 and Viatris's Failure to Remediate Those
        Violations...................................................................................................80

B.    Viatris's Reporting Structure for Quality Management, Including Data-Integrity Issues ..........................................................................................81

C.    Viatris's Remediation Efforts, Including Firing Managers, After Receiving the Form 483..............................................................................82

D.    Defendants' Communications with the FDA After Receiving the Form 483.........................................................................................................83

E.    The Warning Letter and FDA Guidance Make Clear that Viatris's Executive Management Were Personally Responsible for Data-Integrity Issues....................................................................................85

F.    Defendants' False and Misleading Statements Concern Viatris's Core Operations .............................................................................................87

G.    Defendants Affirmed Their Knowledge Through Their Public Statements and by Answering Questions from Analysts .........................................87

H.    Defendants Were Aware of the Lenalidomide Market and of Relevant Regulations ........................................................................................88

I.    Additional Facts Supporting Individual Defendants' Scienter ............................88

PRESUMPTION OF RELIANCE AND FRAUD-ON-THE-MARKET ....................................90

NO SAFE HARBOR ..............................................................................................92

CLASS ACTION ALLEGATIONS ...........................................................................93

COUNT I ............................................................................................................95

COUNT II ...........................................................................................................98

PRAYER FOR RELIEF ...........................................................................................99

DEMAND FOR TRIAL BY JURY ............................................................................100

Lead Plaintiffs Steamfitters Local 449 Retirement Security Fund and Susie Hsueh (together, "Lead Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege in this Amended Complaint (the "Complaint") for violations of the federal securities laws the following based upon personal knowledge with respect to themselves and their own acts, and upon information and belief as to all other matters, including the investigation conducted by their counsel, which included, among other things, review and analysis of: (a) filings made by Viatris Inc. ("Viatris" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) Viatris's public documents, conference calls, press releases, and stock price history; (c) securities analysts' reports and advisories concerning the Company; (d) media reports concerning the Company; (e) federal regulations and guidance for the pharmaceutical industry published by the United States Food and Drug Administration ("FDA"); (f) other publicly available information; and (g) consultation with a pharmaceutical industry expert. Lead Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## INTRODUCTION

1.     This is a federal securities class action on behalf of all persons and entities who purchased or otherwise acquired Viatris common stock from February 28, 2024, through February 26, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated under the Exchange Act. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

2.      Viatris is a pharmaceutical manufacturer headquartered in Canonsburg, Pennsylvania.  A major part of Viatris's business is manufacturing and selling generic drugs, which are designed to be the therapeutic equivalent of existing branded drugs.

3.      One of Viatris's most profitable products during the Class Period was lenalidomide, a top-selling cancer drug that is the generic version of a Bristol-Myers Squibb ("Bristol-Myers") patented brand-name drug called Revlimid.  Bristol-Myers' branded version had a substantial majority of the market for Revlimid/lenalidomide during the Class Period, and a number of generic manufacturers in addition to Viatris produced and sold generic versions of the drug during that period.  Because of patent-litigation settlement agreements with Bristol-Myers limiting the volume of lenalidomide each generic company could sell through the end of 2025, lenalidomide had unusually high prices and profit margins for a generic drug.  Viatris launched its version of lenalidomide in 2022 with great fanfare, proclaiming it an important source of the Company's growth and profitability.

4.      As a pharmaceutical company, Viatris is extensively regulated by the FDA.  Viatris must comply with the FDA's stringent regulations concerning current good manufacturing practice ("cGMP"), which regulate physical manufacturing, testing, and packaging of drugs, including recording and maintaining detailed, accurate, and complete data about the manufacturing, testing, and packaging of drugs.  These "data integrity" requirements are an integral part of the cGMP regulations, because without accurate and complete data, it is impossible to determine whether a drug manufacturer's products are safe and effective for patients.

5.      Applicable U.S. law provides that drugs that are not manufactured in compliance with the FDA's cGMP regulations, including the regulations concerning data integrity, are deemed to be "adulterated" and cannot be sold in the United States, absent an exemption.  The FDA grants

exemptions permitting sale of drugs that are not manufactured in compliance with cGMP only rarely, and only for drugs that are in shortage in the U.S. market, taking into account the entire supply of therapeutic equivalents produced by all manufacturers.

6.    Thus, any purported shortage of lenalidomide would have to take into account the supply of both Revlimid from Bristol-Myers and lenalidomide from all generic manufacturers. Given both Bristol-Myers' ability to manufacture and sell branded Revlimid without limitation, and the limited volume of lenalidomide that any one generic company could sell under its settlement agreement with Bristol-Myers, an FDA decision barring the importation of lenalidomide from any particular generic manufacturer, including Viatris, would not create a shortage that could justify an exemption for the sale of a noncompliant drug.

7.    Unbeknownst to investors, Viatris manufactured its lenalidomide at a facility in Indore, India, where there were persistent and serious cGMP violations both before and during the Class Period.  For example, ducts and testing equipment were not properly cleaned, quality-control records were fabricated, and out-of-specification test results were not adequately investigated to determine the reasons for the invalid tests and remediate the problems.

8.    Viatris's senior management learned about the cGMP violations at Indore no later than January 2024, but Defendants neither notified the FDA of the violations, nor investigated and remediated the violations, nor disclosed the violations to investors.  Five months later, in June 2024, the FDA inspected the Indore facility, discovered the violations, and informed Viatris of its findings.  Instead of fully remediating those violations and disclosing them to investors, Defendants undertook what the FDA ultimately determined were "inadequate" corrective measures, and concealed the violations from investors.

9.      Throughout the Class Period, Defendants falsely touted Viatris's robust quality systems and regulatory compliance, despite becoming aware of serious data-integrity violations at the Indore facility no later than January 2024.  Defendants also materially misled investors by asserting that no one product in any particular geography would have a significant impact on the Company's financial results.  While making these misrepresentations, Defendants concealed the serious quality issues and FDA findings affecting lenalidomide and its importation into the United States, which constituted one product in a particular geography the Defendants knew would have a significant adverse effect on the Company's financial results.

10.     In December 2024, six months after the FDA inspection and Defendants' belated initiation of remediation efforts, the FDA issued a warning letter to Viatris and promptly published the letter on the FDA's website.  Defendants were then forced to disclose both the existence of the warning letter and an import alert that prevented Viatris from importing most products from the Indore facility into the United States (the "Warning Letter" and "Import Alert").  But Defendants continued to conceal material information from investors, including that the Indore facility was where Viatris produced lenalidomide, that Viatris's lenalidomide was barred from importation into the United States, and that Viatris had neither received nor was eligible for an exemption for lenalidomide.

11.     After the Warning Letter became public, Defendants misleadingly minimized its impact as merely a "little bit of headwind" for the Company.  They also falsely reassured investors about the impact of the failed Indore inspection by noting that the FDA had granted import-ban exemptions for four products manufactured at Viatris's Indore facility and claiming that Viatris was in "active discussions" with the FDA to get additional exemptions.  When they made those representations, Defendants knew that the FDA grants such exemptions only for drugs that are in

shortage in the United States, that lenalidomide was not in shortage in the United States, that lenalidomide was therefore ineligible for an import-ban exemption, and that the adverse financial impact on Viatris would therefore be significant.  Additionally, at the same time that Defendants concealed that lenalidomide was one of the banned products as a result of the failed inspection at the Indore facility, they misleadingly and selectively disclosed to investors that another drug produced at Indore, for which an exemption was available, was a "key impacted product."

12.    On February 27, 2025, Defendants admitted for the first time that Viatris's lenalidomide was manufactured at the Indore facility, was covered by the FDA's import ban due to serious cGMP violations, and was ineligible for an exemption from the ban.  Defendants also quantified the impact from the Warning Letter and Import Alert on Viatris's 2025 financial results as a $500 million reduction in revenue and a $385 million reduction in adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA," a measure of operating earnings).

13.    Defendants' belated disclosure of these previously misrepresented and omitted facts caused substantial losses for Viatris shareholders.  The price of Viatris's common stock declined dramatically, from a closing market price of $11.24 per share on February 26, 2025, to a closing market price of $9.53 per share on February 27, 2025, a decline of about 15.21% in just one day.

14.    As a result of Defendants' misconduct, Lead Plaintiffs and all others similarly situated acquired Viatris stock at artificially inflated and maintained prices, and suffered damages when the truth was revealed and the Company's stock price plummeted.  This is a suit to recover those damages under the federal securities laws.

## JURISDICTION AND VENUE

15.     The claims asserted in this Complaint arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated under the Exchange Act by the SEC (17 C.F.R. §240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

17.     Venue is proper in this District under §27 of the Exchange Act and 28 U.S.C. §1391(b), as Viatris is headquartered in this District, and a significant portion of its business and the actions that damaged Lead Plaintiffs and the Class occurred within this District.

18.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mail, interstate telephone communications, and the facilities of the NASDAQ Stock Market (the "NASDAQ"), a national securities exchange.

## PARTIES

19.     Lead Plaintiff Steamfitters Local 449 Retirement Security Fund ("Steamfitters"), based in Harmony, Pennsylvania, is a multi-employer retirement plan with more than $600 million in assets under management operated for the benefit of thousands of participants, pensioners, and beneficiaries.  Steamfitters purchased Viatris common stock at artificially inflated prices during the Class Period and suffered damages upon the revelation of Defendants' fraud, as set forth in the certification attached hereto as Exhibit A and the materials previously submitted at ECF Nos. 22-2 and 22-3, which are incorporated by reference in this Complaint.

20.     Lead Plaintiff Susie Hsueh resides in San Francisco, California, holds a master's degree, is employed as an auditor-appraiser, and has nearly 40 years of experience investing in the securities markets.  Ms. Hsueh purchased Viatris common stock at artificially inflated prices

during the Class Period and suffered damages upon the revelation of Defendants' fraud, as set forth

in the certification attached hereto as Exhibit B and the materials previously submitted at ECF

Nos. 22-2 and 22-3, which are incorporated by reference in this Complaint.

21.    On August 1, 2025, the Court appointed Steamfitters and Susie Hsueh as Lead

Plaintiffs.

22.    Defendant Viatris is a Delaware corporation with its principal executive offices

located at 1000 Mylan Boulevard, Canonsburg, Pennsylvania 15317.  During the Class Period, the

Company's common stock traded on the NASDAQ under the symbol "VTRS."

23.    Defendant Scott Andrew Smith ("Smith") was at all relevant times the Chief

Executive Officer ("CEO") and a director of Viatris.  He joined Viatris's board of directors in

December 2022 and became its CEO in April 2023, and has continued in both roles through the

present.  Previously, he served from 2018 to 2023 as President of BioAtla, Inc., a global

biotechnology company focused on the development of antibody therapeutics, and from 2008 to

2018 as an executive of Celgene Corp., a global pharmaceutical company, where he rose from

SVP and Global Head of Immunology, to President of Inflammation and Immunology, to President

and Chief Operating Officer.  According to Viatris's 2024 annual proxy statement, Defendant

Smith has:

> vast global commercial and pharmaceutical expertise and a proven ability to build,
> grow and manage large complex organizations utilizing his substantial experience
> in developing and executing regulatory, clinical, and business development
> strategies as displayed by [his] time at BioAtla, where he built a clinical
> development structure that moved multiple assets from investigational new drug
> applications into late stage clinical development, drove the company's long-term
> strategic operational plan and led all business development activities and, prior to
> that, his time at Celgene where he led the company's oncology, inflammation and
> immunology franchise, commercial operations and clinical development.

24.    Defendant Theodora "Doretta" Mistras ("Mistras") joined Viatris on March 1, 2024

and served as the Company's Chief Financial Officer ("CFO") throughout the remainder of the

relevant time period through the present. Previously, Defendant Mistras was Managing Director, Healthcare Investment Banking at Citigroup Global Markets Inc. from 2019 to December 2023, and before that she was Managing Director, Healthcare Investment Banking at The Goldman Sachs Group, Inc., where she spent over fifteen years in the healthcare investment banking group.

25.    Defendant Corinne Le Goff ("Le Goff"), Pharm. D., joined Viatris on April 15, 2024 and served as the Company's Chief Commercial Officer ("CCO") throughout the remainder of the relevant time period through the present. As CCO, she oversees the Company's global commercial function. Before joining Viatris, Defendant Le Goff served as President, CEO, and Director of Imunon, Inc., a clinical stage biotechnology company, from 2022 until March 2024; as CCO of the pharmaceutical company Moderna, Inc. from 2021 to 2022; in various roles at the pharmaceutical company Amgen Inc. from 2015 to 2021, including President of the U.S. business from 2019 to 2021, Senior Vice President of Global Product Strategy and Commercial Innovation from 2018 to 2019, and President of the Europe Region from 2015 to 2018; and in various positions in the Roche Group, a Swiss multinational healthcare company, including President of Roche's French affiliate from 2012 to 2015. In her LinkedIn profile, Defendant Le Goff wrote:

> My career has been focused on shaping global scientific advancement and medical strategy, while also leading multibillion-dollar global commercial operations at biotech companies dedicated to pursuing groundbreaking science through business-model innovation, digital transformation, strategic development of global R&D pipelines, high-performing teams and organizational improvements.

26.    Defendants Smith, Mistras, and Le Goff are sometimes referred to in this Complaint as the "Individual Defendants." Viatris and the Individual Defendants are referred to collectively in this Complaint as the "Defendants."

27.    The Individual Defendants possessed the power and authority to control the contents of Viatris's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. Each Individual

Defendant was provided with copies of the Company's reports and press releases alleged in this Complaint to be misleading before, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material nonpublic information, each Individual Defendant knew that the adverse facts specified in this Complaint had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made by the Company were then materially false and misleading.

28.     Viatris is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency, as all wrongful acts complained of in this Complaint were carried out within the scope of their employment and with authorization.

29.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Viatris under principles of respondeat superior and agency.

## VIATRIS'S BUSINESS AND REGULATORY CONTEXT

### A.     Viatris's Business Operations, Including Its Key Generic Drug Lenalidomide

30.     Viatris is a global pharmaceutical company that supplies medicines worldwide. Viatris has 26 manufacturing and packaging sites in various countries, including India, where many of its drugs sold throughout the world, including the United States, are made.

31.     Viatris was formed in November 2020 through a merger of Mylan N.V. ("Mylan") and Upjohn Inc., two international pharmaceutical companies.  Mylan's subsidiary Mylan Laboratories Ltd. ("Mylan Laboratories") had a manufacturing and packaging facility in Indore, India, which has continued to operate under the Mylan Laboratories name since becoming part of Viatris.  For convenience, this Complaint refers to both Viatris and its subsidiary Mylan Laboratories as "Viatris," except in quotations that refer to Mylan Laboratories by that name.

32.    One of the products manufactured by Viatris at its Indore facility is lenalidomide, a cancer drug for treating multiple myeloma.  Lenalidomide is the generic version of Bristol-Myers' patented drug Revlimid, which was originally introduced in 2005.  Viatris and a number of other generic drug manufacturers began selling generic lenalidomide in 2022, and by the end of 2023, at least ten companies offered generic versions of lenalidomide.  Revlimid and lenalidomide are therapeutic equivalents.  Together, they are one of the top-selling drugs in the world, with Revlimid sales of approximately $6 billion in 2024, and generic lenalidomide sales of billions of dollars more.  For example, for Medicare Part D, which represents about two-thirds of the Revlimid/lenalidomide market, generic lenalidomide sales in 2023 were approximately $1.7 billion.  Because generic drug manufacturers can only produce limited volumes under agreements with Bristol-Myers, as discussed below (*see* ¶¶96-97), lenalidomide has unusually high margins for a generic drug and was one of Viatris's most profitable products (*see* ¶¶33, 99, 173-174).

33.    Viatris executives commented repeatedly on lenalidomide's importance to the Company, stating repeatedly on investor conference calls after its launch in late 2022 (on May 8, 2023, August 7, 2023, and November 7, 2023) that Viatris's generics portfolio had performed "better than expected" due in large part to sales of lenalidomide.  Reuters reported in May 2023 that Viatris was "staking its future on drugs such as the recently launched plasma cell cancer treatment, lenalidomide," and the Company stated in a quarterly earnings press release that month that it "generated approximately $85 million in new product revenues" for the quarter, "primarily driven by lenalidomide in the U.S. and [was] on track to achieve approximately $500 million in new product revenues in 2023."  On June 13, 2023, a Viatris executive stated on an earnings call that "products like lenalidomide help[] with the gross margin."  This is because, as Viatris has explained in its SEC filings, "periods of limited generic competition," which was the market

situation for lenalidomide in 2025, are when generic drugs "contribute most significantly to revenues and gross margins."

34.    Accordingly, when Viatris began producing lenalidomide, analysts made note of the drug's importance to Viatris's financial results.  For example, on November 7, 2022, a Piper Sandler analyst report called lenalidomide "[o]ne of [Viatris's] key new launches (U.S. in this case)[.]"  Also on November 7, 2022, a Barclays analyst wrote about Viatris: "Generics . . . performed inline with expectations, driven by strong performance in N[orth] A[merica], including the launch of lenalidomide in the U.S."  Another Barclays analyst report the same day noted: "New product revenues - on track to achieve $525M in 2022: Viatris generated ~$144M in new product revenues during 3Q22, driven primarily by lenalidomide [and two other drugs] in the U.S. and remains [on] track to now achieve ~$525M in new product revenues in 2022 with better-than-expected margins."  Barclays repeated substantially the same comment on January 13, 2023.  Then, on May 8, 2023, Barclays wrote: "**VTRS delivered ~$85M in new product revenues [in the first quarter] driven by lenalidomide in the U.S.** and is on track to achieve ~$500M in new product revenues in 2023."[1]  On August 7, 2023, a Barclays analyst report indicated: "VTRS delivered ~$124M in new product revenues [in the second quarter] driven by lenalidomide in the U.S. and is on track to achieve ~$500M in new product revenues in 2023."  A Jefferies analyst report the same day contained substantially the same information.  On November 7, 2023, a Jefferies analyst report said: "Viatris reported $135M in revenue from new product launches in 3Q and $345M YTD, driven primarily by lenalidomide and Breyna in the U.S.  For 2023, the co[mpany] has noted that it expects >$450M in revenue from new product launches for the full year."

---

[1]    Emphasis is added here and in all quotations throughout this Complaint unless otherwise specified.  References to "¶" or "¶¶" refer to paragraphs in this Complaint unless otherwise specified.

35.     Then, during the Class Period, analysts confirmed lenalidomide's continuing importance to Viatris's financial results.  For example, on February 29, 2024, the day after the start of the Class Period, and again in August 2024, Barclays wrote that lenalidomide was one of the "complex products" that was "driv[ing]" Viatris's expected 3% North American generic growth that year.  Similarly, in August 2024, BofA Securities described lenalidomide sales as one of the Company's 2024 generic drug "pipeline tailwinds."

36.     While the market was aware that lenalidomide was important to the Company's financial results, Viatris did not disclose before or during the Class Period exactly how much of its revenue and earnings was derived from lenalidomide.  Only at the end of the Class Period did the Company disclose that the import ban on products manufactured at the Indore facility, including lenalidomide, would cause a $500 million reduction in the Company's 2025 revenues and a $385 million reduction in its 2025 adjusted EBITDA.  The Company further disclosed at the end of the Class Period that lenalidomide represented approximately 40% of this 2025 revenue impact and, due to the drug's favorable margins, approximately 50% of this 2025 adjusted EBITDA impact.

37.     Viatris generally does not publicly disclose which of its drugs are manufactured in particular facilities, and even after the Warning Letter became public, Defendants did not publicly disclose that Viatris's lenalidomide was manufactured and packaged at its Indore facility and that lenalidomide was subject to the import ban until February 27, 2025, the day after the end of the Class Period.

**B.     Viatris Must Comply with the FDA's cGMP Regulations to Sell Drugs in the United States**

38.     Viatris's ability to sell drugs depends on strict compliance with cGMP, including regulations governing the accurate recording of information concerning the manufacturing

process.  The FDA enforces cGMP through regulatory actions that can prevent the importation or sale of drugs in the United States.

39.    Accordingly, ensuring product quality through cGMP compliance is critical to investors in a pharmaceutical company.  For example, in four reports during the Class Period (on July 19, 2024, August 16, 2024, November 15, 2024, and January 22, 2025), Jefferies analysts noted that "top material issues" for Viatris included "Product Quality & Safety," and highlighted the importance of Viatris's methods "to track and assess product quality and safety[.]"

40.    The federal Food, Drug, and Cosmetic Act ("FD&C Act") authorizes the FDA to issue regulations requiring drug manufacturers to comply with cGMP, which establishes minimum requirements to ensure that drugs satisfy the FD&C Act's standards for drug safety, identity, strength, quality, and purity.  *See* 21 U.S.C. §351(a)(2)(B).  The FDA's cGMP requirements applicable to Viatris are contained in 21 C.F.R. Part 210 ("CGMP in Manufacturing, Processing, Packing, or Holding of Drugs; General") and Part 211 ("CGMP for Finished Pharmaceuticals").

41.    Viatris has acknowledged in its Code of Business Conduct and Ethics that "[a]s a pharmaceutical manufacturer, we are governed by current good manufacturing practices," and that adherence to those practices was vital to its business: "Our customers seek our products because they trust that every product we make will be of the highest quality."[2]  According to Viatris's Code of Business Conduct and Ethics, each employee had to periodically acknowledge receipt of the Code, meaning that all of Viatris's employees, including the Individual Defendants, were aware of these requirements.[3]

---

[2]    Available at: https://www.viatris.com/-/media/project/common/viatris/pdf/corporate-governance/the-code-of-business-conduct-and-ethics.pdf.

[3]    *See id.*

42.    One of the critical components of cGMP is "data integrity." According to FDA guidance, "data integrity refers to the completeness, consistency, and accuracy of data."[4] The FDA's data-integrity requirements are designed to ensure that testing data is complete, consistent, accurate, and free from potential manipulation. Because data integrity is critical to ensuring high-quality pharmaceutical manufacturing, cGMP governs the creation, modification, processing, maintenance, archival, retrieval, transmission, and disposition of data, and requires system design and controls to enable the detection of errors, omissions, and aberrant results throughout the manufacturing process.[5]

43.    The FDA has also made clear that "ensuring data integrity is an important component of industry's responsibility to ensure the safety, efficacy, and quality of drugs, and of FDA's ability to protect the public health."[6] This is because the "FDA must have confidence that data [provided to the agency] is a true and reliable representation of drug product quality; breach in [data integrity] erodes/breaks trust."[7] The FDA further states that data integrity problems are "[m]ostly discovered during inspections," and when found, they are often viewed as the "tip of the iceberg," meaning that "all data in submission are in question."[8]

---

[4]    FDA, *Data Integrity and Compliance With Drug CGMP, Questions and Answers, Guidance for Industry*, Dec. 2018 ("*FDA Data Integrity Guidance*"), p. 4, available at: https://www.fda.gov/regulatory-information/search-fda-guidance-documents/data-integrity-and-compliance-drug-cgmp-questions-and-answers.

[5]    *See id.*

[6]    *Id.* at 2.

[7]    FDA, *Change in API Supplier: Drug Product Quality Tips*, p. 17, available at: https://www.fda.gov/media/168954/download.

[8]    *Id.*

44.     Likewise, according to Pharmaceutical Inspection Convention guidelines, data integrity "is a fundamental requirement for an effective Pharmaceutical Quality System which ensures that medicines are of the required quality.  Poor data integrity practices and vulnerabilities undermine the quality of records and evidence, and may ultimately undermine the quality of medicinal products."[9]  Because data integrity is fundamental to drug manufacturing, a data integrity failure could result in risks to patient health.[10]

45.     Specific cGMP violations that the FDA classifies under the heading of data integrity include "testing into compliance" (i.e., repeating a test until a positive result is obtained), deletion or falsification of data, failure to investigate out-of-specification ("OOS") test results, and inadequate controls on data.[11]

46.     The FDA's cGMP regulations concerning data integrity include, but are not limited to, the following sections of 21 C.F.R.:

§211.68 (requiring that "backup data are exact and complete" and "secure from alteration, inadvertent erasures, or loss" and that "output from the computer . . . be checked for accuracy").

§§211.100 and 211.160 (requiring that certain activities be "documented at the time of performance" and that laboratory controls be "scientifically sound").

§211.180 (requiring that records be retained as "original records," "true copies," or other "accurate reproductions of the original records").

---

[9]     Pharmaceutical Inspection Convention, Pharmaceutical Inspection Co-operation Scheme (PIC/S), *Good Practices for Data Management and Integrity in Regulated GMP/GDP Environments*, July 1, 2021, p. 4.  PIC/S is a cooperative arrangement between regulatory authorities in the field of cGMP for medicinal products from all over the world, including the FDA.

[10]    *See id*. at 58.

[11]    FDA, *Change in API Supplier: Drug Product Quality Tips*, p. 17, available at: https://www.fda.gov/media/168954/download.

§§211.188 and 211.194 (requiring "complete information," "complete data derived from all tests," "complete record of all data," and "complete records of all tests performed").

§§211.22, 211.192, and 211.194(a) (requiring that production and control records be "reviewed" and that laboratory records be "reviewed for accuracy, completeness, and compliance with established standards").

§§211.182, 211.186(a), 211.188(b)(11), and 211.194(a)(8) (requiring that records be "checked," "verified," or "reviewed").

47.     The FDA requires that the data maintained by pharmaceutical companies be "attributable, legible, contemporaneously recorded, original or a true copy, and accurate"—criteria that are known as "ALCOA."[12]  Each element of ALCOA is required to ensure compliance with cGMP.[13]

48.     The meaning of each element of ALCOA is elaborated in an article in a pharmaceutical industry journal:

*Attributable:* The identity of the person who created the data must be known from the information generated or gathered which in turn guarantees responsibility. . . . [Any] adjustments must be signed in a review trail.

\*       \*       \*

*Legible:* . . . [A]ll records must be clear and readable to those who are authorized to review them.

\*       \*       \*

*Contemporaneous:* The data must be recorded only at the time of the observation or action.  Delayed documentation can introduce errors or inaccuracies.

\*       \*       \*

---

[12]     *FDA Data Integrity Guidance*, p. 4.

[13]     For "attributable," *see* §§211.101(d), 211.122, 211.186, and 211.188(b)(11); for "legible," *see* §211.180(e); for "contemporaneously recorded" (at the time of performance), *see* §§211.100(b) and 211.160(a); for "original or a true copy," *see* §§211.180 and 211.194(a); and for "accurate," *see* §§211.22(a), 211.68, and 211.188.

*Original:* Data need to be documented in its original format, and any edits or changes need to be acknowledged and explained.

\*    \*    \*

*Accurate:* Data must accurately reflect the reality of what has occurred.  It should be accurate and truthful in reflecting the actual observations or measurements.[14]

49.    When the FDA inspects a company's drug manufacturing facility and finds a cGMP violation, the FDA sends that company's management a Form 483.  A Form 483 is a report that outlines all observations of objectionable conditions that are "clear, specific and significant" at an inspection site.  A Form 483 is not a comprehensive list of every problem or violation observed, and does not include observations of questionable or unknown significance at the time of the inspection, but instead identifies only the most important issues noted by FDA investigators that could cause the manufactured drugs to become "adulterated or rendered injurious to health."[15]

50.    Under federal law, a drug is "deemed adulterated," i.e., its strength, quality, or purity is not as labeled, if "the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with [cGMP]."[16]

51.    Once cGMP violations are identified in a Form 483, the Form 483 is "issued to firm management at the conclusion of an inspection when an investigator(s) has observed any conditions that in their judgment may constitute violations" of the applicable statute and

---

[14]    Divya Gokulakrishnan and Sowmyalakshmi Venkataraman, "Ensuring data integrity: Best practices and strategies in pharmaceutical industry," *Intelligent Pharmacy* 3 (2025), pp. 297-298.

[15]    FDA Form 483 Frequently Asked Questions, available at: https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/fda-form-483-frequently-asked-questions.

[16]    21 U.S.C. § 351(a)(1).

regulations.[17]  Moreover, at the conclusion of the inspection, the cGMP violations identified in a Form 483 are "discussed with the company's senior management" so that "there is a full understanding of what the observations are and what they mean."[18]  Upon receipt of a Form 483, drug manufacturers must take corrective actions to remediate the cGMP violations.

52.    Form 483s are not published by the FDA or readily available to investors. Accordingly, unless and until the FDA takes public official action such as issuing a warning letter, investors must rely on drug manufacturers to accurately disclose material information about cGMP violations that appear in a Form 483.

**C.    Severe, Undisclosed Quality Deficiencies and Violations Plagued the Company's Indore Facility During the Class Period**

53.    There have been severe violations of cGMP at Viatris's Indore facility since at least January 2024, immediately before the start of the Class Period, when Viatris personnel discovered those violations and reported them to senior management at corporate headquarters.  Viatris, however, failed to adequately investigate the reasons for the violations or to correct them.  The FDA later discovered the violations during an inspection of the Indore facility in June 2024 and reported them to Viatris, which only then began a remediation program that the FDA determined was inadequate.  Due to Viatris's failure to correct the serious violations it had been aware of since at least January 2024, the FDA imposed an import ban on most products manufactured at the Indore facility, including lenalidomide, in December 2024.

54.    Quality problems at the Indore facility were persistent.  A previous FDA inspection

---

[17]    FDA Form 483 Frequently Asked Questions, available at: https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/fda-form-483-frequently-asked-questions.

[18]    *Id.*

of that facility in October 2019 resulted in the issuance of a Form 483 that identified multiple violations of cGMP: (i) failure to comprehensively evaluate invalid laboratory investigations and implement adequate corrective actions to prevent recurrences; (ii) failure to thoroughly investigate repeated major complaints concerning tablet defects; (iii) failure to certify operators who visually inspected tablets in the packaging area; (iv) lack of adequate written procedures for visual inspection of tablets; and (v) failure to perform shipping studies for tablets meant for the U.S. market. The FDA classified the 2019 inspection results as "voluntary action indicated" or "VAI," meaning that the FDA found objectionable conditions or practices but decided not to take any administrative or regulatory action at that time because it determined that the Company could voluntarily remedy these deficiencies.[19]

55.    The FDA employs a "risk-based approach" in choosing which facilities to inspect, based on several factors including "the facility's compliance history, including whether it has been inspected in the last four years."[20]  By early 2024, the Indore facility was a likely target for reinspection under these known criteria: it had not been inspected in the past four years, and its history of compliance was poor given the prior Form 483 documenting multiple serious cGMP violations.

56.    Additionally, due to the results of the FDA's prior inspection of the Indore facility in 2019, Defendants knew or reasonably should have known that repeat violations discovered

---

[19]    The 2019 Form 483 was not disclosed by Viatris and is not readily available to the public, but it is summarized in the FDA's Establishment Inspection Report ("EIR") summary of the 2024 inspection that Lead Plaintiffs obtained from the FDA through a Freedom of Information Act ("FOIA") request.

[20]    FDA's    Risk-Based    Approach    to    Inspections,    available    at: https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/ inspection-basics/fdas-risk-based-approach-inspections.

during a subsequent inspection would more likely be classified by the FDA as "official action indicated," or "OAI," meaning that regulatory action in response to the violations is appropriate because the facility is in an unacceptable state of compliance.  As the director of the FDA Center for Drug Evaluation and Research ("CDER") Office of Manufacturing and Quality, Division of Drug Quality, Carmelo Rosa, stated at a September 2022 conference, the decision to classify an inspection as OAI "is based on many elements, including evidence from the inspection, the content of the [company's] 483 response, the history of the firm, the risk to patients from the deficiencies found, and whether the observations include repeats from previous inspections of the facility . . . ."[21]  The FDA found such repeated violations at its next inspection at Indore.

57.    The FDA conducted its next on-site inspection of Viatris's Indore facility from June 14, 2024 to June 26, 2024, and issued a Form 483 inspection report to Viatris on June 26, 2024. The Form 483 was longer than usual (18 pages) and was addressed to Viatris's Head of Operations for India and Africa.  The Form 483 identified six categories of violations of cGMP at Indore, including severe and pervasive data-integrity violations.

58.    First, in the Form 483, the FDA reported Viatris's "failure to thoroughly review any unexplained discrepancy and the failure of a batch or any of its components to meet any of its specifications whether or not the batch has been already distributed."  Specifically, Viatris's "investigations of out-of-specification (OOS) results were inadequate because they lacked scientific rationale for root cause determinations."  In other words, Viatris failed to properly determine the root cause of persistent quality failures and discrepancies at its Indore facility. Instead, without justification, Viatris simply halted or dismissed test results that showed quality

---

[21]    Jerry Chapman, Senior GMP Quality Expert at Redica Systems, "Who Decides if my FDA Inspection is Classified OAI?" (Sept. 29, 2022), available at: https://redica.com/who-decides-if-my-fda-inspection-is-classified-oai/.

problems.  For example, Viatris's "QC [i.e., quality control] Analyst aborted [testing] upon finding OOS and OOT [i.e., out-of-trend] dissolution test results," and "test samples . . . were not analyzed upon finding failing results."[22]  Those tests were then "reperformed . . . without any justification[.]"  Thus, the Form 483 indicated that Viatris was engaging in an improper practice known as "testing into compliance," that is, repeating tests until positive results were obtained.

59.    These investigatory failures constituted serious data-integrity violations of cGMP and violated FDA regulations which mandate that "[a]ny unexplained discrepancy . . . shall be thoroughly investigated" (21 C.F.R. § 211.192).  In addition, Viatris's conduct was inconsistent with the FDA's Data Integrity Guidance, which states that "[i]nvalidating test results to exclude them from quality unit decisions about conformance to a specification requires a valid, documented, scientifically sound justification."[23]  In addition, those guidelines make clear that the "FDA prohibits sampling and testing with the goal of achieving a specific result or to overcome an unacceptable result (e.g., testing different samples until the desired passing result is obtained). This practice, also referred to as *testing into compliance*, is not consistent with [c]GMP[.]"[24]

60.    Second, the Form 483 reported that "[t]he responsibilities and procedures applicable to the quality control unit are not fully followed."  Specifically, Viatris's "Quality Unit

---

[22]    "Out-of-trend" test results are results that deviate from an established pattern or trend, even if they may remain within the predefined specification limits.

[23]    *FDA Data Integrity Guidance*, p. 6; *see also id.* at 6, 11 ("An investigation with documented, scientifically sound justification is necessary for data to be invalidated and not used in determining conformance to specification for a batch[.]").

[24]    *Id.* at 11 (emphasis in original); *see also* FDA, *Investigating Out-of-Specification (OOS) Test Results for Pharmaceutical Production Guidance for Industry* (Dec. 2022), p. 3 ("To be meaningful, the investigation [of OOS test results] should be thorough, timely, unbiased, well-documented, and scientifically sound."); *id.* at 7 (the "strategy of repeated testing until a passing result is obtained, then disregarding the OOS results without scientific justification," known as "'testing into compliance' is unscientific and objectionable under [c]GMP.").

lacks an oversight on the integrity of data pertaining to packaging material testing." For example, Viatris's "**QC Analysts potentially falsified testing data**," including in instances when the "QC Analysts that claimed to have completed the analysis were not present in the firm to conduct [the relevant tests]." Moreover, on January 16, 2024, Viatris's quality control analysts claimed to have conducted tests even though all the relevant samples "were lost and none of it could be found," and "it appeared that [Viatris's] Analysts potentially completed the raw data worksheet for the referenced batches . . . by simply writing 'Complies' followed by sign[ature] and date."

61.     These failures constituted serious data-integrity violations of cGMP and violated 21 C.F.R. § 211.194, which specifies the information that must be included in a drug manufacturer's records, and 21 C.F.R. § 211.22, which sets out the responsibilities of a drug manufacturer's quality control unit. Moreover, the completion of quality-control data worksheets by personnel who were not present for the testing was inconsistent with the FDA's guidance that forms such as worksheets "should be controlled by the quality unit or by another document control method," and that any "[i]ncomplete or erroneous forms should be kept as part of the permanent record along with written justification for their replacement[.]"[25]

62.     The Form 483 also identified four other serious cGMP violations: (i) failure to clean "[e]quipment and utensils . . . at appropriate intervals" to prevent contamination "that would alter the safety, identity, strength, quality, or purity of the drug product"; (ii) inadequate laboratory controls to test "components, in-process materials and drug products" to ensure their conformance with "appropriate standards of identity, strength, quality, and purity"; (iii) inadequate controls over computers to ensure that only authorized personnel could change "master production and control records or other records"; and (iv) failure to determine "[a]ctual yield and percentages of

---

[25]     *FDA Data Integrity Guidance*, p. 7.

theoretical yield . . . at the conclusion of each appropriate phase of manufacturing and processing of the drug product."

63.    As a result of these deficiencies, Viatris was not in compliance with cGMP and violated numerous regulatory requirements.  The failure to clean equipment and utensils violated 21 C.F.R. § 211.67, which requires that "[e]quipment and utensils shall be cleaned, maintained, and, as appropriate for the nature of the drug, sanitized and/or sterilized at appropriate intervals to prevent malfunctions or contamination that would alter the safety, identity, strength, quality, or purity of the drug product beyond the official or other established requirements."  Viatris's inadequate laboratory controls and inadequate controls over computers violated 21 C.F.R. § 211.160, which requires the establishment of sufficient laboratory controls.  Finally, Viatris's failure to determine actual yield and percentages of theoretical yield at the conclusion of each phase of manufacturing violated 21 C.F.R. § 211.103, which provides that "[a]ctual yields and percentages of theoretical yield shall be determined at the conclusion of each appropriate phase of manufacturing, processing, packaging, or holding of the drug product."

64.    In response to the Form 483, Viatris responded in writing to the FDA on July 18, 2024, but Viatris did not publicly disclose the existence of the Form 483 or its response.

65.    On August 20, 2024, the FDA's Division of Foreign Pharmaceutical Quality Inspections ("DFPQI") made an initial decision that the Indore inspection should be classified as OAI, meaning that further regulatory action was indicated to correct serious cGMP violations that the Company could not be relied upon to correct voluntarily, according to the FDA's Establishment Inspection Report ("EIR") summary for the June 2024 Indore inspection.[26]  Then, on October 18,

---

[26]    Lead Plaintiffs obtained a redacted copy of the EIR summary, which is not publicly available, from the FDA through a FOIA request.

2024, the DFPQI made a final decision that the Indore inspection should be classified as OAI, according to the EIR summary. A warning letter, import alert, or other adverse regulatory action occurs more than 75% of the time when an FDA inspection is classified as OAI.[27]

66.    Between June and December 2024, Viatris and the FDA engaged in an extensive dialogue concerning the cGMP violations and Viatris's corrective efforts. This is clear based on FDA practice and Defendants' own statements. For example, Francis Godwin, Director of the FDA CDER Office of Manufacturing Quality, said at a conference in September 2022 that "**we are letting firms know the OAI status before the regulatory action is taken**," and that even when the EIR itself cannot be shared, nonetheless the company "**will be told [it is] OAI[.]**"[28] Accordingly, when the Warning Letter was later made public, Viatris emphasized in a press release that the Company had "been in regular communication with FDA during this process[.]" As detailed below at ¶¶207-213, there is a strong basis to infer that, during those discussions, the FDA informed Viatris that the Company's corrective efforts were inadequate and that the FDA was going to take official action.

67.    Then, on December 19, 2024, the FDA issued the Warning Letter, which explained that the two data-integrity violations identified in the June 2024 Form 483 (*see* ¶¶58-61) had not been corrected. As a result, the FDA determined that Viatris was engaged in "**significant violations of Current Good Manufacturing Practice (CGMP) regulations** for finished pharmaceuticals."

---

[27]    *75% Get FDA Action After an OAI*, PHARMALLIANCE CONSULTING LTD. (June 6, 2025), available at: https://www.pharmalliance.ie/post/oai-to-compliance-action?srsltid=AfmBOopv5a7DsNhHcBCVBuOCxNpo4dNmTtbHamaG0bITjltwhEi414zc.

[28]    Jerry Chapman, Senior GMP Quality Expert at Redica Systems, "Where is My EIR?" (Sept. 20, 2022), available at: https://redica.com/where-is-my-eir.

68.     The December 2024 Warning Letter was addressed to Viatris's CEO, Defendant Smith, rather than the Indore site manager or a quality-management executive.  In addition, as detailed below, the Warning Letter demanded Company-wide corrective actions, not just corrective actions at the Indore facility.  These facts indicate that the FDA regarded Viatris's data-integrity violations as being particularly severe.

69.     First, in the Warning Letter, the FDA described Viatris's inadequate investigation of out-of-specification test results that had been identified in the June 2024 Form 483 (*see* ¶58):

> **Your firm failed to thoroughly investigate any unexplained discrepancy or failure of a batch or any of its components to meet any of its specifications, whether or not the batch has already been distributed (21 CFR 211.192).**
>
> Your investigations into discrepancies and out-of-specification (OOS) results lacked adequate scientific rationale to support root cause determinations. Specifically,
>
> A.  [Redacted] mg tablets, batches [redacted] and [redacted], exhibited OOS and out-of-trend (OOT) results during the dissolution test by high-performance liquid chromatography (HPLC) at the 18-month and 3-month long-term stability time points, respectively.  The analyst, after consulting their supervisor, aborted the HPLC sample set sequence without providing adequate justification.  You also lacked evidence to substantiate the root cause of improper [redacted] of [redacted].
>
> B.  You invalidated OOT assay results and during retest subsequently dismissed an anomalous content uniformity result for [redacted] mg Capsules, batch [redacted], attributing the original issue to HPLC column leakage.  However, the equipment's audit trail did not document such an error, and you conducted retesting using different samples and equipment.[29]

70.     The Warning Letter then explained why Viatris's response to the FDA's identification of this violation in the Form 483 was inadequate:

> In your response, you acknowledge your inadequate laboratory investigations and data handling practices.  Additionally, you commit to perform an extended

---

[29]     Emphasis in original.  The noted redactions in this paragraph and in ¶72 are redactions by the FDA in the publicly available version of the Warning Letter.

evaluation across the rest of the laboratory to evaluate your laboratory practices and controls.

Your response is inadequate.  The conclusions of your OOS investigations lack the necessary rigor and scope to thoroughly identify root causes, assess the extent of deviations, and evaluate their impact on drug products.  You repeatedly accepted these conclusions, despite insufficient justification.

71.     In light of Viatris's "inadequate" response, the FDA demanded extensive further corrective measures, including: "[a] retrospective, independent review of all invalidated OOS . . . results for U.S. products for the last 3 years"; "[a] comprehensive review and remediation plan for [Viatris's] OOS result investigation systems"; "[a] comprehensive, independent assessment of **[Viatris's] overall system** for investigating deviations, discrepancies, complaints, OOS results, and failures," with "a detailed action plan to remediate this system"; "[a]n independent assessment and remediation plan for [Viatris's] CAPA [i.e., corrective and preventative actions] program"; and "[a] comprehensive, independent assessment of [Viatris's] laboratory practices, procedures, methods, equipment, documentation, and analyst competencies," with "a detailed plan to remediate and evaluate the effectiveness of [Viatris's] laboratory system."  The reference to "Viatris's overall system" makes clear that these required remediations were not limited to the Indore facility.

72.     Second, in the December 2024 Warning Letter, the FDA described the data falsification that had been identified in the Form 483 (*see* ¶60):

> **Your firm failed to establish adequate written responsibilities and procedures applicable to the quality control unit and to follow written procedures applicable to the quality control unit (21 CFR 211.22(d)).**
>
> You failed to ensure the reliability and integrity of quality control data during component release testing at your facility.  Our investigators identified anomalies in four worksheets that reported passing results for [redaction] identification testing by chemical analysis.
>
> Biometric access records documented that the responsible analysts were not physically present at the facility during testing.  Despite their absence, they

documented both the testing process and results as if they had conducted the analyses.

Data integrity is critical throughout the CGMP data life cycle, including in the creation, modification, processing, maintenance, archival, retrieval, transmission, and disposition of data after the record's retention period ends.

In your response, you ". . . confirmed that certain test data generated in the Packaging Material Laboratory were not reliable . . ." and ". . . determined that attendance records did not support that the analyst was present to complete the testing for which they signed."[30]

73.    With respect to these data-falsification violations of cGMP, the Warning Letter noted that after the FDA's inspection, Viatris had dismissed five senior managers at the Indore facility: the Site Head of Quality, Head of Quality Control, Head of Quality Assurance, Head of Investigations, and Manager responsible for the packaging materials laboratory.

74.    However, the Warning Letter stated that Viatris's response concerning these violations, like its response concerning the inadequate investigation of OOS and OOT test results, was "inadequate," because it "fail[ed] to provide sufficient details regarding the extent of the identified data integrity issues, and the thoroughness of [Viatris's] proposed corrective and preventive actions (CAPAs) is unclear."

75.    The Warning Letter further made clear that senior management at Viatris's corporate headquarters, including Defendant Smith (*see* ¶224), knew that the Indore facility had serious data-integrity deficiencies no later than January 2024.  The Warning Letter states: "In subsequent communications following the [June 2024] inspection, you disclosed that **both your site and global quality organization became aware of the data integrity issues related to component testing in January 2024.  FDA is concerned that you did not adequately investigate or begin to implement holistic corrective actions until after the subsequent FDA**

---

[30]    Emphasis and quotation marks in original.

**inspection**."  Viatris's "global quality organization" is based at the Company's corporate headquarters in Pennsylvania and is led by the Chief Quality Officer, who reports directly to Defendant Smith.

76.    Viatris's failure to adequately investigate or correct these data integrity issues after the Company's global quality organization became aware of them no later than January 2024 is inconsistent with FDA guidance that "suspected or known falsification or alteration of records . . . must be fully investigated under the [c]GMP quality system to determine the effect of the event on patient safety, product quality, and data reliability; to determine the root cause; and to ensure the necessary corrective actions are taken."[31]  That failure is also inconsistent with FDA guidance that drug manufacturers should "effectively remediate[] problems by investigating to determine the problem's scope and root causes, conducting a scientifically sound risk assessment of its potential effects (including impact on data used to support submissions to FDA), and implementing a management strategy, including a global corrective action plan that addresses the root causes."[32]

77.    In light of Viatris's inadequate response, the Warning Letter demanded extensive additional corrective and preventative actions, including "[a] complete assessment of documentation systems used throughout [Viatris's] manufacturing and laboratory operations to determine where documentation practices are insufficient"; "[a] comprehensive investigation into the extent of the inaccuracies in data records and reporting"; "[a] current risk assessment of the potential effects of the observed failures on the quality of [Viatris's] drugs," including "risks to patients caused by the release of drugs affected by a lapse of data integrity"; and "[a] management strategy for [Viatris] that includes the details of [Viatris's] **global** CAPA plan."  The reference to

---

[31]    *FDA Data Integrity Guidance*, p. 12.

[32]    *Id.* at 12-13.

Viatris's "global CAPA plan" makes clear that the FDA was demanding Company-wide remediation, not only remediation at the Indore facility.

78.     The Warning Letter concluded: "Because your methods, facilities, or controls for manufacturing, processing, packing, or holding do not conform to CGMP, **[Viatris's] drug products are adulterated** within the meaning of section 501(a)(2)(B) of the Federal Food, Drug, and Cosmetic Act (FD&C Act), 21 U.S.C. 351(a)(2)(B)."  The Warning Letter also concluded that "[s]ignificant findings in this letter demonstrate that **[Viatris] does not operate an effective quality system in accord with CGMP,**" and that Viatris's "**quality system does not adequately ensure the accuracy and integrity of data to support the safety, effectiveness, and quality of the drugs [Viatris] manufacture[s].**"

79.     The Warning Letter also noted that "[t]he violations cited in this letter are not intended to be an all-inclusive list of violations that exist at [Viatris's] facility."  In addition, the Warning Letter indicated that, on December 19, 2024, the FDA imposed an import ban on products manufactured at Viatris's Indore facility, but it did not indicate which specific drugs were affected.

80.     The Warning Letter further concluded that Viatris "does not operate an effective quality control system in accord with CGMP" and that "[e]xecutive management should immediately and comprehensively assess [Viatris's] **global manufacturing operations** to ensure that [Viatris's] systems, processes, and products conform to FDA requirements."  Again, the demand for a "global" assessment makes clear that the FDA was demanding Company-wide corrective action, not limited to the Indore facility.

81.     The Warning Letter also "strongly recommend[ed]" that Viatris engage a qualified consultant to assist the Company in meeting cGMP requirements, which indicates that the FDA did not trust Viatris to meet those requirements on its own.

82.     Finally, the Warning Letter demanded that Viatris "conduct a review of all quality assurance program audits and inspections within the last five years at **all Viatris, Inc. facilities**" and provide a written certification signed by Viatris's CEO confirming that the Company had conducted that audit and taken all corrective actions identified by the audit, or providing the schedule for completion of those corrective actions.  This once again demonstrates the seriousness of Viatris's cGMP violations and the FDA's determination that the Company's response required executive-level attention and could not be limited to the Indore facility.

83.     The Warning Letter's numerous references to "data integrity" make clear that the FDA viewed Viatris's violations as particularly egregious.  According to an industry source, most warning letters that include data-integrity violations can only be identified as such by analyzing the FDA's findings, together with the references to specific regulations.[33]  "In fact, **it is rare for FDA to specifically use the phrase 'data integrity' in a Warning Letter, unless the violations were 'those rare ones where it is so egregious that FDA is pointing to its data integrity guidance**.'"[34]  Here, the Warning Letter uses the phrase "data integrity" **19 times** (not counting instances when that phrase appears in a link to a website) and specifically cites the FDA's Data Integrity Guidance.  This is a strong indication that Viatris's data-integrity violations were highly problematic.

---

[33]     Redica Systems, "What Can Regulatory Data Tell Us About Data Integrity Trends" (Aug. 31, 2021), available at: https://redica.com/what-can-regulatory-data-tell-us-about-data-integrity-trends (quoting Jerry Chapman, Senior GMP Quality Expert).  According to his corporate biography, Mr. Chapman has "over 40 years' experience in the pharma industry, including 31 years at Eli Lilly, where he worked in product development, biosynthetic human insulin manufacturing, and site and corporate quality.  He designed and implemented a comprehensive GMP Intelligence process to identify, analyze, and archive pertinent drug GMP regulations, inspection findings, trends, and best practices in the U.S. and internationally."

[34]     *Id.*

84.     At Lead Counsel's request, pharmaceutical industry expert Todd Clark reviewed the Form 483, the Warning Letter, and other related materials, including the data and information identified in this Complaint.  Mr. Clark has an MBA from the J.L. Kellogg Graduate School of Management of Northwestern University and an MS in Regulatory Science: Drug Development and Regulation from Johns Hopkins University.  He has more than 30 years of professional experience in the pharmaceutical industry and is the author of numerous articles and two handbooks about the pharmaceutical industry, including GenericHandbook®, a comprehensive reference guide to the marketing, intellectual property, legal, regulatory, and competitive aspects of the generic drug sector in the United States.  Mr. Clark is also the founder and president of VOI Consulting, Inc., a pharmaceutical-industry consulting firm.  Since founding VOI Consulting in 1998, he has acted as a consultant for leading branded and generic drug companies, as well as private equity and venture capitalists, marketing communications agencies, and law firms, advising them on global strategies regarding regulatory compliance, sourcing of active pharmaceutical ingredients and finished drugs, commercialization of brand and generic drugs, distribution, and many other aspects of the pharmaceutical business.  Mr. Clark is an expert in pharmaceutical industry practices and regulatory compliance.

85.     In Mr. Clark's expert opinion, the length of the Form 483, the fact that it was addressed to a senior executive (Viatris's Head of Operations for India and Africa), and the fact that it concerned data integrity problems, indicate that an OAI classification and enforcement action were likely to follow the inspection at Indore.  Further, in Mr. Clark's expert opinion, the Warning Letter's demand for Company-wide corrective actions, and the fact that the letter was addressed to Viatris's CEO rather than the site manager or a quality-management executive, indicate that the FDA regarded Viatris's data-integrity violations as especially severe.

D.    **Drugs That Are Not Produced in Compliance with cGMP Cannot Be Imported into the United States Unless the FDA Grants an Exemption Based on a Shortage of the Drug and Therapeutic Equivalents**

86.    Viatris's violations of cGMP at its Indore facility posed a serious threat to the Company's financial results, because that facility produced the high-margin drug lenalidomide and other products that were sold in large volumes in the United States but would be barred from importation into the United States if the FDA discovered Viatris's cGMP violations.

87.    As discussed in ¶50, the FD&C Act provides that a drug is "deemed to be adulterated" if it is not produced in compliance with cGMP "to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess." 21 U.S.C. §351(a)(1). The FD&C Act further provides that if a drug sought to be imported is "adulterated," it "shall be refused admission" into the United States. 21 U.S.C. §381(a).

88.    Accordingly, drugs manufactured outside the United States where the manufacturing process did not comply with cGMP, including cGMP's data-integrity requirements, are deemed adulterated and may not be imported. The FDA Regulatory Procedures Manual therefore states: "Establishment inspections of foreign manufacturers of FDA regulated products that reveal significant deviations from GMPs . . . that result in the articles manufactured at such facilities appearing to be . . . adulterated, or otherwise in violation of the FD&C Act as described in Section 801(a) [21 U.S.C. §351(a)] **should result** in the recommendation of DWPE of the articles offered for import from such manufacturer."[35] DWPE stands for "detention without physical examination" and means that all of the designated product is conclusively presumed to be adulterated, such that none of the designated product may be imported into the United States,

---

[35]    FDA Regulatory Procedures Manual, Section 9-8-12, p. 42.

without the FDA having to test or examine every individual shipment. DWPE remains in effect until the FDA is satisfied that the violation has been resolved, usually through a follow-up inspection.[36] As a practical matter, unless an exemption is granted, importation of a product into the United States is not possible when there is a DWPE finding.[37]

89.     The FDA can grant an exemption from this import prohibition for a particular drug if there is a shortage in the total supply of the drug and its therapeutic equivalents. The Manual of Policies and Procedures of the FDA's Center for Drug Evaluation and Research establishes criteria that the FDA's Drug Shortage Staff ("DSS") uses to determine whether there is a shortage that would justify such an exemption:

The DSS will consider that a product is in shortage if **all** of the following exist:

1.  The national supply available for product within the U.S. is not adequate.

2.  The manufacturer of the product **and those making therapeutic equivalent products** and therapeutic alternative products, if relevant, are not able to meet demand or to increase production to cover the shortfall.

3.  There is notice from the public or practitioners about the lack of product available in the market.[38]

90.     In order to determine whether there is a shortage, the DSS assesses demand for the drug and therapeutic equivalents, conducts market research, and contacts manufacturers regarding current and projected inventory, as well as the ability to provide additional supply if needed.[39]

---

[36]     FDA        Import        Alert        66-40,        available        at: https://www.accessdata.fda.gov/cms_ia/importalert_189.html.

[37]     *See* FDA Import Alerts, available at: https://www.fda.gov/industry/actions-enforcement/import-alerts.

[38]     FDA Center for Drug Evaluation and Research, Manual of Policies and Procedures, p. 11.

[39]     *See id.* at 10-11.

91.     Additionally, this FDA manual states that DSS "focuses on shortages of medically necessary products that have a significant effect on public health" and adds: "Patient convenience alone is an insufficient reason to classify a drug product as medically necessary."[40]

92.     Similarly, a 2011 FDA report entitled "A Review of FDA's Approach to Medical Product Shortages" states that the FDA defines a "drug shortage" as "a situation in which the total supply of all clinically interchangeable versions of an FDA-regulated drug is inadequate to meet the current or projected demand at the patient level."[41]  Additionally, a 2016 FDA presentation entitled "Preventing and Mitigating Drug Shortages – FDA's and Manufacturers' Roles" states that regulatory discretion to allow the manufacture of medically necessary products to continue is "best suited" for "[m]inor, low risk issues," and that "temporary importation from unapproved sources" is reserved for "rare cases."[42]

93.     Exemptions from FDA import bans are not typically granted.  To illustrate, the FDA's Import Alert of drugs subject to DWPE as of June 5, 2025, designated as Import Alert 66-40 and known as the "Red List," contains the import bar resulting from the Indore inspection, as well as 148 discrete import bars resulting from other inspections from 2020 to 2024.  Apart from the Indore facility, only five other facilities (3.4%) were granted exemptions for some of the drugs they manufactured.[43]

---

[40]     *Id.* at 15-16.

[41]     FDA, "A Review of FDA's Approach to Medical Product Shortages," p. 8, available at: https://www.ipqpubs.com/wp-content/uploads/2012/02/FDA_drug_shortages_report.pdf.

[42]     FDA, "Preventing and Mitigating Drug Shortages – FDA's and Manufacturers' Roles," pp. 21, 24-25, available at: https://www.afdo.org/wp-content/uploads/2020/08/afdo_pittsburgh_fda-drug_shortages_june_2016_ppt.pdf.

[43]     *See*     FDA     Import     Alert     66-40,     available     at: https://www.accessdata.fda.gov/cms_ia/importalert_189.html.  The published Red List identifies

94.     Thus, the undisclosed violations of cGMP at Viatris's Indore facility made the drugs manufactured there, including lenalidomide, adulterated and subject to a prohibition on importation into the United States.  Under the relevant FDA policies, an exemption from such an import ban would only be granted if there were a shortage and a "clinically interchangeable" drug were not available.  *See* ¶92.  As detailed below, there was no such shortage, and thus there was no realistic prospect that an exemption to the import ban for Viatris's lenalidomide would be granted.

**E.    There Was No Shortage of Revlimid and Lenalidomide in the United States and Therefore Viatris's Lenalidomide Was Ineligible for an Exemption from the Import Ban**

95.     The relevant FDA policies set out above provide that exemptions from import bans are only available for drugs that are in shortage in the U.S. market, including any therapeutic equivalents.  There was no such shortage of lenalidomide in the United States during the Class Period, nor was there any reason to believe that an import bar on Viatris's lenalidomide would create such a shortage, and thus there was no realistic basis to expect that an exemption would be granted.  This is demonstrated by (1) Viatris's limited share of the total Revlimid/lenalidomide market, (2) Bristol-Myers' ability to supply unlimited amounts of the therapeutic equivalent branded drug Revlimid, and (3) multiple companies other than Viatris that also manufactured generic lenalidomide.  Publicly available data from the American Society of Health-System Pharmacists ("ASHP"), the FDA, and Medicare confirms that there was no shortage of lenalidomide.

---

facilities whose products are barred from importation into the United States, but it does not identify the products that are barred.  Rather, it only identifies products for which the FDA grants exemptions from the import bar.  Thus, the publication of the Red List identifying the Indore facility did not inform the market that Viatris's lenalidomide was barred from importation.

96.    Revlimid was originally developed by Celgene Corporation, which was acquired by Bristol-Myers in 2019.  First Celgene and then Bristol-Myers aggressively enforced their patents on Revlimid to delay and limit generic competition, which began only in 2022.  In particular, Celgene and Bristol-Myers entered into patent-litigation settlements with numerous generic drug makers – including Viatris, as well as Alvogen, Apotex, Camber, Cipla, Dr. Reddy's, Sun Pharma, and Teva – under which each of these generic manufacturers is permitted to produce limited amounts of lenalidomide until January 2026.[44]  At that time, the settlement agreements are expected to expire, the market is expected to open for unlimited generic production of lenalidomide, and the production of that drug will become far less profitable.

97.    Under these settlements, each of the generic manufacturers is permitted to produce an undisclosed amount of lenalidomide that is (according to published reports) equivalent to a single-digit percentage of the total market for the drug.  Even after generic lenalidomide entered the market, Bristol-Myers continued to produce a majority of the total amount of the drug—as much as 80%, according to a published report.[45]

98.    Medicare Part D and Medicaid data confirm that Bristol-Myers retained a majority of the total market for Revlimid and lenalidomide.  For Medicare Part D, which accounts for approximately two-thirds of total Revlimid/lenalidomide sales in the United States, Bristol-Myers had 64% of the market by units in 2023, the last year for which these data are available.  For Medicaid patients, Bristol-Myers had 68% of the market by units in 2023 and 57% in 2024.

---

[44]    Specifically, some reports indicate that these settlements will expire on January 31, 2026.

[45]    Leah Lawrence, "Why Are Generic Cancer Drugs Out of Reach for Many Patients?" *Blood Cancers Today* (January 4, 2024), available at: https://www.bloodcancerstoday.com/post/why-are-generic-cancer-drugs-out-of-reach-for-many-patients (quoting S. Vincent Rajkumar, MD, the Edward W. and Betty Knight Scripps Professor of Medicine at the Mayo Clinic in Rochester, Minnesota).

99.    Because the amount of the drug that each generic company could manufacture and sell was significantly limited until January 2026 by its agreement with Bristol-Myers, the generic companies did not have to compete aggressively with each other or Bristol-Myers on price, and generic lenalidomide was more profitable to manufacture than typical generic drugs.  While Revlimid sold for $840 per unit prior to generic entry into the market, it sold for $878 per unit in 2023, so Bristol-Myers had every incentive to continue manufacturing the drug even after losing exclusivity.  The average generic lenalidomide price in 2023 was $690, only 21% less than the branded price, so generic drug makers were strongly incentivized to produce lenalidomide as well.

100.    Bristol-Myers' large share of the total market for lenalidomide with its branded drug Revlimid, which it is free to manufacture in unlimited quantities, together with the large number of manufacturers producing generic versions, ensured that lenalidomide was readily available on the market.  When patients already taking generic lenalidomide from a particular manufacturer were unable to obtain more of that specific product because the manufacturer hit its limit under its settlement agreement with Bristol-Myers, patients would routinely switch to therapeutically equivalent Revlimid, according to a published report.[46]

101.    The FDA maintains a publicly available list of current and resolved drug shortages. Neither Revlimid nor lenalidomide appears on that list.  This confirms that despite temporary shortages of particular lenalidomide products from particular manufacturers, as discussed below, there was never a shortage of Revlimid or lenalidomide as defined by the FDA.

---

[46]    *Id.*

102.    The ASHP also maintains drug shortage data.  Because the ASHP database tracks "all formulations and dosage sizes" for every drug, it "frequently lists more shortages than FDA."[47] For the FDA, a shortage occurs when "[m]anufacturers cannot meet current market demand for the drug," and the shortage is resolved when "**[o]ne or more manufacturers** are in production and able to meet full market demand," while for the ASHP, a shortage is resolved when "**[a]ll manufacturers** of the drug restore **all formulations and dosage sizes** to full availability."[48]  Thus, the fact that certain drug formulations from certain manufacturers may appear on the ASHP shortage list does not indicate that a drug and its therapeutic equivalents are in shortage under the FDA's definition, and it does not indicate that an exemption to an import bar could be granted.

103.    In any event, the ASHP data shows that Revlimid and generic lenalidomide were widely available.  According to the ASHP database, none of the Revlimid products manufactured by Bristol-Myers (which differ by number of pills per bottle and strength of pills) were on the shortage list, and they were all listed as "available products" on all dates for which data is available in 2024 and 2025.  Likewise, generic lenalidomide was widely available in the same dosages and pill count per bottle as Revlimid, from both Viatris and other manufacturers.  The ASHP data indicates that generic lenalidomide products made by various manufacturers, including Viatris, were generally not in shortage, even when certain generic manufacturers' individual lenalidomide products were temporarily in shortage.[49]

---

[47]    https://www.ashp.org/drug-shortages/current-shortages/fda-and-ashp-shortage-parameters?loginreturnUrl=SSOCheckOnly.

[48]    *Id.*

[49]    Seven generic manufacturers of lenalidomide are listed in the ASHP data.  In all, thirteen generic manufacturers have received FDA approval to produce lenalidomide, but not all are

104.    There were no shortages of any lenalidomide products in the ASHP data before January 2024.  Then, on January 11, 2024, ASHP data shows no shortage of any of the six Revlimid products on the market at that time, no shortage of any of Viatris's 12 lenalidomide products, and no shortage of at least five other generic lenalidomide products from other manufacturers.[50]

105.    ASHP data from February 13, 2024, shows no shortage of any of the 12 Revlimid products on the market at that time, no shortage of any of Viatris's 12 lenalidomide products, and no shortage of at least 11 other generic lenalidomide products from other manufacturers.

106.    ASHP data from May 12, 2024, shortly before the FDA's inspection at Indore, shows no shortage of any of the 12 Revlimid products, no shortage of any of Viatris's 12 lenalidomide products, and no shortage of at least 17 other generic lenalidomide products from other manufacturers.

107.    ASHP data from January 15, 2025, shortly after the Warning Letter, shows no shortage of any of the 12 Revlimid products, no shortage of any of Viatris's 12 lenalidomide products, and no shortage of at least ten other generic lenalidomide products from other manufacturers.

108.    Likewise, ASHP data from March 5, 2025, shows no shortage of any of the 12 Revlimid products, no shortage of any of Viatris's 12 lenalidomide products (which presumably were imported before the ban), and no shortage of at least 11 other generic lenalidomide products from other manufacturers.

---

included in the ASHP data.  For example, the ASHP data does not include generic manufacturer Dr. Reddy's, which had over 5% of the Medicare Part D market for lenalidomide in 2023.

[50]    At that time, the ASHP data was incomplete, because availability information for generic lenalidomide produced by Cipla and Teva had not yet been received by ASHP.

109.    ASHP data from May 16, 2025, is similar, with no shortage of any of the 12 Revlimid products, and no shortage of at least 17 non-Viatris generic lenalidomide products. While Viatris's 25 mg / 21 count and 5 mg / 28 count lenalidomide products were in shortage (at a time when Viatris had been barred from shipping lenalidomide to the United States for five months), ten other Viatris lenalidomide products (which presumably were imported before the ban) were not in shortage.  Moreover, the same 25 mg / 21 count and 5 mg / 28 count products that were then in shortage from Viatris were available as generic lenalidomide from at least three other manufacturers at that time, and those same products by strength and pill count were available in the therapeutically equivalent form of Revlimid as well.

110.    Finally, as of August 4, 2025, ASHP data shows that all 12 Revlimid products were available and that 21 generic lenalidomide products were available, even with 11 of Viatris's 12 generic lenalidomide products then in shortage due to the import ban that had been in effect for months.  Each of those Viatris lenalidomide products' dosages and pill counts were readily available in the therapeutically equivalent form of Revlimid, and most were also available as generic lenalidomide from other manufacturers.[51]

111.    Thus, the consistent availability of Revlimid from Bristol-Myers, and the presence of multiple manufacturers of generic lenalidomide, demonstrates that the loss of one generic manufacturer, including Viatris, would not cause a Revlimid/lenalidomide shortage overall.  While the limitation of each generic manufacturer to a single digit percentage of total market volume meant that there were sometimes shortages of specific generic lenalidomide products from specific

---

[51]    For each of the specific Viatris lenalidomide products not available as generic lenalidomide from another company, patients could have been prescribed either (1) the same product by dosage and pill count in the readily available, therapeutically equivalent form of Revlimid, or (2) generic lenalidomide that was available in the same strength, with a different number of pills per bottle, from other generic drug manufacturers.

manufacturers, it also meant that the impact of the loss of any one of those generic manufacturers on the general availability of Revlimid/lenalidomide was necessarily limited. Further, any patient inconvenience associated with paying a somewhat higher price for the brand-name drug, having to switch prescriptions to a therapeutically equivalent drug, or having to buy a product with a different number of otherwise-identical pills per bottle, would not justify an exemption from the import ban under the relevant regulations. In this context, there was no reasonable prospect that Viatris's lenalidomide would be eligible for an exemption from the import ban resulting from the inspection at the Indore facility.

112.    Additionally, Medicare Part D data, which accounts for approximately two-thirds of the total Revlimid/lenalidomide market in the United States, makes clear that market demand was readily met by existing supply, with or without Viatris's lenalidomide.

113.    In 2023, the last year for which data is available, Viatris was the sixth-ranked provider of lenalidomide under Medicare Part D, selling approximately 241,000 units or 3.5% of the total. That same year, total Medicare Part D demand for Revlimid/lenalidomide fell by approximately 515,000 units, or 7%, relative to 2022. In other words, in 2023, demand for Revlimid/lenalidomide fell by more than two times Viatris's sales, meaning that even if Viatris's lenalidomide had been removed from the market that year, other manufacturers would readily have been able to meet market demand simply by producing lenalidomide at 2022 levels.

114.    Indeed, other manufacturers were fully capable of maintaining, or if necessary increasing, their production to meet market demand in response to an import ban on Viatris's lenalidomide. This includes Bristol-Myers, which supplied all of the lenalidomide in the United States, in the form of Revlimid, before generics entered the market in 2022. In 2023, as generic lenalidomide production increased, Bristol-Myers supplied about 4.4 million units of Revlimid in

the Medicare Part D market, compared with over 7 million units in 2021 and over 6.7 million units in 2022. These figures far exceed the approximately 75,000 units of lenalidomide that Viatris supplied to the Medicare Part D market in 2022 and the approximately 240,000 units it supplied in 2023. Thus, Bristol-Myers had ample spare capacity to make up for any dip in supply caused by a Viatris import ban.

115. Generic manufacturers were capable of maintaining or increasing their production as well. The Medicare Part D data shows that total generic lenalidomide sales across all manufacturers surged from approximately 650,000 units in 2022 to over 2.4 million units in 2023, as the terms of the settlement agreements with Bristol-Myers permitted increased generic production over time. That increase of over 1.7 million units in generic lenalidomide supply in a single year far exceeds Viatris's total lenalidomide sales, and makes clear that generic manufacturers were ramping up their production capacity and were capable of meeting market demand in the event of an import bar on Viatris's lenalidomide.

116. For example, according to ASHP data, while six generic lenalidomide products made by Teva Pharmaceuticals were in shortage as of March 5, 2025, not only was lenalidomide in all of those strengths and quantities available from both Bristol-Myers (as Revlimid) and other generic drug manufacturers at that time, but none of Teva's lenalidomide products remained in shortage as of May 16, 2025, demonstrating Teva's ability to respond to market forces and to produce lenalidomide in sufficient quantity.

117. Medicaid data, which is available through 2024, represents a smaller portion of the market than Medicare Part D, but tells the same story. From 2023 to 2024, there were declines in both total Revlimid/lenalidomide sales into the Medicaid market, and Revlimid sales into that market, by unit. In the same period, Viatris's lenalidomide sales into the Medicaid market, by

unit, were far smaller, in absolute terms, than those declines. Thus, Bristol-Myers had ample spare capacity to meet demand, including in the event of an import ban on Viatris's lenalidomide. And like the Medicare Part D data, the Medicaid data shows a huge increase in total generic lenalidomide sales from 2022 to 2023, and it also shows a substantial increase from 2023 to 2024 (partly offsetting the decline in Revlimid sales). This further indicates that generic manufacturers were expanding their production of lenalidomide, which is another indication there would be sufficient total capacity to meet market demand even without Viatris's lenalidomide.

118.    Moreover, because the relatively high price of Revlimid/lenalidomide was expected to persist through the end of 2025, Bristol-Myers and other manufacturers – including manufacturers that presumably had already begun preparing for expanded production in a free-market environment in 2026 – had every incentive to produce and sell as much Revlimid/lenalidomide as possible in 2025, including in the event of a Viatris import bar.

119.    For all these reasons, there was no reasonable basis to expect that the FDA would consider the availability of Viatris's lenalidomide to be essential to preventing a shortage in the overall market.

120.    At Lead Counsel's request, pharmaceutical industry expert Todd Clark (*see* ¶84) reviewed information concerning the market for Revlimid and lenalidomide, including the data and information identified in this Complaint.

121.    In Mr. Clark's expert opinion, the withdrawal of Viatris's lenalidomide from the market would not risk a shortage, and under these circumstances, it would have been extremely unlikely for the FDA to grant an exemption to the import bar for Viatris's lenalidomide.

122.    Thus, the availability of brand-name Revlimid that Bristol-Myers was free to manufacture in unlimited quantities, as well as multiple generic versions of lenalidomide from

other manufacturers, meant that exclusion of Viatris's lenalidomide from the U.S. market would not create a "shortage" within the meaning of the FDA's criteria for granting an exemption from the import bar. Accordingly, Defendants knew that there was no reasonable prospect that the FDA would grant an exemption from the import bar on Viatris's lenalidomide, and that the adverse impact on Viatris's financial results from the Company's cGMP violations at the Indore facility would therefore be significant.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

123.    Defendants made numerous materially false and misleading statements throughout the Class Period touting the Company's high manufacturing quality standards and regulatory compliance. At the same time, undisclosed material facts about the Company's persistent and significant cGMP violations at the Indore facility were inconsistent with Defendants' public statements. Defendants also emphasized lenalidomide as a source of growth and stability for the Company, without disclosing that the product was at serious risk of being barred from importation into the United States because of internally known but unremedied cGMP violations at the Indore facility. Then, when they disclosed the Warning Letter, Defendants downplayed its significance and told investors that Viatris was actively seeking exemptions to the import bar, while concealing both that lenalidomide was affected by the Warning Letter and that there was no realistic prospect of the FDA exempting that drug from the import bar. All of these statements were materially false and misleading, as detailed below.

### A.    Defendants' False and Misleading Statements from the Start of the Class Period Until the Indore Inspection

124.    On February 28, 2024, Defendants issued Viatris's Form 10-K for 2023 ("2023 10-

K"), which was signed by Defendant Smith.[52]

125.    In the 2023 10-K, Defendants emphasized Viatris's compliance process with respect to manufacturing-quality regulations: "**Manufacturing is conducted under exacting conditions governed by extensive regulation including strict in-process and finished pharmaceutical products specifications and controls.**"

126.    Defendants' statements in ¶125 about the "exacting conditions" and "strict . . . specifications and controls" under which Viatris manufactured its products in light of the applicable regulations were materially false and misleading when made because:

(a)    Defendants were aware of serious data-integrity violations at the Indore facility at least since January 2024, as alleged in ¶75.  Data-integrity violations are a critical, organization-wide issue, and they constitute violations of mandatory cGMP.  Without accurate data, a pharmaceutical-manufacturing company has no basis to make any assertions concerning the quality of its manufacturing processes or about its compliance with regulatory requirements.

(b)    Defendants were aware that despite the data-integrity violations at the Indore facility, they had undertaken neither an adequate internal investigation to determine the reasons for the violations, nor any corrective and preventive actions to prevent recurrence of the violations.  *See* ¶¶75-76.

(c)    Defendants knew that the FDA had previously cited the Indore facility for cGMP violations identified during the FDA's 2019 inspection of that facility, as discussed in ¶54,

---

[52]    Defendants Mistras and Le Goff had not yet joined Viatris on February 28, 2024, and thus did not make the statements in Viatris's 2023 10-K at the time it was filed with the SEC.  However, many of the false and misleading statements in the 2023 10-K were incorporated in subsequent SEC filings signed by Mistras.  *See* ¶¶138, 141-142, 147.

making it more likely that the FDA would conduct another inspection and classify the inspection results as OAI, as discussed in ¶¶55-56.

127.    Defendants also assured investors that Viatris maintained robust quality control and complied with applicable cGMP regulations in a document entitled "Building Sustainable Access at Scale: Viatris 2024 Sustainability Report," which Viatris released on May 21, 2024, and which was continuously available since that date on the "Investors" page of Viatris's website.  In this report, Defendants stated:

> **All of Viatris' operations [and] manufacturing sites . . . globally are subject to robust quality infrastructure and strategy.  This infrastructure is comprised of the extensive experience and expertise of our personnel, our comprehensive Global Quality Policies that establish uniform requirements for fundamental processes and controls within our Global Quality Management System (QMS), as well as Global Quality IT systems, which are implemented and designed to establish industry best practices, consistency and global quality assurance throughout our network.**

> **All of our operations are also subject to robust quality systems, standards and processes which are designed to ensure product quality and patient safety. These programs are designed and implemented across our global operations and are executed in alignment with statutory and regulatory requirements, such as current Good Manufacturing Practices (cGMP) . . . for all markets that they serve.**

128.    Defendants' statements in ¶127 were materially false and misleading when made for the reasons discussed in ¶126.  While touting the Company's "robust" quality systems, standards, processes, and infrastructure, "in alignment" with cGMP, Defendants misleadingly omitted the serious data-integrity violations at the Indore facility and their failure to correct those violations, which demonstrated major deficiencies in Viatris's quality systems, standards, processes, and infrastructure, resulting in the Company's noncompliance with cGMP.

129.    Over the course of the Class Period, as Defendants continued to reiterate the statements in ¶127 by maintaining them on Viatris's website for investors, they became materially false and misleading for the additional reasons that applied after Defendants received the Form

483 in June 2024 (*see* ¶146).  In particular, Defendants materially misled investors by continuing to emphasize Viatris's "robust" quality systems, standards, processes, and infrastructure, "in alignment" with cGMP, while concealing the Form 483 inspection results that demonstrated cGMP violations due to major deficiencies in those systems, standards, processes, and infrastructure.

130.    In the 2023 10-K, Defendants also highlighted that "**[n]ew product launches are an important growth driver**," that "**important recent launches include lenalidomide . . . in the U.S.**," and that "**[n]ew product sales, including lenalidomide . . . in the U.S. . . . helped to partially offset the anticipated lower net sales of certain existing products** . . . as a result of lower volumes and lower pricing due to additional competition."

131.    Defendants' statements in ¶130 touting the recent launch of lenalidomide as an "important growth driver" were materially false and misleading because Defendants failed to disclose that Viatris's lenalidomide was manufactured at the Indore facility, where data-integrity deficiencies violated cGMP and rendered Viatris's lenalidomide an adulterated drug within the meaning of the FD&C Act.  Touting the launch of lenalidomide was especially false and misleading in the context of a filing in which, as discussed above at ¶125, Defendants also emphasized the "exacting conditions" and "strict . . . specifications and controls" under which Viatris manufactured its products in light of the applicable regulations, while knowing that those conditions, specifications, and controls were severely deficient with respect to lenalidomide production at Indore.  Calling lenalidomide an "important growth driver" was also materially false and misleading for the additional reasons that:

(a)    Defendants were aware that there was no shortage of lenalidomide in the United States under the FDA's standard for a shortage, as discussed in ¶¶95-119.

(b)    Defendants were aware that only drugs that are in shortage in the United States under the FDA's standard qualify for exemptions from FDA import bans on drugs manufactured at facilities with unremedied cGMP violations, as discussed in ¶¶86-94.

(c)    Therefore, Defendants were aware that (i) there was a high likelihood that the FDA would identify severe cGMP violations the next time it inspected the Indore facility, resulting in a ban on importing lenalidomide and other products from the Indore facility into the United States; and (ii) there was no realistic prospect that the FDA would grant an exemption from the import ban for lenalidomide.

132.    Defendants' false and misleading statements successfully assured the market that Viatris's generic drug business was stable.  For example, on March 7, 2024, a UBS analyst report commented positively on Viatris' "growing narrative of generics stability."

133.    Defendants made statements similar to those alleged in ¶¶125 and 127 throughout the 2023 10-K, and those statements were materially false and misleading for the same reasons. In particular:

(a)    Defendants assured investors of Viatris's "strong commitment to quality" and "what [they] believe to be best-in-class manufacturing[.]"

(b)    Defendants emphasized that Viatris "remains committed to meeting the highest quality manufacturing standards at its facilities around the world and to continuous assessment and improvement in a time of evolving industry dynamics and regulatory expectations."

(c)    Defendants assured investors about the operating condition of all of Viatris's facilities: "We believe all our facilities are in good operating condition, the machinery

and equipment are well-maintained, the facilities are suitable for their intended purposes, and they have capacities adequate for the current operations."

134. Defendants' statements in ¶133 were materially false and misleading when made for the reasons discussed in ¶¶126 and 128.

135. The 2023 10-K also discussed risks relating to quality inspections at Viatris's manufacturing facilities, which Defendants misleadingly described as being "in the past" or merely hypothetical, while reiterating Viatris's commitment to regulatory compliance, despite their awareness of Viatris's cGMP violations at the Indore facility and vulnerability to an import ban:

> Further, approved drugs, as well as their manufacturers, are subject to ongoing post-marketing review and inspection, which can lead to the discovery of previously unknown attributes of the products or the manufacturing or quality control procedures used in their production, which may impact the marketing of the products or result in restrictions on their manufacture, sale or use or in their withdrawal from the market. **Any failure or delay by us . . . in obtaining and maintaining regulatory approvals could adversely affect the marketing of our products and our ability to receive product revenue . . . .**
>
> *    *    *
>
> The pharmaceutical industry is subject to regulation by various governmental authorities in the jurisdictions in which we operate, including the U.S., EU, China and India. For instance, we must comply with applicable laws and requirements of the FDA and other regulatory agencies, including foreign authorities, with respect to the research, development, manufacture, quality, safety, effectiveness, approval, labeling, tracking, tracing, authentication, storage, record-keeping, reporting, pharmacovigilance, sale, distribution, import, export, marketing, advertising, and promotion of pharmaceutical products. **We are committed to conducting our business, including the sale and marketing of our products, in compliance with all applicable laws and regulations.** These laws and regulations, however, are numerous, complex and continue to evolve, and **it is possible that a governmental authority may challenge our activities, or that an employee or agent could violate these laws and regulations without our knowledge. Failure to comply with these laws, regulations or expectations could result in a range of consequences, including**, but not limited to, . . . recall or seizure of products, **total or partial suspension of production and/or distribution, [and] our inability to sell products** . . . .
>
> *    *    *

The FDA and comparable foreign regulatory authorities also regulate the facilities and operational procedures that we use to manufacture our products. We must register our facilities with the FDA and similar regulators in other countries. Products must be manufactured in our facilities in accordance with cGMP or similar standards in each territory in which we manufacture. Compliance with such regulations and with our own quality standards requires substantial expenditures of time, money, and effort in multiple areas, including training of personnel, record-keeping, production, and quality control and quality assurance. The FDA and other comparable regulatory authorities, including foreign authorities, periodically inspect our manufacturing facilities for compliance with cGMP or similar standards in the applicable territory. Regulatory approval to manufacture a drug is granted on a site-specific basis. **Failure to comply with cGMP and other regulatory standards at one of our** or our partners' or suppliers' **manufacturing facilities could result in an adverse action brought by the FDA or other regulatory authorities, which has resulted and could in the future result in the receipt of an untitled or warning letter, . . . unanticipated compliance expenditures, . . . recall or seizure of products, total or partial suspension of production and/or distribution, our inability to sell products, the return by customers of our products, . . . refusal to permit import or export, . . . and/or other adverse actions.**

**Our business could be adversely affected if any regulatory body were to . . . require a recall or other adverse product action; require one of our manufacturing facilities to cease or limit production; or suspend, vary, or withdraw related marketing authorization**. . . .

Although we have established internal quality and regulatory compliance programs and policies, there is no guarantee that these programs and policies, as currently designed, will meet regulatory agency standards in the future or will prevent instances of non-compliance with applicable laws and regulations. **Additionally, despite our compliance efforts, we or our partners have in the past and may in the future receive notices of manufacturing and quality-related observations following inspections by regulatory authorities around the world, as well as official agency correspondence regarding compliance. If we are unable to resolve these observations and address regulatory concerns in a timely fashion, our business, financial condition, results of operations, cash flows, ability to pay dividends and/or stock price could be materially adversely affected.**

136.    Likewise, the 2023 10-K discussed risks relating to quality deficiencies in the manufacturing process, which Defendants misleadingly described as being "in the past" or merely hypothetical:

A substantial portion of our capacity, as well as our current production, is attributable to a limited number of manufacturing facilities . . . . **A significant disruption at any such facilities within our internal** or third-party **supply chain,**

**even on a short-term basis, whether due to** the failure of a third-party supplier to fulfill the terms of their agreement with us, labor disruption, **adverse quality or compliance observation, other regulatory action**, infringement of brand or other third-party intellectual property rights, natural disaster, civil or political unrest, **export or import restrictions, or other events could impair our ability to produce and ship products to the market on a timely basis and could, among other consequences, subject us to exposure to claims from customers. Any of these events could have a material adverse effect on our reputation, business, financial condition, results of operations, cash flows, ability to pay dividends and/or stock price. . . . If we** or our third-party suppliers' **face significant manufacturing issues, this could lead to shutdowns, delays or product shortages, or to our being entirely unable to supply certain products to customers for an extended period of time.**

\*      \*      \*

In addition, **quality deficiencies in the products which we** or our suppliers **provide, or at our** or their **manufacturing facilities, have in the past and could in the future adversely impact our manufacturing and supply capabilities, [or] cause supply interruptions** . . . .

\*      \*      \*

In addition, the manufacture of some of our products is a highly exacting and complex process, due in part to strict regulatory requirements. **Problems may arise during manufacturing at our** or our third-party suppliers' **facilities for a variety of reasons, including**, among others, equipment malfunction, **failure to follow specific protocols and procedures**, problems with raw materials, natural disasters, power outages, labor disputes or other civil unrest, cybersecurity or **compliance issues**, and environmental, health and safety issues, laws, regulations and permits. **If problems arise during the production of a batch of product, that batch of product may have to be discarded. This could, among other things, lead to increased costs, contractual penalties, lost revenue, damage to customer relations, time and expense spent investigating the cause, and, depending on the cause, similar losses with respect to other batches or products**.

137.    Defendants' statements in ¶¶135-136 describing the risks related to regulatory compliance and manufacturing quality as being "in the past" or merely hypothetical, while reiterating Viatris's commitment to regulatory compliance, were materially false and misleading because:

(a)    Defendants were aware of serious data-integrity violations at the Indore facility at least since January 2024, as alleged in ¶75. Data-integrity violations are a critical, organization-wide issue, and they constitute violations of mandatory cGMP. Without accurate data, a pharmaceutical-manufacturing company has no basis to make any assertions concerning the quality of manufacturing processes or about its compliance with regulatory requirements.

(b)    Defendants were aware that despite the data-integrity violations at the Indore facility, they had undertaken neither an adequate internal investigation to determine the reasons for the violations, nor any corrective and preventive actions to prevent recurrence of the violations, as they were required to do. *See* ¶¶75-76.

(c)    Defendants knew that the FDA had previously cited the Indore facility for cGMP violations identified during the FDA's 2019 inspection of that facility, as discussed in ¶54, making it more likely that the FDA would conduct another inspection and classify the inspection results as OAI, as discussed in ¶¶55-56.

(d)    Defendants' statements that Viatris had experienced quality deficiencies and had received notices of noncompliance "in the past," while characterizing the associated risks as merely hypothetical, were materially false and misleading because Defendants were aware that there actually were serious violations of cGMP at Viatris's Indore facility that the Company had not adequately investigated or taken any steps to remedy. Defendants' statements gave the materially false and misleading impression that, while Viatris had experienced these problems in the past and could hypothetically experience them again in the future, it was not experiencing them at present.

(e)    Defendants' description of the risk that batches of drugs might have to be discarded as merely hypothetical was materially false and misleading because Defendants knew,

but failed to disclose, that rather than conducting an adequate root-cause investigation of OOS and OOT test results, Viatris had improperly "tested into compliance" by simply conducting additional tests, without justification, at the Indore facility.  *See* ¶¶58, 69.

138.   Defendants continued to mislead investors by directing them in subsequent SEC filings to the risk factors in the 2023 Form 10-K.  For example, in the Company's April 26, 2024 Form 10-KA, signed by Defendants Smith and Mistras, Defendants stated: "For more detailed information on the risks and uncertainties associated with Viatris, see the risks described in Part I, Item 1A of the Original Filing [i.e., the 2023 10-K] and our other filings with the SEC."  Likewise, Defendants included a similar instruction in the Company's May 9, 2024 Form 8-K (signed by Defendant Mistras) and Form 10-Q (signed by Defendants Smith and Mistras), stating: "For more detailed information on the risks and uncertainties associated with Viatris, see the risks described in Part I, Item 1A of the Company's Annual Report on Form 10-K for the year ended December 31, 2023, as amended, and our other filings with the SEC."  The statements from the 2023 10-K incorporated by reference in these filings (*see* ¶¶135-136) remained materially false and misleading at the time of these filings for the same reasons as described in ¶137.

139.   Additionally, in Viatris's May 9, 2024 Form 10-Q, Defendants emphasized the Company's "**strong commitment to quality**," which was materially false and misleading for the same reasons described in ¶¶126 and 128.

**B.    Defendants' False and Misleading Statements from the Indore Inspection Until the Issuance of the Warning Letter**

140.   As detailed above, the FDA issued the Form 483 describing serious data-integrity and other manufacturing-quality problems to Viatris on June 26, 2024, following its inspection of the Indore facility.  *See* ¶¶57-63.  Defendants did not disclose the issuance of the Form 483 until six months later, when the FDA issued the Warning Letter.

141.    On July 3, 2024, Viatris issued a Form 8-K (signed by Defendant Mistras), stating: "For more detailed information on the risks and uncertainties associated with Viatris, see the risks described in Part I, Item 1A of the Company's Annual Report on Form 10-K for the year ended December 31, 2023, as amended, and our other filings with the SEC."  *See* ¶¶125, 131, 135-136 (statements from 2023 10-K incorporated by reference).

142.    On August 8, 2024, Viatris issued its quarterly report on Form 10-Q for the second quarter ended on June 30, 2024, which was signed by Defendants Smith and Mistras.  In the 10-Q, Defendants included the following among the risks that "could cause or contribute to . . . differences" in the Company's financial results:

> [A]ny changes in or difficulties with the Company's manufacturing facilities, **including with respect to inspections, remediation and restructuring activities**, supply chain or inventory in the ability to meet anticipated demand.

143.    Viatris's August 8, 2024 10-Q also reiterated the Company's "**strong commitment to quality**," and instructed: "[f]or more detailed information on the risks and uncertainties associated with Viatris, see the risks described in Part I, Item 1A in the 2023 Form 10-K, and our other filings with the SEC."  *See* ¶¶135-136 (statements from 2023 10-K incorporated by reference).

144.    Defendants' statements in ¶¶141-143 were materially false and misleading because (a) the statements from the 2023 10-K that were incorporated by reference remained materially false and misleading for the reasons detailed in ¶137; (b) the statement about Viatris's strong commitment to quality was materially false and misleading for the reasons stated in ¶¶126 and 128; (c) the statements about risks related to inspections and remediation misleadingly characterized risks that had already materialized as merely hypothetical; and (d) all of these statements were particularly misleading in light of Viatris's undisclosed receipt of the FDA's

June 26, 2024 Form 483, which identified serious data-integrity and other quality violations at the Indore facility.

145.    On October 25, 2024, Defendants filed the Company's Annual Proxy Statement, which stated:

> **Our global operations are supported by companywide quality systems, standards and processes which are designed to ensure product quality and patient safety**.  From product development to making or sourcing raw materials to producing finished dosage forms, **every step of our development, manufacturing and monitoring processes is grounded in our commitment to good manufacturing practices and the quality and safety of our products**.

146.    Defendants' statements in ¶145 which highlighted Viatris's "companywide quality systems," "standards and processes which are designed to ensure product quality," and manufacturing processes "grounded in our commitment to good manufacturing practices and the quality and safety of our products," were materially false and misleading because:

(a)    At the time these statements were made, Defendants were aware of the FDA's June 26, 2024 Form 483, which identified serious data-integrity violations at the Indore facility.  Data-integrity violations are a critical, organization-wide issue, and they constitute violations of mandatory cGMP.  Without accurate data, a pharmaceutical manufacturing company has no basis to make any assertions concerning the quality of its manufacturing systems or products.

(b)    Defendants were also aware that the FDA's June 26, 2024 Form 483 had identified additional manufacturing-process cGMP violations at the Indore facility.

(c)    Defendants were aware that despite learning of the data-integrity violations at the Indore facility by January 2024, they had undertaken neither an adequate internal investigation to determine the reasons for the violations, nor any corrective and preventive actions

to prevent recurrence of the violations, before the FDA identified the violations during the June 2024 inspection and demanded that Viatris remedy them. *See* ¶¶75-76.

(d)     Defendants knew that the FDA had previously cited the Indore facility for cGMP violations identified during the FDA's 2019 inspection of that facility, making it more likely that the FDA would conduct another inspection and classify the inspection results as OAI. *See* ¶¶54-56.

(e)     Defendants were aware of the undisclosed facts that Viatris's lenalidomide was manufactured at its Indore facility, was subject to the findings in the FDA's Form 483, would be subject to any import ban imposed by the FDA on products manufactured at the Indore facility, and was not eligible for an exemption from such an import ban.

(f)     Defendants were aware of their ongoing, undisclosed remediation efforts at the Indore facility that began only after they received the June 26, 2024 Form 483, including firing the facility's Site Head of Quality, Head of Quality Control, Head of Quality Assurance, Head of Investigations, and Manager responsible for the packaging materials laboratory.

147.     On November 7, 2024, Viatris issued its quarterly report on Form 10-Q for the third quarter of 2024, signed by Defendants Smith and Mistras.  This Form 10-Q again identified inspections and remediation activities as a merely hypothetical risk that "could cause or contribute to . . . differences" in the Company's financial results:

> [A]ny changes in or difficulties with the Company's manufacturing facilities, **including with respect to inspections, remediation and restructuring activities**, supply chain or inventory in the ability to meet anticipated demand.

148.     Viatris's 10-Q for the third quarter of 2024 also reiterated the Company's "**strong commitment to quality**" and stated: "For more detailed information on the risks and uncertainties associated with Viatris, see the risks described in Part I, Item 1A in the 2023 Form 10-K . . . ." *See* ¶¶135-136 (statements from 2023 10-K incorporated by reference).

149.    Defendants' statements in ¶¶147-148 were materially false and misleading because (a) the statements from the 2023 10-K that were incorporated by reference remained materially false and misleading for the reasons detailed in ¶137; (b) the statement about Viatris's strong commitment to quality was materially false and misleading for the reasons stated in ¶¶126 and 128; (c) the statements about risks related to inspections and remediation misleadingly characterized risks that had already materialized as merely hypothetical; and (d) all of these statements were particularly misleading in light of Viatris's undisclosed receipt of the FDA's June 26, 2024 Form 483, which identified serious data-integrity and other quality violations at the Indore facility.

150.    On November 21, 2024, Defendants participated in the Jefferies London Healthcare Conference, where Defendant Smith minimized the likelihood of any particular problem with any of the Company's products in any particular geography having a significant impact on the Company's financial results:

> Glen Santangelo, Jefferies Financial Group, Inc., Moderator: **This diversification issue, I think, remains underappreciated, right?** Given that you're running those, that branded and that generics portfolio**. No one product accounts for any meaningful share of your revenue and you're in 100-and-something countries and so no one country really represent – you're very diverse from a product and geographic perspective. So you don't really, I guess, worry too much about any one specific issue or maybe that's not the right characterization.**
>
> Scott Smith, Viatris Inc., CEO, Director:    **No, I think that's a good characterization, right?    That 165 countries, 4,400 different products in different areas.    It provides incredible base of stability for the company.** On the other side of that, also we need to do things from a BD [i.e., business development] perspective, which move the needle, right? And when you have $15 billion of diversified sales, there's some comfort and stability there. **And as you said, not one product in any one geography really changes the needle.    So we do have incredible stability.** It's our ability then to add to that stability with new products and new revenue that's going to really create a growth profile for the future.

151.     Defendant Smith's statements in ¶150 were materially false and misleading because Defendants knew that lenalidomide was "one product" with "one specific issue" in "one geography" that was highly likely to have a significant adverse impact on the Company's financial results.  Because of the cGMP violations uncovered by the FDA's inspection of the Indore facility, Defendants knew there was a high likelihood that the importation of lenalidomide into the United States would be barred, with no realistic prospect of an exemption from the FDA.  Defendants also knew that, due to lenalidomide's favorable margin profile, an import bar on Viatris's lenalidomide would have a significant adverse impact on the Company's financial results for 2025.

152.     The November 21, 2024 Jefferies London Healthcare Conference continued as follows:

> Glen Santangelo, Jefferies Financial Group, Inc., Moderator:  And Doretta, I know you're not going to give me any 2025 guidance here today, but I'm going to push a little bit, right?  **And so the obvious question would be, as we segue the conversation to 2025, based on all the previous answers, it feels like a lot of the trends that we've seen year to date continue to be in place. . . .  I think Corinne [Le Goff] mentioned that generic pricing is sort of stable.  And so when we think about what we've seen in 2024, is that a reasonable baseline for us to start to think about 2025?  Or is there anything else that you'd call out specifically that we should have on our radar screen?**
>
> Theodora Mistras, Viatris Inc., CFO:  **No, I think it is.  As we've mentioned, this is the sixth consecutive quarter that we've seen of operational revenue growth, and we expect to see that momentum to continue into next year.  And it's really two factors that give us that confidence.  Number one, it's what we've talked about, the kind of stability that we've kind of seen in the base business and then compounded by the $450 million to $550 million of new product revenue that we kind of anticipate to be able to deliver on.  So the combination of those factors is what continues to give us the momentum that we expect to see as we go into next year.**
>
> *          *          *
>
> Scott Smith, Viatris Inc., CEO:  **I think the company is significantly undervalued at where we sit today.  I think what's underappreciated is the stability of the base business and the fact that the base business has actually returned to growth.**

153.    Defendant Smith's and Mistras's statements in ¶152 were materially false and misleading.  Mistras's agreement with an analyst's suggestion that "what we've seen in 2024" was "a reasonable baseline for us to start to think about 2025," and Smith's emphasis on Viatris's stability and growth, were false and misleading because Defendants knew that the severe cGMP problems at Indore were highly likely to deprive Viatris in 2025 of the substantial revenue and profits it had earned from lenalidomide in 2024.

154.    Defendants' materially false and misleading statements at the November 21, 2024 Jefferies conference reassured investors that Viatris's financial growth would continue through 2025.  A Jefferies analyst report dated December 16, 2024, highlighted Jefferies' confidence in Viatris after the London Healthcare Conference:  "**We hosted VTRS mgmt in London last month and came away confident that the 6 quarters of consecutive LSD [low single digit] growth is sustainable into 2025.**"

155.    Additionally, the significance of Defendants' concealment of the Form 483 inspection findings is underscored by an October 15, 2024 analyst report in which Jefferies noted that their "confidence" in Viatris's generic drug business was bolstered because "the industry has experienced increased 483 filings in Sept[ember] which will likely continue to augment pricing."  In other words, Jefferies viewed Form 483 filings in the industry at large as a positive indicator for Viatris because it would mean upward pressure on generic drug pricing.  All the while, Defendants concealed that Viatris itself had received serious inspection findings in a Form 483.

**C.    Defendants' False and Misleading Statements from the Issuance of the Warning Letter Until the End of the Class Period**

156.    On December 23, 2024, Defendants were forced to disclose the inspection at the Indore facility for the first time.  The FDA had issued the Warning Letter and Import Alert four days earlier, and the FDA published the Warning Letter on its website.[53]

157.    In a December 23, 2024 press release, Viatris stated that the import alert "affects 11 actively distributed products that will no longer be accepted into the U.S. until the Warning Letter is lifted."  Viatris also highlighted that "four products" were exempt from the ban "based on shortage concerns," and misleadingly added that **"[t]here could be the potential for additional exceptions based on further discussions with the Agency**."

158.    Defendants' statement in ¶157 about the "potential for additional exceptions," as well as Defendants' failure to disclose in that statement that lenalidomide was manufactured at the Indore facility and was subject to the import bar, were materially false and misleading because:

(a)    Defendants were aware of the undisclosed facts that Viatris's lenalidomide was manufactured at its Indore facility and was impacted by the findings in the FDA's Form 483 and Warning Letter and the Import Alert barring it from importation into the United States.

(b)    Defendants were aware that there was no shortage of lenalidomide in the United States under the FDA's standard for a shortage, as discussed in ¶¶95-119, and that only drugs that are in shortage in the United States under that standard qualify for exemptions from FDA import bans on drugs manufactured at facilities with uncorrected cGMP violations, as discussed in ¶¶86-94.

---

[53]    As noted above, the publicly available version of the Import Alert does not identify banned drugs that have not received an exemption.

(c)      Thus, Defendants were aware that there was no realistic prospect that lenalidomide, the most important barred drug produced at Indore, would qualify for an "additional exception," and they were aware that the continuing ban on lenalidomide and other products manufactured at the Indore facility would have a material adverse impact on Viatris's financial results.

159.    On January 14, 2025, Viatris presented at the 43rd Annual J.P. Morgan Healthcare Conference.  During the Company's panel presentation, Defendants Smith and Mistras discussed the FDA Warning Letter and downplayed its impact on the Company's financial results, while continuing to tout the contribution of lenalidomide to Viatris's portfolio:

> Q.  Chris Schott, JPMorgan Chase & Co. Senior Analyst: Maybe one last bigger picture one.  Just – I know, you're not giving formal guidance for 2025.  But just headwinds and tailwinds, what are the things we should watch for as we go for this year?
>
> A.  Scott Smith, Viatris Inc., CEO, Director:  So headwinds and tailwinds.  So just one thing, and I'll let Doretta take on the headwinds and tailwinds from a finance perspective.  **One of the things that was announced was an Import Alert from our facility in Indore**, and she will address that, I think, **a little bit as a headwind for us**.  And I just wanted to say before she gets into the headwinds and tailwinds.  **So we take it very seriously.**
>
> **The Indore facility is 1 of 26 manufacturing facilities.  It's an important facility within our global network.  It's focused on oral solid doses.  The Warning Letter and Import Alert are a result of an inspection which happened about 8 months ago.  And we're in close communication with the FDA and receiving initial FDA feedback some months ago.**
>
> **When we got that feedback, we agreed to immediate remediation at that time of the issues that they had.  And the Import Alert involves 11 products in the US; however, 4 products of the 11 are on an exempt list, and we're in active discussions with the FDA to add more products to that exempt list.**  So that was one of the things and Doretta go into it a little bit more to **provide a little bit of headwind for us as we move into 2025**.
>
> A.  Theodora Mistras, Viatris Inc., CFO:  Yeah.  Just to give some additional color regarding our headwinds and our tailwinds.  There are some pushes and pulls to consider as we think about 2025. . . .

**From a headwind perspective, as Scott mentioned, specifically with respect to Indore, currently, we're having ongoing discussions, both with the FDA as well as current customers.  And so we're not in a position right now to disclose specific products, and we're continuing to assess the potential impact from Indore**. . . .

Q.   Chris Schott, JPMorgan Chase & Co. Senior Analyst: I know the specific products aren't disclosed and you're still working on it.  Just any – just to quantify just how big is this facility from a revenue perspective?

A.   Theodora Mistras, Viatris Inc., CFO: So as Scott – **it's 1 of 26 facilities.  It's an oral dose manufacturing facility.  It services our network across the world.  So it's a global facility for us as it relates to Indore.**

\*      \*      \*

Q.   Chris Schott, JPMorgan, Analyst:  Maybe just one specific generic product. **Generic Revlimid, how big of a tailwind has that been for you?**  And do we have to think about that as a headwind at some point as we look out to 2026 and beyond?

A.   Corinne Le Goff, Viatris Inc., Chief Commercial Officer:  **So generic Revlimid has been like a stable component of our generic portfolio.**

160.    Defendants' statements in ¶159 were materially false and misleading for the following reasons:

(a)    By characterizing the Indore inspection results as "a little bit of a headwind" (twice) and emphasizing that Indore was just "1 of 26" manufacturing facilities (also twice), Defendants materially misled investors by downplaying the significance and financial impact of the Indore inspection results, while omitting that lenalidomide was produced at Indore and was subject to the import bar, and that there was no realistic prospect that lenalidomide would be exempted from the import bar.

(b)    Defendants' statement that "we're in active discussions with the FDA to add more products to that exempt list" was materially false and misleading for the reasons stated in ¶158.  Defendant Smith's statement indicated that there was a reasonable prospect that additional Viatris products would be exempted, but Defendants concealed that lenalidomide was

produced at Viatris's Indore facility and was subject to the import bar, and that there was no reasonable prospect that lenalidomide would be exempted from the import bar.

(c)     Defendants materially misled investors by responding positively to an analyst's question concerning lenalidomide acting as a positive "tailwind" for Viatris.  In stating that lenalidomide "has been like a stable component of our generic portfolio," Defendant Le Goff misleadingly omitted the truth that lenalidomide was seriously impacted by the FDA's findings at Indore, and that Viatris therefore would not be in a position to earn the profits on lenalidomide that the market expected through the end of 2025.

161.    As part of their effort to falsely reassure the market about the impact of the Warning Letter, Defendants held on-the-record discussions with securities analysts in which Defendants made representations that Defendants understood and intended would be conveyed to the market via analyst reports.  On January 17, 2025, a Barclays report described a then-recent discussion with Viatris management in which Defendants focused on the purportedly limited impact of the Warning Letter:

> FDA warning letter post-inspection of VTRS' facility in Indore, India affects 11 actively distributed products that will no longer be accepted into the U.S. until the warning letter is lifted.  **VTRS noted 4 exceptions made due to shortage concerns and *noted that these products are all oral solids, with no complex products impacted*.  Mgmt also noted that discussions to resolve the issue have been slow since receiving the letter in December owing to the holiday season, but expect to have greater clarity in the coming weeks.**  We expect VTRS to actively pursue resolution strategies like Site Switching to mitigate the impact.[54]

162.    Defendants conveyed materially false and misleading information to the market by means of the discussion with Barclays analysts described in ¶161.  Defendants attempted to minimize the impact of the Warning Letter by reassuring investors that only oral solid drugs and

---

[54]    Italics in original.

no complex products were impacted, while misleadingly failing to disclose that lenalidomide was affected by the severe cGMP violations and was not eligible for an exemption from the import bar. Defendants also misleadingly blamed the "holiday season" for the fact that Viatris's discussions with the FDA had not yet resulted in additional exemptions, while in fact Defendants knew that there was no realistic prospect that Viatris would receive an exemption from the import bar for lenalidomide at any time.

163.    Defendants also misled the market into believing that the Indore inspection results would have only a small impact on the Company by relaying materially false and misleading information in an on-the-record discussion with securities analysts from UBS.  A UBS analyst report dated February 7, 2025, reported on a then-recent discussion between UBS analysts and Viatris's management regarding the failed inspection at the Indore facility.  Defendants understood and intended that the UBS analysts would report the substance of the discussion to investors. Accordingly, the report relayed information that UBS received from Defendants in that discussion regarding the "**key products that [were] impacted by this [Warning Letter]**."  However, Defendants concealed from UBS, and thus from the market, that lenalidomide was affected by the Indore inspection, or even that lenalidomide was produced at Indore at all.  Rather, Defendants discussed an entirely different drug produced at Indore called levothyroxine, which the FDA had exempted from the import ban.  The UBS report relayed the following:

> **The warning letter blocks 11 oral products from entering the US market, with four currently on the exempt list and the potential for more to be exempted, per [Viatris] mgmt.**

> \*        \*        \*

> **Based on our discussion with [Viatris] mgmt, we note that levothyroxine is one of the key products that was impacted by this WL [Warning Letter]; however, similar to levothyroxine, a number of these products are/ could be sourced from multiple manufacturing sites.**

164. The February 7, 2025 UBS analyst report also included a chart containing UBS's assessment of the impact of the Warning Letter. Notably, lenalidomide is not listed among the 21 products that UBS understood to be potentially affected, meaning that Defendants kept UBS, and the market at large, in the dark that lenalidomide was affected by the Indore quality issues and the subsequent Warning Letter. The chart from the UBS report is as follows:



**Figure 1: Assessing impact of Indore warning letter on 2025 Outlook - Levothyroxine key impacted product**

Source: IQVIA data

165. The February 7, 2025 UBS analyst report also references the website of Viatris's Mylan India subsidiary, where Defendants continued to downplay the impact of the failed inspection at the Indore facility by once again noting that Indore was only one of Viatris's 26 manufacturing facilities:

According to the Mylan India website (link), **the Indore plant exclusively manufactures oral solid drugs, which limits our concern. This plant, one of 26 facilities, supplies products globally**.

166.    UBS concluded from this discussion that the "**[i]mpact seems small**" from the Indore inspection, and that the inspection was only a "**small hiccup**[.]"

167.    Defendants conveyed materially false and misleading information to the market by means of the discussion with UBS analysts described in ¶¶163-164.  Knowing that the information they communicated to UBS would be publicized, Defendants selectively disclosed that levothyroxine was a "key impacted product," while withholding the fact that Viatris's lenalidomide was barred from importation into the United States due to the results of the Indore inspection.  Selectively disclosing that levothyroxine was a "key impacted product" while omitting the more significant ban of lenalidomide was especially misleading because levothyroxine, unlike lenalidomide, was one of the four products from the Indore facility that were granted exemptions from the import ban in the FDA's December 19, 2024 Import Alert.  Defendants also emphasized the potential for more products to be exempted, while omitting that lenalidomide was affected by the import ban and was ineligible for an exemption.  Moreover, Defendants misleadingly downplayed the inspection failure on their Mylan India subsidiary's website (*see* ¶165). Consequently, the market was materially misled regarding the financial consequences of the quality problems and failed inspection at the Indore facility.

**THE TRUTH IS REVEALED, CAUSING VIATRIS'S STOCK PRICE TO PLUMMET**

168.    On February 27, 2025, Viatris finally revealed the truth about the Company's quality deficiencies, the failed Indore facility inspection eight months earlier, and the ensuing material financial impact on the Company.   Correcting their prior assurances, Defendants acknowledged that importation of Viatris's lenalidomide into the United States was banned as a result of the inspection, and that no further exemptions, including for lenalidomide, would be

forthcoming.  And Defendants finally acknowledged that Viatris's cGMP violations at Indore and the resulting import ban would have a significant adverse financial impact on the Company.

169.    Before trading hours on February 27, 2025, Viatris issued a press release which revealed that the import bar applied to lenalidomide, that neither lenalidomide nor any other products manufactured at Indore would be granted additional exemptions, and that the resulting financial headwinds in 2025 would be significant.   In particular, Viatris announced that the negative impact on 2025 revenue and operating earnings as a result of the quality deficiencies at the Indore facility would be approximately $500 million and $385 million, respectively, caused in significant part by the import ban on lenalidomide.  The press release stated:

> Following an inspection of Viatris' oral finished dose manufacturing facility in Indore, India, in June 2024 the Company received a warning letter and import alert from the U.S. Food and Drug Administration (FDA) in December 2024.   **The import alert affects 11 actively distributed products, including lenalidomide and everolimus.  The FDA made exceptions, subject to certain conditions, for four products based on shortage concerns.  Following recently concluded interactions with the FDA regarding potential additional product exceptions, the Company currently does not expect any additional product exceptions to be granted.**
>
> **While product continues to be shipped from the Indore facility to markets outside the U.S., the Company currently anticipates some impact in other markets, including to parts of its ARV business in Emerging Markets and to select generic products in Europe.  The Company currently estimates the negative impact on 2025 total revenues to be approximately $500 million and to 2025 adjusted EBITDA to be approximately $385 million.**

170.    Also on February 27, 2025, Defendants filed Viatris's 2024 Form 10-K (the "2024 10-K"), which was signed by Defendant Smith.   The Form 10-K repeated much of the same information about the Import Alert's impact as the press release issued earlier that day:

> Following an inspection by the FDA at our oral finished dose manufacturing facility in Indore, India in 2024, the FDA has issued a warning letter, and an import alert related to this facility.   **The import alert affects 11 actively distributed products that will no longer be accepted into the U.S. until the warning letter is lifted.  It makes exceptions, subject to certain conditions, for four products based on shortage concerns.  Following recently concluded discussions with the FDA,**

**the Company does not expect additional product exceptions to be granted by the FDA**.

*       *       *

**While product continues to be shipped from the Indore facility to markets outside the U.S., some impact in other markets, including the ARV business in Emerging Markets and select generic products in Europe, is anticipated.  The Company currently estimates the negative impact to 2025 total revenues to be approximately $500 million and to 2025 earnings from operations to be approximately $385 million.**

171.    The 2024 10-K also acknowledged the broader impact of the Indore cGMP violations and inspection results:

> [I]n December 2024 the FDA issued a warning letter and import alert related to our oral finished dose manufacturing facility in Indore, India.  **The warning letter and import alert restrict our ability to distribute certain products into the U.S. and have also negatively impacted our ability to sell products made at this facility to customers in other regions**.  We currently expect a negative impact from the Indore actions on our financial condition, results of operations and cash flows in fiscal year 2025, and, if we are unable to resolve any such observations and address regulatory concerns in a timely fashion, our business, financial condition, results of operations, cash flows, ability to pay dividends or repurchase shares, and/or stock price could be materially adversely affected in 2025 as well as future periods.
>
> *       *       *
>
> **Negative publicity** related to the receipt of a warning letter, import alert, or similar restrictions from the FDA or other regulatory authorities, **such as the recent restrictions at our Indore facility, have damaged and could continue to damage our reputation among customers, lead customers to seek other suppliers of our products, or lead to additional inquiries from other regulatory authorities.**
>
> *       *       *
>
> In addition, **actual or alleged quality deficiencies in the products** which we or our suppliers provide, or at our or their manufacturing facilities, **including with respect to the recent warning letter and import alert at our Indore facility, have in the past and could in the future adversely impact our manufacturing and supply capabilities, cause supply interruptions**, or lead to voluntary market withdrawals or product recalls.

172.    Viatris also held an earnings call the same day at 9:30 a.m. Eastern Time, as the market opened.  On the call, Defendant Smith disclosed that no other products would be granted

exemptions as Defendants had previously suggested, and that the resulting headwinds for Viatris's

2025 financial results would be significant:

> **[We r]eceived a warning letter and import alert from the FDA at the end of December.  The import alert affects 11 actively distributed products in the U.S., including lenalidomide.**
>
> **The FDA made exceptions subject to certain conditions for 4 products based on shortage concerns.  We recently finished interactions with the FDA about potential additional product exceptions, and we do not expect any additional exceptions will be granted at this time**.
>
> While product continues to be shipped from the facility to markets outside the U.S., **we currently anticipate some impact on other markets, including parts of our ARV business and emerging markets and to select generic products in Europe. We currently estimate the negative impact on 2025 total revenues to be approximately $500 million and on 2025 adjusted EBITDA to be approximately $385 million**.

173.    Defendant Mistras then revealed the substantial impact of the lenalidomide import

bar in particular on Viatris's finances:

> **We estimate an impact of approximately $500 million to 2025 total revenue and $385 million to adjusted EBITDA.  This includes estimated penalties and supply disruptions of approximately $100 million, which we believe are mostly short-term in nature.**
>
> **Lenalidomide, which after discussions with the FDA was not granted an exception, is the largest product impacted and represents approximately 40% of the total revenue impact and 50% of the total adjusted EBITDA impact given its margin profile.**

174.    The question-and-answer portion of the call followed, during which Defendants

acknowledged that the import ban on lenalidomide, a high-margin product, significantly and

adversely affected Viatris's profits:

> Q.  Chris Schott, JPMorgan Chase & Co., Senior Analyst: [C]an you just walk through a little bit **when we think about the year-over-year step down in gross margins, how much of that's coming from Indore** and how much of that's coming from some of the factors that you cited?
>
> A.  Theodora Mistras, Viatris Inc., CFO: And to your question, Chris, around gross margin, there were a couple of components, as I mentioned, that we're factoring

into the step down.  **The largest component is Indore.  Just given the high-margin nature of both the penalties as well as lenalidomide, the margin impact of Indore is about kind of close to 80% margin**.

175.    Defendant Smith also explained that the impact of the Indore inspection findings was not limited to the United States:

Q.  Jason Gerberry, Bank of America, Managing Director in US Equity Research: [W]hy does the Indore facility issues have an impact on revenues outside the United States?

A.  Scott Smith, Viatris Inc., CEO, Director: . . . **I think when you get a situation like Indore and warning letter and an active remediation that's ongoing right now, that active remediation sometimes can cause you to have a pause in manufacturing, supply issues in certain cases.  Even though the product can go into Europe, there might be shortages of certain products as we work through that plan and remediate.**

176.    Also during the conference call's question-and-answer portion, an Evercore analyst expressed doubt about the accuracy and completeness of Defendants' prior public statements about the Warning Letter and Import Alert, particularly their failure to disclose that lenalidomide was covered by the FDA's import ban at the January 14, 2025 J.P. Morgan Healthcare Conference (*see* ¶159):

Q.  Umer Raffat, Evercore ISI Institutional Equities, Senior MD & Senior Analyst of Equity Research:  First, Scott, Doretta, for you.  **At the conference in January, you guys talked about for the Indore warning letter, you guys mentioned it's 11 products and 4 of the 11 were exempt and more could get exempt, so most folks listening in just assuming what, hundreds of products in this company, 11 of them, so probably not so much.  But the type of EBITDA hit we learned about today, considering also that you knew generic Revlimid [i.e., lenalidomide] was one of them, I'm just curious about the thought process around how you guys communicated that to investors previously**.

A.  Scott Andrew Smith:  Yeah, **so relative to disclosure, JPMorgan, it was a very dynamic situation at that time.  There were some products which were excluded, others in which we had agreement from the FDA that we could go ahead and ask for exclusion and put our case together why.  So, we were unsure exactly what that would look like.  We were also exploring alternate forms of Lenalidomide from other companies to help fill that shortage gap.  So it was a very dynamic situation at that time.**

**We didn't even have a good view on exact[ly] whether lenalidomide would be excluded or not until just a few days ago. So, it's been very dynamic. We thought we had a great case because of the importance of the medication, it just did not materialize. And so, for me at JPMorgan to start to say, well, there's this product and not that product without being able to give the whole picture, I think gets to our credibility. What was really concerning to me was to be accurate, to be credible, to when I understood what exactly that list would look like and what exactly the impacts would look like that I could share that.**

**And I think it's only been in the last couple of days that it's been very clear to us what the US and non-US impacts are including Lenalidomide. I think the distortion that you see in terms of the magnitude from a revenue and EBITDA perspective is because specifically of Lenalidomide and the profit profile of that particular product.**

177.    Defendant Smith's answer makes clear the significance of the import bar on lenalidomide in particular to Viatris's financial results. However, his attempt to justify Defendants' prior failure to disclose to the market that lenalidomide was covered by the ban, based on ongoing discussions about a possible exemption, flew in the face of reality. Smith's attempted excuse disregarded the key facts that Defendants had known throughout the Class Period that there was no shortage in the total supply of Revlimid and lenalidomide in the United States, that "the importance of the medication" is not a sufficient basis for an exemption when a drug and its therapeutic equivalents are not in shortage, and that, for the reasons detailed in this Complaint, there was no realistic prospect that an exemption from the import bar for Viatris's lenalidomide would be granted. Further, Smith's assertion that it would have undermined his "credibility" to identify "this product and not that product without being able to give the whole picture" ignored the fact that in an on-the-record meeting with UBS analysts, Defendants selectively identified one product that was affected by the Warning Letter – levothyroxine – which was one of the four products manufactured at Indore where an exemption was granted. *See* ¶163.[55] Thus, despite

---

[55]    In addition, Defendants knew or should have known that "other companies" were highly likely to take advantage of the high-margin opportunity to sell lenalidomide themselves rather than

being aware of the risks of misleading the investing public by means of selective disclosure, Defendants did exactly that.

178.    Similarly, Defendant Smith stated during the question-and-answer portion of the February 27, 2025 call that "relative to Lenalidomide, we talked extensively with the FDA and thought we had a really good case to get it on the exempt list because of the critical nature of that particular medicine.  We were unable to do so."  Smith's attempted excuse ignored the fact that a medicine's "critical nature" does not justify an exemption from an import ban under FDA regulations when there is no shortage, and there was no shortage of lenalidomide.

179.    Defendant Smith concluded the call by acknowledging that "the situation of Indore" had a "significant impact here on '25," i.e., on Viatris's 2025 financial guidance.

180.    The disclosures quoted in ¶¶169-179 corrected Defendants' false and misleading statements detailed above, in which Defendants, *inter alia*, (1) touted Viatris's high manufacturing-quality and regulatory-compliance standards and processes, (2) concealed the fact that Defendants became aware of serious data-integrity violations at the Indore facility by at least January 2024 but did not remediate those violations until after the FDA's inspection, (3) concealed and downplayed the impact of the serious data-integrity and manufacturing-process violations identified in the June 2024 Form 483, (4) downplayed the significance and financial impact of the Warning Letter and Import Alert by telling investors that they caused a mere "little bit of headwind" for Viatris's 2025 financial results, (5) gave the impression that it was realistic for

---

providing it to Viatris, or at a minimum, that those other companies would have insisted on keeping all or nearly all of that margin and the resulting profits.  That is why, after the Class Period, Viatris acknowledged to Piper Sandler analysts that the Company was "not getting its hopes up" about finding an alternate source of lenalidomide supply, as noted in a March 4, 2025 analyst report.  In any event, if Defendants had not misled the market during the Class Period, investors would have been in a position to make this assessment for themselves.

Viatris to get more products exempted from the import ban, and (6) did not disclose that lenalidomide was one of the banned products or that there was no realistic prospect of it being exempted, while selectively disclosing that levothyroxine was a "key impacted product."

181.    The market reacted sharply in response to Defendants' revelation of previously concealed adverse information.  The price of Viatris's common stock declined dramatically from a closing market price of $11.24 per share on February 26, 2025, to a closing price of $9.53 per share on February 27, 2025, a decline of about 15.21% in the span of a single day, on unusually high volume of over 47 million shares traded on February 27, 2025.  By way of comparison, that is over four times the number of Viatris shares traded on February 26, 2025.  Viatris's stock price then further declined to close at a price of $9.23 per share on February 28, 2025.

182.    Many analysts who followed Viatris commented that they and the market were surprised by how Viatris's disclosures on February 27, 2025 differed from Defendants' prior assurances.  For example, a Jefferies analyst wrote on February 27, 2025 that the "much worse than expected" news about Indore was the market's "primary focus":

> **The Indore impact was much worse than feared[.]  We are not surprised to see shares down in pre-market.  We expect shares to be rangebound NT [near term] amidst Indore uncertainty. . . .**

> 2025 guidance came in below as expected, but **Indore impact of $500M and $385M on rev/EBITDA was much worse than we thought**.  Viatris issued a widely expected below-consensus guide given 1) 2-3% FX headwinds and 2) the Indore facility shutdown.  However, **the Indore impact came in much worse than expected so we think that will be the primary focus post the print.**

> *    *    *

> **[T]he Indore impact for 2025 was much worse than we thought, which will be the primary driver of the stock post 4Q as we think the update overshadows underlying stability in the business. . . . [W]ith the key positive catalyst (a repo announcement) overshadowed by negative news, we think shares could be pressured in the NT.**

183.    Jefferies repeated in a March 7, 2025 report that "**the Indore impact for 2025 was much worse than we thought, which has been the primary driver of the stock post 4Q, as we think the update overshadows underlying stability in the business and the $500-650M repo update**."

184.    Similarly, a Piper Sandler analyst wrote in a February 27, 2025 analyst report that Viatris's disclosures about Indore had "shock value":

> **There is a certain degree of shock value associated with the 2025 top-line and EBITDA impact of the FDA warning letter/ import alert out of company's facility in Indore, India.  It would also not entirely surprise us to see some degree of impact spill into 2026.**
>
> *        *        *
>
> **Turns out that the FDA warning letter/import letter is actually a pretty big deal.  Management is guiding to 2025 total revenue of $13.5B-$14.0B, a decline of ~4% versus 2024 at the midpoint (ex-divestitures), owing in large part to a ~$500M impact from the challenges at the Indore facility (and an adjusted EBITDA impact of ~$385M).**

185.    The February 27, 2025 Piper Sandler report continued by questioning Defendants' prior disclosures concerning the Indore inspection and noting that the impact extended beyond U.S. sales:

> **When management cited an impact on 11 U.S. products in December 2024 when it received the warning letter, that appeared on the surface to be fairly benign given that the facility produces quite a number of products.  Well, it turns out that some of those products are pretty important, such as generics of Revlimid and everolimus, relatively high-margin assets that represent 85% of the total net sales impact in North America.  What was also surprising was that management noted that there will be some impact on the antiretroviral business in emerging markets, as well as impact on select generic products in Europe (i.e., this is not simply an issue confined to U.S. products).**

186.    Piper Sandler added in a report on March 4, 2025: "**Given the importance of the product to the U.S. generics business, it would be fair to question why management did not disclose that the Revlimid generic would be impacted when it received the warning letter last**

**December**." Having "recently hosted a dinner with Viatris senior leadership and investors," Piper Sandler noted that the "simple answer here was that there was some degree of uncertainty regarding whether the generic would be part of any product exceptions to the import alert granted by the FDA." Viatris's "simple answer," however, was not a correct or complete answer. Notwithstanding Defendants' efforts to cover their tracks, there was never a realistic prospect that Viatris's lenalidomide would be granted an exemption to the import bar. Piper Sandler also noted in that report that, regardless of the exact timing of FDA re-inspection at Indore, e.g. at the end of 2025 or the start of 2026, the "consequential" damage was already done, since "the flood of additional Revlimid generics in 2026" after the expiration of the settlement agreements with Bristol-Myers meant that 2025 was the critical year for Viatris's remaining lenalidomide sales.[56]

187.    J.P. Morgan also expressed surprise in an equity analyst report issued on February 27, 2025, and contrasted the expectations created by Defendants' statements at the January 14, 2025 J.P. Morgan Healthcare Conference discussed above at ¶159 with the reality:

> **Overall, 2025 guidance came in below expectations largely due to the company's Indore manufacturing plant warning letter, which is particularly impacting gRevlimid [i.e., generic Revlimid or lenalidomide] sales. While VTRS had talked about this warning letter at the JPMorgan Healthcare Conference, the size of the impact is larger than we/the Street expected and we see Indore as a setback for the VTRS story** (as the company had been posting solid/stable results over the past year). Elsewhere, VTRS's business is largely trending in-line with our expectations and we exit today's update lowering our 2025/2026 estimates.

188.    The February 27, 2025 J.P. Morgan equity analyst report went on to highlight that the impact of the Indore facility's failed inspection was worse than expected:

---

[56]    The Piper Sandler report states: "In terms of timing of FDA re-inspection, it is not yet clear if this will be a 4Q25 or 1Q26 event. . . . with the flood of additional Revlimid generics in 2026, [Viatris's] product was essentially going away after this year to begin with, rendering any impact from Indore that spills into 2026 as far less consequential relative to 2025[.]"

**Indore impact bigger than expected and could take time to resolve**. VTRS is expecting the import restrictions at Indore to reduce revenues by $500mm and EBITDA by $385mm this year. Revlimid is driving ~50% of this impact with VTRS estimating a $200mm revenue/$190mm EBITDA headwind from the product. . . . VTRS is also expecting a $75mm impact in Europe and a $125mm impact in Emerging Markets . . . . **VTRS is working on remediating the plant, although this could take some time (mgmt. hoping for an FDA inspection in late 2025/2026) and we would not be surprised for this issue to potentially persist into 2026**.

189.    A J.P. Morgan credit analyst report on the same day also highlighted the contrast

between the corrective disclosures and the Company's prior statements about Indore:

> **We see results today for VTRS as a setback for the credit, with the much larger than expected impact from Indore surprising in our view based on prior company disclosures.**
>
> \*       \*       \*
>
> The weaker outlook was primarily driven by the financial impact from the Indore facility warning letter and import alert, which is expected to negatively impact 2025 revenue by ~$500mn and adjusted EBITDA by $385mn. **While the company previously noted the issue as a headwind to 2025 results during the January conference, we see the overall impact as more sizable than expected**. . . . Given much of the shortfall is coming from generic Revlimid and the competitive picture for the product, it does not appear much of the decline will be reversed after FDA reinspection.

190.    Similarly, a Morningstar report on February 27, 2025 expressed surprise at the scale

of the headwinds from the Indore inspections:

> **Headwinds from facility inspections in Indore, India, were revealed at a conference in January but look much more significant than we had originally anticipated**. The import alert affects seven products mainly distributed in the US and is to create $500 million sales and $385 million EBITDA headwinds for 2025. **Importantly, lenalidomide is included in the seven impacted products and is responsible for the majority of the headwinds. This was especially discouraging since 2025 was the last full year that Viatris, along with other key generic manufacturers, would have enjoyed meaningful contributions from the drug before additional competition is expected starting in 2026. The profit impact is also disappointing since the firm's consolidated EBITDA margin of 35% (average of the past three years) is likely to see meaningful headwinds given the margin impact of the facility looks to be close to 80%.**

191.    Additionally, in a February 27, 2025 report, an Evercore analyst contrasted Defendants' statements at the January 14, 2025 J.P. Morgan conference with the truth about the impact of the Warning Letter:

**So wait – didn't this new warning letter come out in Dec? How did mgmt. speak about impact in Jan conf? It didn't sound so bad . . . only 11 products in a large generics company[.]**

\*        \*        \*

**Actual impact we learned today: $500M on revs and $385M on EBITDA . . . and it turns out, a couple of those products were quite significant: Revlimid and Evorilomus = 300M worth for 2025**. On call, CEO did mention that visibility on Revlimid impact increased in recent days vs when those comments were first made[.]

192.    BofA Securities also expressed surprise in a February 27, 2025 report:

**FY25: Indore import ban worse than expected . . . The biggest surprise in the 4Q update was the generic Revlimid impact, which is on the import ban list ($200m lost revenue at an >95% gross margin)**. While g-Revlimid should be out of investors 2026+ forecasts (when true generics can launch), the disclosure leads us to lower our 2026+ developed markets and out-year gross margin estimates to reflect better the underlying business.

\*        \*        \*

**Model changes: baking in Indore facility disruption. With this model update, we reduce our FY25 sales and EBITDA by -1% and -5%, respectively, to reflect larger-than-expected headwinds tied to the Indore import ban.**

193.    Notably, in a February 27, 2025 report, a UBS analyst expressed what the market would have known all along had Defendants told the truth: the import bar on Viatris's lenalidomide was not going to result in a shortage. Rather, UBS responded to the news about Indore by observing: **"We note that g-Revlimid [i.e., lenalidomide] quota is manufacturer specific, thus this benefits the innovator."** In other words, UBS recognized that Bristol-Myers (the "innovator") would be able to sell branded Revlimid as a therapeutically equivalent replacement

for Viatris's lenalidomide.  Thus, there was never a reasonable prospect that the FDA would grant

an exemption to the import ban for lenalidomide.

194.    Additionally, Barclays commented in a February 28, 2025 report that Viatris's

stock price decline was a result of the Indore revelations:

> **VTRS stock fell ~15% (vs S&P flat) post-Q4 earnings miss, and
> underwhelming 2025 guidance which was largely driven by regulatory
> challenges (warning letter) at its Indore Facility, resulting in the halting of
> production of 11 actively distributed products (notably, gRevlimid [i.e.,
> lenalidomide] which represents ~40%/50% of the total Rev/ Adj. EBITDA
> impacts of $500M/$385M)).  That said, we see a tough path forward for the
> stock to regain momentum until VTRS successfully resolves these hurdles at
> Indore - which we expect is still a few quarters away.**

195.    As a Barclays analyst commented while addressing Defendant Smith at a March 11,

2025 Barclays Global Healthcare Conference, **Indore was "clearly top of mind for investors**[.]"

196.    For months, analysts continued to comment on the unexpected nature of Viatris's

February 27, 2025 disclosures about the impact of the Indore cGMP violations and the FDA's

import ban.  For example, a J.P. Morgan equity analyst wrote on May 8, 2025, that "the recent

Indore manufacturing 483 led to a larger than anticipated impact and could take time to resolve

(would not be surprised for this issue to persist into 2026)"; a J.P. Morgan credit analyst wrote on

May 14, 2025, that Fitch had moved Viatris to a negative credit-rating outlook based in part on

"'high' regulatory and reputational risk in the near term due to the FDA warning letter for the

Indore facility"; and Jefferies wrote on August 16, 2025, that "sentiment continues to be mixed

(the Indore situation certainly didn't help earlier this year…)."

197.    The frequent, in-depth discussions about these issues and their impact on Viatris's

2025 financial guidance in the analyst statements quoted in ¶¶182-196 demonstrate that the

misrepresented and omitted facts about Viatris's quality problems at Indore, the failed inspection

at that facility, and the impact on the Company's financial results were highly material to investors,

and that the disclosures on February 27, 2025 corrected Defendants' false and misleading statements, causing Viatris's stock price to plunge.

## LOSS CAUSATION AND ECONOMIC LOSS

198.   Defendants made materially false and misleading statements during the Class Period and engaged in a scheme to deceive the market.  Defendants' acts and omissions artificially inflated and maintained the price of Viatris's common stock and operated as a fraud or deceit on Class Period purchasers of Viatris's common stock.  When Defendants' prior misrepresentations and omissions about their violations of cGMP and those violations' financial impact on the Company were revealed to the market, the price of Viatris's common stock significantly declined, as the prior artificial inflation came out of the price, as detailed above in ¶¶168-197.

199.   As recognized by a treatise on FDA practices and proceedings, "[d]isclosure of adverse FDA inspection findings has a direct economic effect on the stock price of the regulated companies."[57]

200.   As a result of their purchases of Viatris's common stock during the Class Period, Lead Plaintiffs and other members of the Class suffered economic loss, i.e., damages under the federal securities laws.  Viatris's stock price fell in response to the corrective disclosures on February 27, 2025, which were directly related to and corrected Defendants' prior material misrepresentations and omissions, as detailed above in ¶¶168-197.

## ADDITIONAL SCIENTER ALLEGATIONS

201.   There is a strong basis to infer that Defendants acted intentionally or with reckless disregard for the truth.  In addition to the facts detailed above, facts supporting Defendants'

---

[57]   James T. O'Reilly and Katharine A. Van Tassel, 2 Food and Drug Admin. § 22:56 (4th ed. 2023 & Nov. 2023 update).

scienter include: (1) the January 2024 reporting of severe data-integrity violations to Viatris's global quality organization at corporate headquarters, and the Company's failure to remediate those violations in a timely manner; (2) the reporting lines from Viatris's quality organization to the Company's CEO, Defendant Smith; (3) Viatris's senior leadership's stated focus on driving quality management, including with respect to data-integrity issues; (4) the Company's remediation efforts after the June 2024 inspection at Indore; (5) the dialogue between the FDA and Viatris concerning the Company's inadequate remediation efforts, leading up to the December 2024 Warning Letter; (6) executive management's responsibility for and involvement in addressing the quality problems at Indore and auditing the Company's global manufacturing operations, as required by the Warning Letter; (7) the importance both of quality manufacturing in accordance with cGMP and of lenalidomide production to Viatris; (8) Defendants' responses to analysts' specific questions about regulatory issues, about which they held themselves out as personally knowledgeable; (9) Defendants' strongly inferable knowledge of the regulations concerning when the FDA may grant an exemption from an import ban; and (10) the knowledge that each of the Individual Defendants had due to his or her extensive experience in the pharmaceutical industry.

### A. Reporting of Severe Data-Integrity Violations to Viatris's Global Quality Organization in January 2024 and Viatris's Failure to Remediate Those Violations

202. First, Viatris's global quality control organization at the Company's Pennsylvania headquarters was informed in January 2024 about the data-integrity violations of cGMP at the Indore facility. *See* ¶75. There is a strong basis to infer that senior corporate leadership, including Defendant Smith, as well as Defendants Mistras and Le Goff when they joined the Company in March and April 2024, respectively, were promptly informed of these serious violations. Rather than disclosing these violations, Defendants concealed them from the market while making the

false and misleading statements alleged in this Complaint, both before and after receiving the Form 483 findings from the FDA in June 2024.

203.    Defendants' scienter is also supported by the Company's knowing failure to implement adequate corrective measures after being informed of the Indore data-integrity problems in January 2024.  Despite the vital importance of data integrity for drug manufacturers' ability to comply with cGMP and verify that their drugs are not adulterated within the meaning of the FD&C Act, Defendants chose not to conduct a reasonable investigation of the Indore facility's violations or commence corrective actions once they learned of those violations no later than January 2024.  Instead, the Company only began remediation efforts after receiving the Form 483 from the FDA in June 2024.

**B.    Viatris's Reporting Structure for Quality Management, Including Data-Integrity Issues**

204.    Defendants' scienter is also supported by Viatris' reporting structure concerning data-integrity and other quality issues.  According to Viatris's 2024 Sustainability Report released on May 21, 2024, and continuously available since that date on the "Investors" page of Viatris's website, Viatris's senior leadership, including Defendant Smith as CEO, was directly involved in the Company's quality management.   The report specified that "**[t]he Chief Quality Officer reports to the CEO**[.]"   The report also stated that "senior leadership" was responsible for the types of cGMP requirements that were violated at Indore, including data-integrity requirements in particular:

> **Key programs within our Quality Management organization driven by senior leadership currently include, but are not limited to, the following:**
>
> • **Governance over our global data integrity program**, including a broad scope: computerized systems, record management, documentation governance, training, policy, auditing, etc. to ensure data reliability throughout the data lifecycle.

205.    Viatris's Sustainability Report continues by specifying particular responsibilities of the Company's "overall Global Quality structure," including among others: "Global Quality Compliance," "Global Complex Products Quality," "Global Quality Systems/QA IT Technical Quality," and "Global Quality Investigations, Surveillance and Regulatory Communication," which were implicated by the cGMP violations at the Indore facility.  The Individual Defendants, as part of "senior leadership," were responsible for overseeing the Company's Quality Management organization, including the data-integrity program.  Additionally, Defendant Smith's actual knowledge of the undisclosed material facts is highlighted by the fact that the Chief Quality Officer reported to Smith on all functions within the Global Quality structure.  Thus, there is a strong basis to infer that the Defendants knew or recklessly disregarded the undisclosed adverse facts about the Indore facility's cGMP violations.

### C.    Viatris's Remediation Efforts, Including Firing Managers, After Receiving the Form 483

206.    Moreover, Defendants' scienter can be strongly inferred in light of the Company's flurry of activity after receiving the Form 483 inspection results in June 2024.  Defendants began attempting to remediate the Indore facility's cGMP violations immediately after receiving the Form 483 in June 2024.  As Defendant Smith said at a March 11, 2025 Barclays investor conference: "We immediately began the remediation on all the things that the FDA said just right after June."  These remediation efforts included firing the Indore facility's Site Head of Quality, Head of Quality Control, Head of Quality Assurance, Head of Investigations, and Manager responsible for the packaging materials laboratory.  There is a strong basis to infer that these terminations at an important manufacturing facility in the wake of the FDA's adverse inspection findings would have been at the direction of the Individual Defendants, or at a minimum would have required their approval.  While the FDA ultimately determined that these measures were

inadequate, these remediation efforts demonstrate that Viatris's executive management, including the Individual Defendants, were well-informed about Viatris's cGMP violations at Indore.

### D. Defendants' Communications with the FDA After Receiving the Form 483

207. Defendants' scienter is also evident in light of the Company's communications with the FDA between the inspection and the issuance of the Form 483 identifying the Indore violations on June 26, 2024, and the issuance of the Warning Letter on December 19, 2024. There is a strong basis to infer, in light of FDA practice and Defendants' own statements, that the FDA informed Viatris that its remediation efforts were insufficient and that the agency was going to take official action to address the cGMP violations at the Indore facility.

208. The FDA states on its website that "[t]he FDA often meets with manufacturers to discuss inspection findings to achieve more timely and effective corrective action. Sometimes we do this prior to taking formal actions to encourage voluntary compliance with FDA regulations."[58] At those meetings, the FDA "tell[s] the firm if [it] think[s] they are in or out of compliance so it is very clear to everyone what the agency's current thinking is regarding the [c]GMP compliance of the site[.]"[59] And as discussed in ¶51 above, the FDA as a matter of policy discusses Form 483s "with the company's senior management" to ensure "a full understanding of what the observations are and what they mean."

---

[58]  *Inspection Questions and Answers*, FDA, available at: https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-basics/inspection-questions-and-answers.

[59]  Jerry Chapman, Senior GMP Quality Expert at Redica Systems, "What is a VAI or OAI Regulatory Meeting?" (Oct. 2, 2024), available at: https://redica.com/what-is-a-vai-or-oai-regulatory-meeting (quoting Francis Godwin, FDA CDER Director of the Office of Manufacturing Quality).

209.    According to a statement by Francis Godwin, Director of the FDA CDER Office of Manufacturing Quality, at a conference in September 2022, "**we are letting firms know the OAI status before the regulatory action is taken**."[60]  Even when the EIR itself cannot be shared with the company under the relevant disclosure regulations, Godwin emphasized that the company "**will be told [it is] OAI[.]**"[61]

210.    Defendants' own statements indicate that such pre-formal action (*i.e.*, pre-Warning Letter) communications with the FDA occurred here.  In its December 23, 2024 press release disclosing the Warning Letter, Viatris indicated: "We have been in regular communication with FDA during this process[.]"  At the January 14, 2025 J.P. Morgan Healthcare Conference, Defendant Smith stated that "**we're in close communication with the FDA and receiv[ed] initial FDA feedback some months ago**," and Defendant Mistras noted that "we're having ongoing discussions . . . with the FDA . . . ."  Then, after the end of the Class Period, in a March 4, 2025 Piper Sandler report, an analyst commented, based on a "recent[] . . . dinner with Viatris senior leadership," that Defendants understood when they received the Form 483 in June 2024 that correcting two violations identified by the Form 483 was likely to be "more challenging."[62]  This is information that, according to their own statements, Defendants would have communicated about with the FDA before the issuance of the Warning Letter.

---

[60]    Jerry Chapman, Senior GMP Quality Expert at Redica Systems, "Where is My EIR?" (Sept. 20, 2022), available at: https://redica.com/where-is-my-eir.

[61]    *Id.*

[62]    The Piper Sandler analyst report states: "Management noted there were 6 items on the Form 483 following FDA inspection, and further characterized 4 of these as straightforward in terms of ease of resolution (e.g., cleaning of ducts).  VTRS characterized the remaining 2 items as more challenging; these were related to packaging for blister packs and the cadence of testing of certain materials being produced not being up to standard operating procedure."

211.    In light of the importance of the Form 483 findings and the impending Warning Letter, any information that Viatris received from the FDA about the inadequacy of the Company's remediation efforts and the FDA's decision to take official action would have been known to the Company's executive management, including each of the Individual Defendants.

212.    Thus, Defendants were in frequent communication with the FDA about the Indore inspection results and remediation efforts between June and December 2024, and there is a strong basis to infer that Defendants became aware during that period that the FDA was going to take official action in response to the Indore violations.

213.    Defendants' unsuccessful remediation efforts, and their communications with the FDA about those efforts, support a strong inference that Defendants knew or recklessly disregarded that their public statements detailed above concerning Viatris's manufacturing processes, regulatory compliance, and—once the Warning Letter was made public—attempts to obtain further exemptions from the FDA's import ban, were materially false and misleading.

E.    **The Warning Letter and FDA Guidance Make Clear that Viatris's Executive Management Were Personally Responsible for Data-Integrity Issues**

214.    Viatris's executive management's responsibility for cGMP compliance and direct involvement in responding to the Indore violations, as required by the FDA, confirm that the Defendants acted intentionally or recklessly when they misled the investing public.

215.    The Warning Letter itself strongly supports an inference of Defendants' scienter. In the Warning Letter, the FDA made clear that its expectation was that Viatris's "executive management" would be aware of and respond personally to the Company's severe quality violations. Due to the critical nature of Viatris' compliance with cGMP requirements, including those relating to data integrity, the FDA stated in the Warning Letter: "Executive management should immediately and comprehensively assess your company's global manufacturing operations

to ensure that your systems, processes, and products conform to FDA requirements." The Warning Letter also underscored executive management's personal responsibility, stating that "**executive management remains responsible** for resolving all deficiencies and systemic flaws to ensure ongoing CGMP compliance."

216.    Confirming the executive management team's personal involvement, Defendant Smith stated in Viatris's February 27, 2025 earnings call: "We recently **traveled to Indore** to review the progress.  I can tell you we are more than halfway through our [remediation] efforts."

217.    In addition, the Warning Letter demanded "global" corrective actions at all Viatris facilities, as detailed above at ¶¶71, 77, 80, and 82, which could only take place with the involvement of the Company's executive management, including the Individual Defendants.

218.    Further, the Warning Letter was directly addressed to Defendant Smith, and it demanded that he personally certify that required corrective actions were being taken, or the timeline for their completion.

219.    The Warning Letter's discussion of Viatris's executive management's responsibility for resolving the cGMP failures at Indore is consistent with FDA guidance concerning data integrity, which places significant responsibility on executive management.  In particular, that guidance provides that "[i]t is the role of management with executive responsibility to create a quality culture where employees understand that data integrity is an organizational core value and employees are encouraged to identify and promptly report data integrity issues."[63] Likewise, FDA guidance concerning the investigation of out-of-specification test results states that "[a]s part of an effective quality system, a firm's upper management should appropriately monitor

---

[63]    *FDA Data Integrity Guidance*, p. 2.

these [OOS] trends and ensure that any problematic areas are addressed," and that OOS "investigations should be given the highest priority."[64]

### F. Defendants' False and Misleading Statements Concern Viatris's Core Operations

220.    Defendants' scienter is also strongly inferable because the production of high-quality drugs, in compliance with regulatory obligations, concerns Viatris's core operations. Compliance with cGMP by producing high-quality drugs is critical to any pharmaceutical company, and it was the foundation of Viatris's value to shareholders. *See* ¶¶38-48. Moreover, the violations at the Indore facility in particular affected one of Viatris's most profitable drugs, lenalidomide, and posed a grave threat to the Company's revenues and profitability. Lenalidomide was a high-margin product and was an important contributor to the Company's financial results. *See* ¶¶33-35. Accordingly, the cGMP violations at the Indore facility and the resulting import ban on lenalidomide concerned Viatris's core operations, which supports a strong inference that Viatris and the Individual Defendants knew about these undisclosed problems and their impact on the Company's financial results, or recklessly disregarded these matters.

### G. Defendants Affirmed Their Knowledge Through Their Public Statements and by Answering Questions from Analysts

221.    In addition, Defendants Smith and Mistras spoke publicly about the Indore facility's problems and their impact on the Company's financial results on investor calls and at investor conferences, and Defendant Le Goff spoke publicly about lenalidomide as a stable component of Viatris's portfolio. By making public statements and responding to securities analysts about these issues, the Individual Defendants affirmed that they were sufficiently

---

[64]    FDA, *Investigating Out-of-Specification (OOS) Test Results for Pharmaceutical Production Guidance for Industry* (May 2022), pp. 5-6.

knowledgeable to address these topics and to answer the analysts' questions, which further supports a strong inference that they knew or recklessly disregarded the true facts concerning these matters.

**H.    Defendants Were Aware of the Lenalidomide Market and of Relevant Regulations**

222.    Defendants were aware that Bristol-Myers had a large majority of the market for Revlimid/lenalidomide, that Bristol-Myers was free to produce an unlimited amount of the drug, that there were multiple competing generic manufacturers of the drug, and that there was no shortage of Revlimid/lenalidomide in the United States, as demonstrated by publicly available information from the FDA, ASHP, and other sources. Defendants were also aware of the publicly available regulations governing the pharmaceutical industry, including regulations governing when the FDA may grant an exemption to an import ban. Accordingly, Defendants had no reasonable basis to expect that the FDA would grant an exemption to the import ban for Viatris's lenalidomide. The investing public, however, was not informed that lenalidomide was produced at Viatris's Indore facility, nor that there were serious cGMP violations at that facility that caused Viatris's lenalidomide to be deemed "adulterated." Thus, when Defendants told investors that, for example, Viatris was "in active discussions with the FDA to add more products to that exempt list," they knew that lenalidomide was one of the banned products and that there was no shortage of lenalidomide in the United States that would justify an exemption.

**I.    Additional Facts Supporting Individual Defendants' Scienter**

223.    There are also additional facts specific to each of the Individual Defendants that support a strong inference that each of them acted intentionally or recklessly in making and not correcting the materially false and misleading statements during the Class Period.

224.    Defendant Smith's "substantial experience in developing and executing regulatory, clinical, and business development strategies" in the pharmaceutical industry, as described in Viatris's 2024 proxy statement, further supports his scienter.  *See* ¶23.  As a longtime senior executive in the pharmaceutical industry, including previously serving as President and Chief Operating Officer of Celgene at a time when Revlimid was one of Celgene's most profitable products (just before Celgene was acquired by Bristol-Myers), there is a strong inference that Smith knew about lenalidomide's market and competitive dynamics, including that there was no reasonable basis for an exemption from the import ban.  Further, with his extensive background in the pharmaceutical industry, there is a strong inference that Smith understood the severity of the data-integrity and other cGMP violations at the Indore facility.  In addition, the Warning Letter was personally addressed to Smith, and the FDA insisted in the Warning Letter that Smith personally certify Viatris's completion of its remediation efforts.  This demonstrates that Smith was personally involved in and aware of the cGMP deficiencies at the Indore facility and Viatris's communications with the FDA about those violations.  Smith therefore knew or recklessly disregarded the adverse facts contradicting his and the other Defendants' public statements detailed above.

225.    Defendant Mistras had substantial experience in pharmaceutical finance, *see* ¶24, and was directly involved in managing the financial impact of the cGMP violations at the Indore facility and the FDA's regulatory response to the violations.  She also claimed to be knowledgeable about Viatris's "all hands" remediation efforts, as indicated by her comments on the Company's February 27, 2025 earnings call ("[W]ith respect to Indore, ongoing remediation has been an all hands effort and is a top priority for our organization.  We take the quality of our products very seriously and are making progress on the remediation plan.").  In addition, Mistras stated at the

Barclays Global Healthcare Conference on March 11, 2025, that "as we thought about contextualizing that impact of Indore, there are multiple discussions not only with the FDA, but other alternatives to figure out the full impact of lenalidomide," indicating that she was directly involved in, or at least knowledgeable about, the Company's discussions with the FDA. Defendant Mistras thus knew or recklessly disregarded the adverse facts contradicting her and the other Defendants' public statements.

226.    Defendant Le Goff's experience as a longtime senior executive in the pharmaceutical industry, including holding senior positions at Roche Group, Amgen Inc., and Moderna, Inc. before joining Viatris as CCO, further supports her scienter. *See* ¶25.  Le Goff's background in managing operations in the pharmaceutical industry supports a strong inference that she knew about and was involved in managing Viatris's handling of the serious cGMP violations at its Indore facility that affected lenalidomide and the facility's other products.  Further, with her extensive background in the pharmaceutical industry, there is a strong inference that Le Goff understood the severity of the data-integrity and other cGMP violations at the Indore facility, and understood that under the circumstances, including the availability of therapeutic equivalents, there was no realistic prospect of lenalidomide being exempted from the import ban.  Additionally, there is a strong inference that Le Goff, as Viatris's CCO, was involved in addressing, or at least was knowledgeable about, the problems at Indore during the Class Period, as it would have been her responsibility to manage relationships with Viatris's customers in the aftermath of those problems.  Le Goff therefore knew or recklessly disregarded the adverse facts contradicting her and the other Defendants' public statements detailed above.

## PRESUMPTION OF RELIANCE AND FRAUD-ON-THE-MARKET

227.    At all relevant times, the market for Viatris's common stock was efficient for the following reasons, among others:

(a)    Viatris's common stock met the requirements for listing and was listed and actively traded during the Class Period on the NASDAQ, a highly efficient market;

(b)    Viatris communicated with public investors via established market communication mechanisms, including disseminations of press releases through major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)    Viatris was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales forces and customers of their respective brokerage firms during the Class Period, which were publicly available and entered the public marketplace; and

(d)    Unexpected material news about Viatris was reflected in and incorporated into the Company's stock price during the Class Period.

228.    As a result of the foregoing, the market for Viatris's common stock promptly digested current information regarding the Company from all publicly available sources and reflected that information in Viatris's stock price.  Under these circumstances, all purchasers of Viatris's common stock during the Class Period suffered similar injury through their purchases of Viatris's common stock at artificially inflated and maintained prices, and a presumption of reliance applies.

229.    Alternatively, reliance need not be proven in this action because the action involves omissions.  Positive proof of reliance is not a prerequisite to recovery for securities-fraud claims based on omissions under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that, as is the case here, the facts withheld be material in the sense that a

reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## NO SAFE HARBOR

230.    Defendants' "Safe Harbor" warnings accompanying any statements pled in this Complaint that may be claimed by Defendants to be forward-looking were ineffective to shield those statements from liability, even if the statements were predictive.  Defendants are liable for any false or misleading statements pleaded here and characterized by Defendants as forward-looking because, at the time each statement was made, the speaker knew the statement was false and misleading and the statement was authorized or approved by an executive officer of the Company who knew that the statement was false.  None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be assumptions underlying or relating to any plan, projection, or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

231.    Additionally, to the extent that the statutory safe harbor is claimed by Defendants to apply to any statements pled in this Complaint that Defendants claim to be forward-looking, or any portions of those statements, Defendants are liable for those false and misleading statements because the statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements or portions of statements.  As alleged above in detail, given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and misleading statements and, in fact, were false and misleading themselves.  Furthermore, at the time each of those statements was

made, the particular speaker knew that the statement was false and misleading, or the statement was authorized or approved by an executive officer of Viatris who knew that the statement was false and misleading when made.

## CLASS ACTION ALLEGATIONS

232.    Lead Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Viatris's common stock during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosure.  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

233.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Viatris's common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Viatris or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.  As of February 21, 2025 (the last date before the end of the Class Period for which the number of Viatris shares outstanding is available), there were 1.194 billion shares of the Company's common stock outstanding.  In addition, there were approximately 95,287 Viatris common stock holders of record, according to Viatris's 2024 Form 10-K, and there were many more beneficial owners of Viatris stock.  Upon information and belief, these shares are held by

thousands, if not millions, of geographically dispersed individuals and institutions. Joinder of all Class members would be highly impracticable.

234.    Lead Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law as alleged in this Complaint.

235.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

236.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the federal securities laws as alleged in this Complaint;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented and omitted material facts about the business and operations of Viatris;

(c)    whether the Individual Defendants caused Viatris to issue false and misleading statements and omissions during the Class Period;

(d)    whether Defendants acted intentionally or recklessly in issuing false and misleading statements and omissions;

(e)    whether the prices of Viatris's common stock during the Class Period were artificially inflated and maintained because of the Defendants' conduct as alleged in this Complaint; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

237.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Against All Defendants for Violations of
### Section 10(b) and Rule 10b-5

238.    Lead Plaintiffs repeat and reallege every allegation contained above as if fully stated in this Count.

239.    This Count is asserted against all Defendants under Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated under the Exchange Act by the SEC.

240.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they intentionally or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. This scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members; (ii) artificially inflate and maintain the market price of Viatris common stock; and (iii) cause Lead Plaintiffs and other members of the Class to purchase or otherwise acquire Viatris

stock at artificially inflated and maintained prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions alleged in this Complaint.

241.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts that were designed to influence the market for Viatris's securities.  These reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

242.    By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged in this Complaint and intended to deceive Lead Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose facts that would reveal the materially false and misleading nature of the statements made, although those facts were readily available to Defendants.  These acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

243.    Information showing that Defendants acted intentionally or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers or directors of the Company, the Individual Defendants had knowledge of the details of Viatris's internal affairs, including the data integrity and other cGMP violations at the Indore facility and their impact on Viatris's financial results.

244.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of in this Complaint.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the Company's statements.  As officers or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information about Viatris's business, operations, and financial results.  As a result of the dissemination of the false and misleading reports, releases, and public statements alleged above, the market price of Viatris's common stock was artificially inflated and maintained throughout the Class Period.  In ignorance of the adverse facts concerning the Company that were concealed by Defendants, Lead Plaintiffs and the other members of the Class purchased or otherwise acquired Viatris's common stock at artificially inflated and maintained prices and relied upon the price of the common stock, the integrity of the market for the common stock, or the false and misleading statements and omissions by Defendants, and were damaged thereby.

245.    During the Class Period, Viatris's common stock was traded on an active and efficient market.  Lead Plaintiffs and the other members of the Class, relying on the materially false and misleading statements and omissions described in this Complaint, which Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Viatris's common stock at prices artificially inflated and maintained by Defendants' wrongful conduct.  Had Lead Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired Viatris common stock, or would not have purchased or otherwise acquired it at the inflated prices that they paid. At the time of the purchases and other acquisitions by Lead Plaintiffs and the Class, the true value of Viatris's common stock was substantially lower than the prices paid by Lead Plaintiffs and the

other members of the Class. The market price of Viatris's common stock declined sharply upon public disclosure of the facts alleged in this Complaint, to the injury of Lead Plaintiffs and other Class members.

246. By reason of the conduct alleged in this Complaint, Defendants intentionally or recklessly, directly or indirectly, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated under the Exchange Act.

247. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases and acquisitions of the Company's common stock during the Class Period, upon the disclosure of the previously materially misrepresented or omitted facts alleged in this Complaint.

## COUNT II
### Against the Individual Defendants
### for Violations of Section 20(a) of the Exchange Act

248. Lead Plaintiffs repeat and reallege every allegation contained in the foregoing paragraphs as if fully stated in this Count.

249. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse nonpublic information about the data integrity and other cGMP violations at Viatris's Indore facility and those violations' impact on Viatris's financial results.

250. As officers or directors of a publicly traded company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct or update promptly any public statements issued by Viatris that had become materially false or misleading.

251.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the reports, press releases, and public filings which Viatris disseminated in the marketplace during the Class Period containing the misrepresentations and omissions.    Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Viatris to engage in the wrongful acts complained of in this Complaint.    The Individual Defendants therefore were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act.    In this capacity, they participated in the unlawful conduct alleged, which artificially inflated and maintained the market price of Viatris's common stock.

252.    Each Individual Defendant, therefore, acted as a controlling person of the Company.    By reason of their senior management positions or being directors of the Company, each of the Individual Defendants had the power to direct Viatris's actions and exercised that power to cause Viatris to engage in the unlawful acts and conduct complained of in this Complaint. Each Individual Defendant exercised control over the general operations of the Company and possessed the power to control the specific activities constituting the primary violations set out in this Complaint.

253.    By reason of the above conduct, the Individual Defendants are liable under Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs demand judgment against Defendants as follows:

A.    Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Lead Plaintiffs and the Class by reason of the acts and transactions alleged in this Complaint;

C.    Awarding Lead Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiffs demand a trial by jury.

DATED: September 30, 2025

ROBBINS GELLER RUDMAN
  & DOWD LLP
Chad Johnson (*pro hac vice*)
Noam Mandel (*pro hac vice*)
Jonathan Zweig (*pro hac vice*)
Desiree Cummings (*pro hac vice*)
Jai Chandrasekhar (*pro hac vice*)
Alyssa Plascoff (*pro hac vice*)

*/s/ Jonathan Zweig*
JONATHAN ZWEIG

420 Lexington Avenue, Suite 1832
New York, NY 10170
Telephone: 212/432-5100
chadj@rgrdlaw.com
noam@rgrdlaw.com
jzweig@rgrdlaw.com
dcummings@rgrdlaw.com
jaic@rgrdlaw.com
aplascoff@rgrdlaw.com

POMERANTZ LLP
Omar Jafri (*pro hac vice*)
Christopher Tourek (*pro hac vice*)
Jianan Jiang (*pro hac vice*)

*/s/ Omar Jafri*
OMAR JAFRI

10 South LaSalle, Suite 3505
Chicago, IL 60603
Telephone:  312/377-1181
ojafri@pomlaw.com
ctourek@pomlaw.com
ajiang@pomlaw.com

*Lead Counsel for Lead Plaintiffs and the Class*

LAW OFFICE OF ALFRED G.
    YATES, JR., P.C.
Alfred G. Yates, Jr. (PA 17419)
1575 McFarland Road, Suite 305
Pittsburgh, PA 15216
Telephone: 412/391-5164
412/471-1033 (fax)
yateslaw@aol.com

*Local Counsel for Lead Plaintiffs and the Class*